UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LESLIE JACK, et al.,

                Plaintiffs,

    v.

BORG-WARNER MORSE TEC
LLC, et al.,

                Defendants.

CASE NO. C17-0537JLR

ORDER ON MOTIONS TO
EXCLUDE EXPERT
TESTIMONY

## I.  INTRODUCTION

Before the court are several motions to exclude the following experts:  Sean Fitzgerald, Ronald Gordon, Carl Brodkin, Arnold Brody, Barry Castleman, Charles Cushing, and William Longo.  (*See* Dkt.)  The following defendants bring the challenges: (1) Defendant DCo LLC (f/k/a Dana Companies, LLC) ("DCo") moves to exclude Sean Fitzgerald (1st MTE Fitzgerald (Dkt. # 456); 2d MTE Fitzgerald (Dkt. # 511)); (2) DCo, Defendant Ford Motor Company ("Ford"), and Defendant Ingersoll Rand Company

("Ingersoll Rand") move to exclude Ronald Gordon (DCo MTE Gordon (Dkt. # 461);[1] Ford MTE Gordon (Dkt. # 465); Warren Pumps MTE (Dkt. # 470) at 3-8);[2] (3) Ingersoll Rand, Honeywell, DCo, and Defendant Borg-Warner Morse TEC LLC ("Borg-Warner") move to exclude Carl Brodkin (Warren Pumps MTE at 3-8; Honeywell MTE Brodkin (Dkt. # 483);[3] DCo MTE Brodkin (Dkt. # 497); Borg-Warner MTE Brodkin (Dkt. # 516)); (4) Ingersoll Rand and Honeywell move to exclude Arnold Brody (Warren Pumps MTE at 3-8; Honeywell MTE Brody (Dkt. # 490));[4] (5) Ford and Ingersoll Rand move to exclude Barry Castleman (Ford MTE Castleman (Dkt. # 463);[5] Warren Pumps MTE at 14-17); (6) Ford moves to exclude Charles Cushing (MTE Cushing (Dkt.

---

[1] DCo inadvertently filed the wrong motion at docket entry 461 and attached the correct motion as a later exhibit. (*See* Praecipe (Dkt. # 487); Corrected Mot. (Dkt. # 487-1).)

[2] Ingersoll Rand and DCo join former Defendant Warren Pumps LLC's ("Warren Pumps") motion to exclude, part of which challenged Dr. Gordon's testimony. (*See* Warren Pumps MTE at 3-8; 7/23/18 Order (Dkt. # 542) (granting Ingersoll Rand's motions for joinder); Not. of Joinder (Dkt. # 592).) On July 30, 2018, the court dismissed Warren Pumps pursuant to the parties' stipulation. (7/30/18 Order (Dkt. # 558).) DCo and Defendant Honeywell International Inc. ("Honeywell") additionally join Ford's motion to exclude. (7/20/18 Order (Dkt. # 539) (granting Honeywell's motions for joinder); Not. of Gordon Joinder (Dkt. # 473).)

[3] DCo, Ford, and Ingersoll Rand join Honeywell's motion to exclude Dr. Brodkin. (Not. of Brodkin Joinder (Dkt. # 485); 7/19/18 Order (Dkt. # 529) (granting Ford's motions for joinder); 7/23/18 Order.)

[4] DCo, Ford, Ingersoll Rand, and Defendant Union Pacific Railroad Company ("Union Pacific") join Honeywell's motion to exclude Dr. Brody. (Not. of Brody Joinder (Dkt. # 492); 7/19/18 Order; 7/23/18 Order; 7/24/18 Order (Dkt. # 544) (granting Union Pacific's motions for joinder).)

[5] DCo, Honeywell, and Union Pacific join Ford's motion to exclude Mr. Castleman. (DCo Not. of Castleman Joinder (Dkt. # 471); 7/20/18 Order; 7/24/18 Order.)

# 464));[6] and (7) Ingersoll Rand and DCo move to exclude videos and studies conducted by William Longo (Warren Pumps MTE at 8-14).

Defendant Viad Corporation ("Viad") opposes the motion to exclude Mr. Cushing (Cushing Resp. (Dkt. # 573)), and Plaintiffs Leslie Jack and David Jack (collectively, "Plaintiffs") oppose the remaining motions to exclude (Fitzgerald Resp. (Dkt. # 571); Gordon Resp. (Dkt. # 554); Brodkin Resp. (Dkt. # 561); Brody Resp. (Dkt. # 559); Castleman Resp. (Dkt. # 563); Longo Resp. (Dkt. # 569)). Plaintiffs additionally file a motion to extend the discovery deadline for Mr. Fitzgerald's supplemental report. (Mot. (Dkt. # 567).)

The court has reviewed the motions, the parties' submissions in support of and in opposition to the motions, the relevant portions of the record, and the applicable law. Being fully advised,[7] the court GRANTS Ford's motion to exclude Mr. Cushing (Dkt. # 464) and DENIES the remaining motions (Dkt. ## 456, 461, 463, 465, 470, 483, 490, 497, 511, 516). The court further DENIES Plaintiffs' motion to extend the discovery deadline (Dkt. # 567) as moot.

//

---

[6] DCo and Honeywell join Ford's motion to exclude Mr. Cushing. (Not. of Cushing Joinder (Dkt. # 472); 7/20/18 Order.)

[7] Ford and Honeywell request oral argument on their motions. (*See* Ford MTE Gordon at 1; Ford MTE Castleman at 1; Ford MTE Cushing at 1; Honeywell MTE Brodkin at 1; Honeywell MTE Brody at 1.) Plaintiffs request oral argument on all motions. (*See, e.g.*, Fitzgerald Resp. at 1.) The court finds that oral argument on these motions would not be helpful to its disposition of the motions. *See* Local Rules W.D. Wash. LCR 7(b)(4). Moreover, district courts are not required to hold a separate *Daubert* hearing before ruling on motions to exclude. *See Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F.3d 971, 979 (9th Cir. 2009). The court finds that the briefing, expert reports, deposition testimony, and other exhibits attached to the motions provide an adequate record from which the court can make its rulings. *See id.*

## II.   BACKGROUND

Plaintiffs claim that decedent Patrick Jack was exposed to asbestos from various asbestos-containing products manufactured or supplied by the defendants and that as a result of this asbestos exposure, Mr. Jack developed mesothelioma and died from the disease.  (SAC (Dkt. # 253) ¶¶ 46E-46F.)  They allege that Mr. Jack was exposed when he worked as a machinist in the Navy and in the Naval reserve from 1954 to 1962; as a machinist and piping inspector at the Puget Sound Naval Shipyard ("the Shipyard") from 1967 to 1973; as a mechanic from 1962 to 1967; and when he performed automotive work on personal vehicles from 1955 to 2001.  (Brodkin Adams Decl. ¶ 2, Ex. 2 ("Brodkin Rep.") at 1.1.)[8]  Plaintiffs bring various product liability and negligence claims and seek compensatory and punitive damages.  (SAC ¶¶ 47-59.)

The parties rely on expert witness testimony opining on matters ranging from asbestos exposure to medical causation.  (*See generally* Dkt.)  The court now summarizes the testimony of the challenged expert witnesses.

**A.     Sean Fitzgerald**

Mr. Fitzgerald is a licensed geologist, mineralogist, and asbestos expert with 30 years of experience analyzing asbestos.  (Fitzgerald Adams Decl. (Dkt. # 572) ¶ 2, Ex. F ("4/17/18 Fitzgerald Rep.") ¶ 1.)  He is the Director of Research and Legal Services at the Scientific Analytical Institute.  (*Id.*)  Mr. Fitzgerald received training on asbestos-related

//

---

[8] Dr. Brodkin divides his report into sections and then numbers the pages within those sections.  (*See* Brodkin Rep. at 2.)  Thus, the court cites the section number, followed by a period and the page number.

air sampling and analysis of asbestos-containing materials. (*Id.* ¶ 5.) He has been

certified as an Environmental Protection Agency ("EPA") asbestos inspector. (*Id.*) He

has published several articles on asbestos in peer-reviewed literature. (*See id.* ¶ 7.)

On October 24, 2017, Plaintiffs' counsel sent Mr. Fitzgerald a sealed box stamped

"VICTOR GASKETS" with the words "Allis Chalmers complete O-Haul set"

handwritten on the top and an attached inventory list titled "Victor Gasket Set." (*See id.*

¶ 12; *see also* Fitzgerald Adams Decl. ¶ 2, Ex. A (photograph of sealed box with Victor

Gaskets labeling).) Plaintiffs' counsel found this sealed box in Mr. Jack's garage, and

Mr. Jack testified that the box contained gaskets "for an old Allis-Chalmers bulldozer

[he] worked on." (Fitzgerald Adams Decl. ¶ 2, Ex. B ("Jack Dep.") at 53:21-54:1.) Mr.

Fitzgerald noted that the box "appeared to be unopen and unused and in its original

condition." (4/17/18 Fitzgerald Rep. ¶ 12.)

Utilizing EPA methods 600/R-93/116 and 600/M3-82-020, Mr. Fitzgerald

performed a bulk asbestos analysis using Polarized Light Microscopy ("PLM") of the

gaskets in the sealed box. (*Id.* ¶ 13.) He found that of the 31 gaskets in the box, six

"contained between 25 and 60% chrysotile asbestos." (*Id.* ¶ 14.) Based on his testing,

Mr. Fitzgerald concluded to a reasonable degree of scientific certainty that "the Victor

gaskets in Mr. Jack's garage . . . contained 25 to 65% chrysotile asbestos." (*Id.* ¶ 15.)

On May 29, 2018, Dr. Gordon, another one of Plaintiffs' expert witnesses, notified

Plaintiffs' counsel that he found both chrysotile and tremolite asbestos in Mr. Jack's lung

//

//

and lymph node tissue.[9]  (Fitzgerald Adams Decl. ¶ 3.)  Plaintiffs' counsel notified Mr.

Fitzgerald of those findings.  (*Id.* ¶ 4.)  Because Mr. Fitzgerald had tested only for

chrysotile—and not tremolite—Mr. Fitzgerald retested the gaskets "specifically for

amphiboles such as the tremolite found by [Dr.] Gordon."  (Fitzgerald Kero Decl. (Dkt.

# 457) ¶ 3, Ex. 2 ("6/8/18 Fitzgerald Rep.") at 1.)

      Mr. Fitzgerald followed the analytical procedures in test method

EPA/600/R-93/116 to analyze samples using Transmission Electronic Microscopy

("TEM") from the gaskets previously found to contain chrysotile asbestos.  (*Id.* at 2.)

The TEM analysis revealed that various forms of amphibole asbestos—including

tremolite, actinolite, and anthophyllite—were throughout the gaskets.  (*Id.*)  Indeed, all

six of the gaskets "contained countable tremolite and/or actinolite asbestos fibrous

structures."  (*Id.*)  Mr. Fitzgerald shared those findings with Plaintiffs' counsel in his June

8, 2018, supplemental report.  (*See generally* 6/8/18 Fitzgerald Rep.)  That same day,

Plaintiffs' counsel disclosed the supplemental report to defendants and offered Mr.

Fitzgerald for further deposition on June 15, 2018.  (Fitzgerald Adams Decl. ¶ 5;

Fitzgerald Kero Decl. ¶ 8.)  DCo declined to depose Mr. Fitzgerald after the supplemental

report.  (*Id.* ¶ 7.)

//

//

---

[9] Chrysotile and tremolite asbestos are from two distinct families of asbestos.  (*See* Brody Gaston Decl. (Dkt. # 491) ¶ 3, Ex. 2 ("Brody Rep.") ¶ 7.)  Tremolite asbestos are a type of amphibole asbestos, whereas chrysotile asbestos are the only type of serpentine asbestos.  (*Id.*) Chrysotile is frequently contaminated with tremolite.  (*Id.*)  The class of amphibole asbestos is known to be more potent in causing asbestos-diseases than chrysotile.  (*Id.* ¶ 30.)

**B.      Ronald Gordon**

Since 2003, Dr. Gordon has been a research professor and the Director of Electron Microscopy in the Department of Pathology at the Mount Sinai School of Medicine. (Gordon Adams Decl. (Dkt. # 555) ¶ 2, Ex. C ("Gordon CV") at 1; *Id.* ¶ 2, Ex. A ("Gordon Rep.") at 4.)  He holds a B.S. and a Ph.D., and he was a post-doctoral fellow as well as an instructor of pathology at the State University of New York.  (Gordon Rep. at 4.)  Dr. Gordon serves as a reviewer for several journals, including the American Journal of Pathology, American Journal of Industrial Medicine, and American Review of Respiratory Disease.  (*See* Gordon CV at 3.)  He additionally serves as a grant reviewer for the National Institutes of Health and the National Science Foundation.  (*Id.* at 3-4.)  Dr. Gordon has published over 200 peer reviewed manuscripts and over a dozen books and chapters.  (Gordon Rep. at 4.)

Dr. Gordon reviewed Mr. Jack's pathology report and answers to interrogatories and analyzed Mr. Jack's lung and lymph node tissue.  (*Id.* at 5.)  Dr. Gordon's electron microscopic analysis of Mr. Jack's lung tissue revealed "two amphibole asbestos fibers . . . identified as amosite type asbestos."  (*Id.*)  Dr. Gordon also found "10 asbestos bodies per gram wet weight of lung."  (*Id.*)  Electron microscopic analysis of Mr. Jack's lymph node tissue "revealed one chrysotile and one tremolite asbestos fiber."  (*Id.* at 6.)  Based on these findings, Dr. Gordon concludes that Mr. Jack had "substantial exposure to amosite, chrysotile[,] and tremolite asbestos."  (*Id.*; Gordon Adams Decl. ¶ 2, Ex. B ("Gordon Dep.") at 62:11-16 (stating that Mr. Jack "had to have been exposed to quite a bit of [fibers]" based on his "exposure history and the fact that we're still finding

chrysotile . . . and/or tremolite . . . in his lungs").) Dr. Gordon further opines to a reasonable degree of scientific certainty that "[Mr. Jack had] a mixed occupational exposure to asbestos which is documented by his fiber burden of chrysotile and amphibole asbestos fibers, tremolite, amosite and chrysotile and asbestos body counts." (*Id.* at 7-8.) Dr. Gordon concludes that his "analytic fiber analysis findings of chrysotile, tremolite[,] and amosite . . . would account for the development of Mr. Jack's pleural malignant mesothelioma." (*Id.* at 8.)

At his deposition, Dr. Gordon testified that he has looked at a number of cases analyzing the presence of asbestos fibers in brake dust and automotive products. (Gordon Adams Decl. ¶ 2, Ex. B ("Gordon Dep.") at 15:23-16:2.) He also conducted a few studies specifically concerning brakes and clutches. (*Id.* at 16:5-17:3.) For instance, he has analyzed the dust collected from various automobile parts. (*Id.* at 18:1-19:3; *see also id.* at 92:6-8 ("I looked at brake dust . . . from car brakes.").) However, Dr. Gordon acknowledged that he never researched fiber release from automotive products, although he has read reports on the subject. (*Id.* at 17:4-18; 92:19-25.)

Dr. Gordon also expounded on his fiber burden analysis of the lymph nodes. He qualified lymph nodes as places in the body where "fibers and particles go . . . once they leave the lung or other structures." (*Id.* at 112:7-9.) He explained that both the Helsinki criteria report and published research by Ronald Dodson support analyzing lymph nodes to determine the fiber burden. (*Id.* at 36:20-37:15.) However, Dr. Gordon acknowledged that on one occasion, he participated in a study attempting to find a correlation between asbestos exposure and fibers in the lymph nodes, but the researchers eventually

terminated the study when the correlation they were looking for did not materialize. (*Id.* at 61:12-62:1.)

Opposing counsel questioned Dr. Gordon on whether the chrysotile fibers found in Mr. Jack's tissue originated from his time in the Navy or at the shipyard. (*Id.* at 54:10-21.) Dr. Gordon responded that it was unlikely the fibers were from that time period because any chrysotile fibers from Mr. Jack's stint in the Navy would have digested away by the time of the fiber burden analysis. (*Id.* at 54:22-55:2.) Subsequently, Plaintiffs' counsel asked Dr. Gordon the following hypothetical:

> Q: I want you . . . to assume that there was a box of Victor gaskets found in Mr. Jack's garage after his diagnosis with mesothelioma. Can you assume that?
>
> A: I can.
>
> Q: And I want you also to assume that those Victor gaskets were tested for asbestos content, and tremolite and chrysotile asbestos was found in the box of Victor gaskets. Do you have that?
>
> A: I do.
>
> Q: How does that affect your opinions in this case about the source of the tremolite and chrysotile fiber found in Mr. Jack's lymph system?
>
> A: Well, based on the times that he was exposed to all of these products . . . it's more than likely that the chrysotile and the tremolite came from those products.

(*Id.* at 140:14-141:8.)

## C.    Carl Brodkin

Dr. Brodkin practices occupational and environmental medicine. (*See* Brodkin Adams Decl. (Dkt. # 562) ¶ 2, Ex. 1 ("Brodkin CV") at 1.) He holds an M.D. from the

University of Colorado Medical School and an M.P.H. from the University of Washington, School of Public Health. (*Id.*) For his report, Dr. Brodkin conducted a telephonic interview of Mr. Jack and reviewed his medical records, pathology reports, deposition testimony, employment records, naval personnel records, and other discovery documents regarding Defendants' products. (Brodkin Rep. at 1.4-11.) He also relied on a number of studies on occupational exposure to asbestos. (*See id.* at 6.)

Dr. Brodkin recounts in detail Mr. Jack's occupational history, as well as the asbestos-containing products that he worked with in each job. (*See id.* at 2.1-23.) For instance, Dr. Brodkin notes that Mr. Jack worked intermittently on automobiles from 1955 to after 2001. (*Id.* at 2.10.) During this time, Mr. Jack had direct exposure to asbestos fibers from installing, cleaning, and removing brakes. (*Id.* at 2.10-11; *see also id.* at 2.13 (qualifying Mr. Jack's exposure during his work with brakes as an identified exposure).) Dr. Brodkin opines that Mr. Jack also had direct exposure to asbestos when he used compressed air to blow out clutch bell-housings when he removed clutches. (*Id.* at 2.13-14.) Mr. Jack specifically recalled working with "lots" of Borg-Warner clutches and performing "repeat clutch jobs" at the shop and on personal vehicles. (*See id.* at 2.14.) Dr. Brodkin qualifies Mr. Jack's removal of clutches as an identified exposure, whereas the installation and regular handling of the clutches only subjected Mr. Jack to de minimis exposure. (*Id.* at 2.15.)

Based on Mr. Jack's occupational history, Dr. Brodkin concludes that Mr. Jack's mesothelioma is "causally related to direct and/or bystander occupational asbestos exposure" from Mr. Jack's time as a naval machinery repairman aboard the naval vessel;

a shipyard shop machinist and a nuclear inspector at the Shipyard; and an automotive mechanic. (*Id.* at 5.1.) Specifically, as to the exposure during his automotive work, Dr. Brodkin observes that Mr. Jack regularly worked with brakes, clutches, and engine gaskets over his three decades of automotive work, often in an enclosed garage setting. (*Id.* at 5.4.) Such work included blowing out brakes with compressed air; grinding, sanding, and filing new brakes in the installation process; cleaning up brakes; and removing clutches with a compressed air blowout. (*Id.*) The literature reveals that these activities release large amounts of asbestos fibers. (*See id.*) Moreover, the products themselves have a high asbestos content. (*Id.*) Thus, Dr. Brodkin describes Mr. Jack's exposure to asbestos through his automobile work as "significant." (*See id.*)

At his deposition, Dr. Brodkin stated that he could not express Mr. Jack's total exposure to asbestos because "there is not a way to quantify Mr. Jack's dose" given that he was "not wearing a dosimeter" at the time of exposure.[10] (Brodkin Gaston Decl. (Dkt. # 486) ¶ 19, Ex. 18 ("Brodkin Dep.") at 26:23-27:6, 40:1-7; *see also id.* at 53:5-9 ("When you use the word 'quantitative,' it implies that there is some actual measurement. That's not possible in Mr. Jack's case.").)[11] Indeed, Dr. Brodkin notes that the literature on asbestos exposure does not identify a specific numerical threshold above which there is

//

---

[10] A dosimeter is a device that measures exposure.

[11] Other parties also attach portions of Dr. Brodkin's deposition testimony to their briefing. (*See* Brodkin Adams Decl. ¶ 2, Ex. 3; Brodkin Ross Decl. (Dkt. # 517) ¶ 3, Ex. C.) Despite the multiple filings, the court refers generally to "Brodkin Dep." when citing to Dr. Brodkin's deposition testimony.

risk of disease, although various studies provide a range or exposure that is correlated with increased risk of disease.  (*Id.* at 36:13-22, 50:21-24, 161:17-23.)

Instead, Dr. Brodkin utilizes a qualitative approach, where the totality of the evidence—that is, the occupational and environmental history—determines whether an exposure increases the risk of an asbestos-related disease.  (*Id.* at 35:5-8, 40:5-7.) Whether an exposure is significant depends on the intensity, the duration, and the frequency of that exposure.  (*Id.* at 52:10-21; *see also id.* at 193:15-17 ("My assessment . . . is qualitative in terms of characterizing the duration, frequency, [and] intensity of exposures.").)  Dr. Brodkin acknowledges that "[n]ot all exposures are significant."  (*Id.* at 34:2-8, 122:15-24; *see also id.* at 45:1-3 ("Just because you have a source of asbestos does not mean it is a significant exposure.").)  Rather, he looks for an "identified exposure," which is an exposure "that has a well-characterized source of asbestos, an activity that disrupts that source to generate significant airborne asbestos fibers that have sufficient intensity to overcome the body's defenses, add to the body's burden of asbestos, and, therefore, increase risk for asbestos-related diseases."  (*Id.* at 47:2-7.)

**D.    Arnold Brody**

Dr. Brody is the Professor Emeritus in the Pathology Department at Tulane University Medical School and an adjunct professor at North Carolina State University in the Department of Molecular and Biomedical Sciences.  (Brody Rep. ¶ 1.)  He holds a B.S. in Zoology, an M.S. in Functional Vertebrate Anatomy, and a Ph.D. in cell biology. (*Id.*)  He focuses on the pathobiology of lung diseases and conducts experiments to understand—on a cellular and genetic level—the progression of a disease.  (*Id.* ¶ 2.)

Dr. Brody's report lays out what asbestos is and how asbestos fibers cause disease. (*See generally id.*)  He gives an overview of the types of asbestos fibers and the diseases that asbestos fibers induce.  (*Id.* ¶¶ 7-17.)  He then describes how asbestos fibers overcome the body's natural defenses and cause abnormalities on a cellular level, ultimately leading to cancer.  (*Id.* ¶¶ 22-43.)  Dr. Brody states that "asbestos-induced cancers are dose-response diseases" and that the "cumulative dose . . . cause[s] the disease."  (*Id.* ¶ 44.)  He further expounds that "[s]cientists have established that brief or low-level cumulative exposures to asbestos significantly increase the risk of developing mesothelioma."  (*Id.*)  The "consensus scientific opinion . . . is that no amount of exposure to asbestos above the background levels present in ambient air has been established as too low to induce mesothelioma."  (*Id.* ¶ 45.)  In other words, "[t]he mainstream scientific community is in consensus that there is no safe level of exposure to asbestos."  (*Id.*)

In his deposition, Dr. Brody reiterated that brief exposures can increase the risk of developing mesothelioma, pointing to cases of mesothelioma where the patients had only been exposed for short periods of time.  (Brody Adams Decl. (Dkt. # 560) ¶ 2, Ex. 9 ("Brody Dep.") at 28:20-29:4.)[12]  He stated that although background levels of exposure are safe, whether an individual contracts mesothelioma often depends on that individual's susceptibility.  (*See id.* at 30:22-31:5.)  As for levels of exposure above background, Dr.

//

---

[12] Honeywell also attaches portions of Dr. Brody's deposition testimony to its briefing. (*See* Brody Gaston Decl. ¶ 4, Ex. 3.)  Despite the multiple filings, the court refers generally to "Brody Dep." when citing to Dr. Brody's deposition testimony.

Brody states that science has not determined whether there is a level that does not increase the risk of disease. (*Id.* at 31:6-22.) However, Dr. Brody believes that every exposure adds to the cumulative dose, or total amount, to which the individual is exposed. (*Id.* at 34:13-16.)

**E.    Barry Castleman**

Dr. Castleman works in the field of occupational and environmental health policy and focuses on "the recognition of risk factors and the prevention of disease from industrial activities." (Castleman Adams Decl. (Dkt. # 564) ¶ 2, Ex. A ("Castleman Rep.") at 1.)[13] He holds a B.S. in Chemical Engineering, an M.S.E. in Environmental Engineering, and a Doctor of Science Degree in Health Policy. (*Id.*) As part of his doctorate work, he concentrated in the areas of toxicology, epidemiology, biostatistics, physiology, and public health policy. (*Id.*) Dr. Castleman additionally authored a thesis titled "Asbestos:  An Historical Case Study of Corporate Response to an Industrial Health Hazard," which was later published as a book:  "Asbestos: Medical and Legal Aspects." (*Id.*) The thesis and book contain "an historical review of the asbestos problem," including "a comprehensive review of medical literature of all kinds, as well as other literature available." (*Id.* at 1-2.) Several courts, including the Supreme Court, have cited Dr. Castleman's book. *See, e.g.*, *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 631 (1997) (Breyer, J. concurring in part and dissenting in part).

//

---

[13] The court cites the page number on the bottom center of the document. (*See generally* Castleman Rep.)

Dr. Castleman has over 40 years of experience analyzing asbestos and other occupational and environmental health problems. (*Id.* at 1.) He has examined both published and unpublished historical documents—including corporate documents, trade association minutes, and corporate officials' testimony—regarding the asbestos hazard. (*Id.* at 2.) Additionally, he has interviewed "old-timers in the field of industrial medicine and hygiene," including physicians and other authorities who studied asbestos in the 1900s. (*Id.*) In addition to his book, Dr. Castleman published numerous articles on asbestos (*see id.* at 20-28) and testified in front of both the United States Senate and House of Representatives regarding asbestos (*see id.* at 19-20). He served as a consultant to various organizations, including the EPA, the Occupational Safety and Health Administration ("OSHA"), and the National Academy of Sciences. (*Id.* at 18.)

In his report, Dr. Castleman reviews the body of knowledge regarding asbestosis, lung cancer, and mesothelioma dating back to the 1800s. (*See id.* at 2-7.) Specifically, he recounts studies in the automotive industry that analyzed asbestos in brakes, clutches, and gaskets, as well as the history of regulation addressing asbestos in brake and clutch work. (*Id.* at 14-15.) Based on his review, Dr. Castleman concludes that "the literature had largely established that asbestos was a lethal material by the early 1930s" and that "[b]y the mid-1940s, it was widely accepted . . . that asbestos inhalation could also cause lung cancer." (*Id.* at 17.) Mesothelioma, in particular, became "a subject of intense discussion in the early 1960s." (*Id.*) This literature, Dr. Castleman maintains, "was available in the medical libraries to anyone who knew how to spell the word asbestosis" and would not require a computer or other modern techniques to access. (*Id.*)

1

**F.      Charles Cushing**

2          Dr. Cushing is the President of C.R. Cushing & Co., Inc., a firm of "naval

3   architects, marine engineers, and transportation consultants."  (Ford MTE Cushing, Ex. 1

4   ("Cushing Rep.") at 27.)[14]  He holds a B.S. in Marine Transportation, a B.S. in Naval

5   Architecture and Marine Engineering, an M.S. in Ocean Transportation, and a Ph.D. in

6   Maritime Studies.  (*Id.*)  He has designed and constructed more than 250 vessels.  (*Id.*)

7   His expertise also extends to risk analyses, safety audits, vessel maintenance, and air

8   quality monitoring.  (*Id.*)  Dr. Cushing belongs to numerous shipping and naval

9   professional associations, and he has authored several articles on ship design, naval

10  operations, and marine safety investigations.  (*Id.* at 29.)

11         Dr. Cushing reviewed Mr. Jack's deposition testimony, interrogatory answers,

12  personnel records, and the second amended complaint.  (*Id.* at 26.)  He summarizes Mr.

13  Jack's career as a machinery repairman aboard various naval vessels and his work as an

14  inside machinist, a nuclear inspector, and an outside and inside engineer at the Shipyard.

15  (*Id.* at 4-13.)  Dr. Cushing then reviews the use of asbestos by the U.S. Navy on naval

16  vessels.  (*Id.* at 14-22.)  Based on his review, Dr. Cushing concludes that Mr. Jack was

17  likely exposed to asbestos aboard naval vessels and at the Shipyard.  (*Id.* at 23.)  Dr.

18  Cushing additionally opines that Mr. Jack was likely exposed to asbestos when he

19  worked on automobiles, which involved handling clutches, brakes, and gaskets.  (*Id.*)

20  //

21

22         [14] The court cites the page number on the bottom center of the document.  (*See generally* Cushing Rep.)

## G. William Longo

Dr. Longo has a Ph.D. in Materials Science and Engineering and has over 20 years of experience utilizing electron microscopy methods to analyze all types of asbestos samples. (Longo Adams Decl. (Dkt. # 570) ¶ 2, Ex. 3 ("Longo Aff.") ¶ 2.) He was the president of Materials Analytical Services, Inc. ("MAS"), an engineering consulting firm that specializes in analyzing asbestos-containing products. (*Id.*) Although Plaintiffs have not retained Dr. Longo as a testifying witness, Plaintiffs' expert witnesses rely on studies by Dr. Longo or MAS to determine the amount of dust Defendants' products emit. (*See* Longo Resp. at 1.) Plaintiffs also intend to offer two video demonstrations of these studies to illustrate the visible dust released when working with brakes, gaskets, and other products. (*Id.*; Warren Pumps MTE at 8 n.38.)

In their studies of gaskets, Dr. Longo and MAS utilize both a direct sample preparation method in accordance with the NIOSH 7400 method and a TEM indirect method to analyze how much airborne asbestos is released during the studies. (*See* Longo Aff. ¶¶ 5, 5A.) The government recognizes TEM indirect method as a standard method of analysis, and several peer-reviewed publications utilize this methodology to evaluate asbestos exposures. (*Id.* ¶ 5D.)

Dr. Longo and MAS additionally employ a technique called "Tyndall Light Scattering" ("Tyndall lighting") in their video demonstrations. (*See id.* ¶¶ 6A-6E.) The EPA developed Tyndall lighting as a standard testing method for visualizing microscopic particles for industrial hygiene and environmental studies. (*Id.* ¶ 6A.) Industrial hygienists generally use Tyndall lighting to more easily view the pathway of exposure.

(*Id.* ¶¶ 6A-6B.)  Dr. Longo attests that Tyndall lighting "is a standard method that has existed for decades . . . [and] has been extremely effective in demonstrating the pathways of exposure."  (*Id.* ¶ 6D.)

Having summarized the expert testimonies at issue, the court now addresses the motions to exclude.

### III.    ANALYSIS

**A.    Legal Standard**

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 requires that the expert be qualified and that the "'[e]xpert testimony . . . be both relevant and reliable.'"  *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (quoting *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001)); Fed. R. Evid. 702.  Relevancy "simply requires that '[t]he evidence . . . logically advance a material aspect of the party's case.'"  *Estate of Barabin*, 740 F.3d at 463 (quoting *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007)).

Reliability requires the court to assess "whether an expert's testimony has a 'reliable basis in the knowledge and experience of the relevant discipline.'" *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)) (internal citations and alterations omitted). The Supreme Court has suggested several factors that courts can use in determining reliability: (1) whether a theory or technique can be tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate of the theory or technique; and (4) whether the theory or technique enjoys general acceptance within the relevant scientific community. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-94 (1993). The reliability inquiry is flexible, however, and trial judges have broad latitude to focus on considerations relevant to a particular case. *See Kumho Tire*, 526 U.S. at 150.

In determining reliability, the court must rule on the soundness of the expert's methodology, *Estate of Barabin*, 740 F.3d at 463 (citing *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)), and the analytical connection between the data, the methodology, and the expert's conclusions, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Cooper*, 510 F.3d at 942 ("Rule 702 demands that expert testimony relate to scientific, technical or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs."); Fed. R. Evid. 702 Advisory Committee's Notes to 2000 Amendments ("[T]he testimony must be the product of reliable principles and methods that are reliably applied to the facts of the case."). The court should not rule on the correctness of the expert's conclusions. *Estate of Barabin*, 740 F.3d at 463. "[T]he

//

proponent of the expert . . . has the burden of proving admissibility." *Cooper*, 510 F.3d at 942 (citing *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996)).

Defendants raise a myriad of arguments against each of the challenged experts, and the court addresses each expert in turn.

**B.    Sean Fitzgerald**

DCo moves to exclude Mr. Fitzgerald's testimony for two reasons:  (1) his supplemental report finding tremolite was untimely; and (2) his conclusions regarding the asbestos content of Victor gaskets are based on speculation and thus are irrelevant, unreliable, and unhelpful to a trier of fact.  (*See generally* 1st MTE Fitzgerald; 2d MTE Fitzgerald.)  The court disagrees with both arguments.

First, as to the timeliness of disclosure, DCo is correct that a party must submit its expert witness disclosures "at the times and in the sequence that the court orders."  Fed. R. Civ. P. 26(a)(2)(C); (*see* 1st MTE Fitzgerald at 4-11.)  However, "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing," the party "must supplement or correct its disclosure or response."  *Id.* 26(e)(1).  Rule 26(e) is not "a loophole through which a party who . . . wishes to revise her disclosures in light of her opponent's challenges to the analysis and conclusions therein, can add to them to her advantage after the court's deadline."  *Luke v. Family Care & Urgent Med. Clinics*, 323 F. App'x 496, 500 (9th Cir. 2009).  Instead, Rule 26(e) applies only when the party "correct[s] an inaccuracy" or "fill[s] in a gap based on information previously unavailable."  *Id.*

Mr. Fitzgerald's supplemental report falls within the ambit of Rule 26(e). After learning that Dr. Gordon found tremolite—information that was previously unavailable—Mr. Fitzgerald "fill[ed] in a gap" in his prior report by retesting the gaskets for tremolite. *See Luke*, 323 F. App'x at 500; (6/8/18 Fitzgerald Rep. at 1.) The situation here is unlike that in *Luke*, upon which DCo relies, where the court excluded an untimely expert declaration that "attempted to fix the weakness" identified by a summary judgment motion. *See* 323 F. App'x at 500. Accordingly, Mr. Fitzgerald's supplemental report is timely. As such, the court denies DCo's motion to exclude on this basis and denies Plaintiffs' motion to extend the discovery deadline for Mr. Fitzgerald as moot.

Second, the court finds that Mr. Fitzgerald's conclusion regarding the asbestos content in the gaskets is relevant, reliable, and helpful to the trier of fact. DCo maintains that the testing of the gaskets found in Mr. Jack's garage is irrelevant because (1) "there is no evidence any of the asbestos-containing gaskets . . . are Victor gaskets," and (2) "there is no evidence [Mr. Jack] was exposed to any of the [tested] asbestos-containing gaskets." (2d MTE Fitzgerald at 8.) DCo misstates the record in its first point and misconstrues the law in its second. The record contains sufficient evidence upon which a jury may infer that the gaskets Mr. Fitzgerald tested were Victor gaskets: the gaskets were found in a sealed box bearing the Victor logo with an inventory list titled "Victor Gasket Set" (*see* Fitzgerald Adams Decl. ¶ 2, Ex. A; 6/8/18 Fitzgerald Rep. at 4), Mr. Jack testified that the box contained Victor gaskets for a vehicle he was working on (*see* Jack Dep. at 53:21-54:1), and the box remained sealed until Mr. Fitzgerald's testing (4/17/18 Fitzgerald Rep. ¶ 12). When opened, the gaskets in the box matched the

inventory list. (6/8/18 Fitzgerald Rep. at 1.) And at least one of the gaskets had a Victor

logo. (*See* Fitzgerald Adams Decl. ¶ 2, Ex. E (displaying a picture of the gasket).)

Similarly, the record contains evidence that Mr. Jack worked with Victor gaskets.

Mr. Jack testified that he recognized the box as containing Victor gaskets "for an old

Allis-Chalmers bulldozer I worked on." (Jack Dep. at 53:23-54:1.) Moreover, he

specifically recalled Victor as a brand he worked with. (*Id.* at 43:18-23; 210:20-23.) But

even if Mr. Jack was not exposed to those specific gaskets, their asbestos content is

nonetheless relevant because it indicates the asbestos content in Victor gaskets generally.

Such information undoubtedly "logically advance[s] a material aspect of [Plaintiffs']

case." *See Cooper*, 510 F.3d at 942.

DCo's reliability arguments are similarly unavailing. DCo first contends that

"there is no evidence that the asbestos-containing gaskets [Mr. Fitzgerald's] laboratory

tested actually came from [Mr. Jack's] garage." (2d MTE Fitzgerald at 8.) But upon

receiving the sealed box of gaskets, Mr. Fitzgerald noted that the box had the same label

and same handwritten note as the box from Mr. Jack's garage. (*See* 6/8/18 Fitzgerald

Rep. at 1; *compare id.*, Ex. 1 (Mr. Fitzgerald's pictures of the box), *with* Fitzgerald

Adams Decl. ¶ 2, Ex. A (picture of box in Mr. Jack's garage).) Moreover, the chain of

custody document shows that the box transferred from Mr. Jack to Plaintiffs' counsel to

Mr. Fitzgerald. (Fitzgerald Adams Decl. ¶ 2, Ex. D at 5.) DCo may certainly

cross-examine Mr. Fitzgerald about the chain of custody, but the fact that the items

changed hands does not warrant exclusion.

//

Lastly, DCo argues that Mr. Fitzgerald's methodology is unreliable because it should be used only for building materials and insulation, not automotive gaskets. (2d MTE Fitzgerald at 9.) But the record evinces that both EPA methods and PLM are accepted and routinely used by scientists in the field. (*See* Fitzgerald Adams Decl. ¶ 2, Ex. G ("Fitzgerald Dep.") at 20:23-21:6, 42:11-25.) Mr. Fitzgerald's lab has performed a PLM analysis hundreds, if not thousands, of times to determine the presence of asbestos in automotive gaskets. (*Id.* at 26:1-9.) Because Mr. Fitzgerald's methodology is sound, any qualms DCo has regarding the implementation of that methodology—such as whether Mr. Fitzgerald compared the tested gaskets to the correct known samples—may be addressed on cross-examination. *See Estate of Barabin*, 740 F.3d at 463.

In sum, Mr. Fitzgerald's expert testimony is both relevant and reliable. *See id.* Accordingly, the court denies both of DCo's motions to exclude Mr. Fitzgerald's testimony.

**C.   Ronald Gordon, Carl Brodkin, and Arnold Brody**

Defendants' challenges to Dr. Gordon, Dr. Brodkin, and Dr. Brody all involve the application of the "every exposure theory." (*See, e.g.*, Warren Pumps MTE at 3-8.) Thus, the court first addresses the admissibility of that theory and its variants before turning to the admissibility of each expert.

1.   Every Exposure Theory

The "every exposure" theory posits that "any exposure to asbestos fibers whatsoever, regardless of the amount of fibers or length of exposure constitutes an underlying cause of injury." *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 672 (7th Cir.

2017).  A minor variation of the "every exposure" theory states that "every exposure to asbestos above a threshold level is necessarily a substantial factor in the contraction of asbestos-related diseases."  *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1177 (9th Cir. 2016).  A further outgrowth of the "every exposure" theory is the "cumulative exposure" theory:  the cumulative exposure to asbestos is the cause of the disease, but because each exposure, no matter how small, adds to that cumulative exposure, each exposure becomes a substantial contributing factor.  *See Krik*, 870 F.3d at 672-73.

The court recently reviewed in detail the legal landscape surrounding the "every exposure" and "cumulative exposure" theories.[15]  *See Barabin v. Scapa Dryer Fabrics, Inc.*, No. C07-1454JLR, 2018 WL 840147, at *11-16 (W.D. Wash. Feb. 12, 2018).  After surveying the relevant precedent—including *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170 (9th Cir. 2016)—the court "agree[d] with t[he] overwhelming precedent that the 'every exposure' theory is unreliable" because it "is not tied to the severity of exposure," is not based on sufficient supporting facts and data, cannot be tested, and does not have a known error rate.  *See Barabin*, 2018 WL 840147, at *11-12.  The court further concluded that the "cumulative exposure" theory is unreliable because it "contains the same reliability problems that the 'every exposure' theory does"—namely that "every exposure becomes a substantial factor based on one fact alone:  that it was part of the total dose."  *Id.* at *13.

---

[15] As the court stated in *Barabin*, the "every exposure" theory goes by many names, including the "any exposure" theory, the "single fiber" theory, and the "each and every exposure" theory.  *See* 2018 WL 840147, at *11 n.11 (citing *Yates v. Ford Motor Co.*, 113 F. Supp. 3d 841, 846 (E.D.N.C. 2015)).

The court reiterates its conclusion regarding the unreliability of the "every exposure" and "cumulative exposure" theories. Neither theory addresses the frequency of, regularity of, proximity to, or the strength of the exposure in question; indeed, neither theory depends on any characteristic of the exposure at all. Instead, the fact that the exposure occurs is sufficient under either theory to qualify that exposure as a substantial factor. Allowing these theories to be presented at trial would, as the Ninth Circuit articulated, "undermine the substantial factor standard" and allow "unbounded liability." *McIndoe*, 817 F.3d at 1177.

Having concluded that neither the "every exposure" nor the "cumulative exposure" theory is admissible under Rule 702 and the *Daubert* standard, the court now ascertains whether any of the challenged causation experts rely on those theories.

2. Ronald Gordon

DCo, Ford, and Ingersoll Rand challenge the admissibility of Dr. Gordon's testimony regarding his microscopic testing of Mr. Jack's lung and lymph node tissues. (*See* DCo MTE Gordon; Ford MTE Gordon; Warren Pumps MTE at 3-7.) They raise three main arguments: (1) Dr. Gordon relies on the impermissible "every exposure" theory (Ford MTE Gordon at 9-10; Warren Pumps MTE at 3-7); (2) Dr. Gordon, although qualified to give opinions regarding microscopy, is not qualified to opine on the source of the detected fibers (DCo MTE Gordon at 8; Ford MTE Gordon at 10-11); and (3) Dr. Gordon's focus on lymph nodes is unreliable (Ford MTE Gordon at 7-9).[16]

---

[16] DCo additionally argues that a portion of Dr. Gordon's deposition testimony is an untimely opinion precluded by Federal Rule of Civil Procedure 37(c). (DCo MTE Gordon at

The first argument is now moot because Plaintiffs clarify that Dr. Gordon "will not be offering an opinion in this case that 'each and every exposure' to asbestos causes mesothelioma or that 'each and every exposure' to asbestos caused [Mr.] Jack's mesothelioma." (Gordon Resp. at 12.) Instead, he will focus on his "microscopy findings" and "the significance of those findings in evaluating [Mr.] Jack's exposure." (*Id.*; *see id.* at 1 (offering Dr. Gordon to "opine as to [Mr. Jack's] exposure to asbestos").) Thus, the court declines to exclude Dr. Gordon on this ground.[17]  Defendants may renew this objection, however, if Dr. Gordon proffers causation testimony during trial.

The court addresses the remaining arguments in turn.

     *a.  Dr. Gordon's Qualifications*

No party challenges Dr. Gordon's qualifications in microscopy or his credentials to testify about the fiber burden study that he performed on Mr. Jack's lung and lymph node tissue.  (*See* DCo MTE Gordon at 8; Ford MTE Gordon at 10-11.)  Instead, they question Dr. Gordon's qualifications to opine on the source of those fibers, and in particular, whether the fibers may have originated from automotive products.  (*See id.*)

//

_____

6-8.)  But Dr. Gordon gave the testimony at issue in response to a hypothetical posed by Plaintiffs' counsel, in which Plaintiff's counsel informed Dr. Gordon of Mr. Fitzgerald's findings regarding the asbestos content of automotive products.  (Gordon Dep. at 140:14-141:8.)  A hypothetical is generally allowed as long as there is a reasonable basis for the facts posed by the hypothetical.  *Woods v. Conagra Foods Lamb Weston, Inc.*, No. 4:15-cv-05067-SAB, 2016 WL 4719886, at *4 (E.D. Wash. June 3, 2016).  The court finds no reason to doubt the facts posed by Plaintiffs' counsel's hypothetical.  Thus, the court declines to exclude the testimony as an untimely supplemental report under Rule 37(c).

[17] Because Dr. Gordon will not be testifying to causation, Ford's argument that he is not qualified to render causation opinions is also moot.  (*See* Ford MTE Gordon at 10.)

Although Dr. Gordon is a microscopist, his experience is not limited to that role. Instead, he has participated in studies of the asbestos content of various products. (*See* Gordon Adams Decl. ¶ 2, Ex. N (attaching an article co-authored by Dr. Gordon that analyzes the asbestos concentration of talcum powder).) More significantly, Dr. Gordon analyzed automotive parts in particular. For instance, he has "looked at a number of cases of people that have been exposed to brake dust as mechanics" and additionally analyzed "what fibers have been associated with . . . those brakes . . . and correlated them with the exposures." (Gordon Dep. at 15:23-16:2.) In fact, Dr. Gordon conducted studies on brakes and clutches to determine whether they correlated to fibers found in the patient. (*Id.* at 16:7-14.) Moreover, Dr. Gordon has reviewed literature on the asbestos content in automotive products. (*See id.* at 17:13-23.)

True, Dr. Gordon has not conducted any fiber release studies to measure the exposure levels that automotive products produce, nor is he aware of the manufacturer of the brakes. (*Id.* at 16:11-18, 17:4-6.) But Dr. Gordon does not opine on the fibers/cc level of exposure from automotive products or identify any specific brand. (*See* Gordon Rep.; Gordon Dep. at 139:20-140:13.) Instead, he opines on whether the fibers could have originated from automotive products based on his experience studying such products. (*See id.*) Dr. Gordon's experience with automotive products enables him to draw links between Mr. Jack's fiber burden study and automotive products generally.

> b. *Lymph Node Study*

Ford challenges the reliability of Dr. Gordon's fiber burden study of Mr. Jack's lymph nodes, arguing that there is no correlation between fibers found in lymph nodes

and occupational exposure to asbestos.  (Ford MTE Gordon at 7-9.)  Thus, Ford seeks to exclude "Dr. Gordon's lymph node fiber burden analysis . . . as lacking foundation in reliable, peer-reviewed science."  (*Id.* at 9.)  The court disagrees.

Expert testimony may be admitted when the knowledge in the field "permits the assertion of a reasonable opinion."  *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006) (internal quotation marks omitted) (quoting *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002)).  "A court may admit somewhat questionable testimony if it falls within 'the range where experts might reasonably differ, and where the jury must decide among the conflicting views.'"[18]  *S.M. v. J.K.*, 262 F.3d 914, 921 (9th Cir. 2001) (quoting *Kumho Tire*, 526 U.S. at 153).  Here, Dr. Gordon's extrapolation of Mr. Jack's exposure, based on the presence of fibers in Mr. Jack's lymph node tissue, is reasonable, even if experts might reasonably differ about that extrapolation.

Various published studies support the notion that asbestos fibers can deposit in the lymph nodes after the fibers leave the lungs.  For example, the report on the Helskini criteria states that asbestos bodies, which are "the hallmark of asbestos exposure," are "deposited in the lung parenchyma" but "may also be found in regional lymph nodes." (Gordon Adams Decl. ¶ 2, Ex. J at 127.)  Several publications by Ronald Dodson also correlate asbestos fibers in lymph node tissue with exposure.  Dr. Dodson's book *Asbestos Risk Assessment, Epidemiology, and Health Effects* explains that because lymph

//

---

[18] Ford questions the applicability of this authority because it predates *Estate of Barabin*. (Gordon Reply (Dkt. # 593) at 3.)  But *Estate of Barabin* did not address, let alone overrule, this statement of law.  *See* 740 F.3d at 464.

nodes are the "reservoirs of retained material," the ability of fibers to "relocate through the lymphatic system to the . . . lymph nodes is well recognized." (*Id.* ¶ 2, Ex. L at 74.) A comparative study performed by Dr. Dodson on eight shipyard workers revealed that all but one had asbestos bodies in their lymph node tissue, suggesting "a relocation of mature bodies from the lungs to the lymph nodes." (*Id.* at 75.)

Indeed, Dr. Gordon has also published an article detailing the correlation of asbestos exposure with fibers found in the lymph nodes. (*See* Gordon Adams Decl. ¶ 2, Ex. N.) When studying a patient exposed to asbestos through talcum powder, Dr. Gordon performed analysis on the lung and lymph node tissues. (*Id.* at 4-5.) He found asbestos fibers in both locations. (*Id.* at 7-9.) The study "tracked the asbestos in the talc . . . into the lung and lymph nodes of the users of those products." (*Id.* at 13.) The above literature persuades the court that there is a reasonable and reliable basis in science for Dr. Gordon's lymph node fiber burden analysis.

Ford provides its own expert testimony disclaiming lymph node fiber burden analyses; its pathologist Andrew Churg even characterizes Dr. Gordon's conclusions as "completely illegitimate." (Ford MTE Gordon, Ex. 3 at 1; *id.*, Ex. 4 at 55:11.) But Dr. Churg's disagreement with Dr. Gordon's conclusion only illustrates that this is an area about which reasonable experts may disagree. In such a situation, the jury—not the court—must decide amongst the conflicting views. *See S.M.*, 262 F.3d at 921; *see also Marketquest Grp., Inc. v. BIC Corp.*, No. 11-cv-618-BAS (JLB), 2018 WL 1756117, at *4 (S.D. Cal. Apr. 12, 2018) (leaving the determination of "which of several competing scientific theories has the best provenance" to the jury).

Because the court finds that Dr. Gordon is sufficiently qualified and relies on a sufficient foundation, the court concludes that his testimony is admissible.

### 3. Carl Brodkin

Honeywell challenges the reliability of Dr. Brodkin's testimony regarding brake dust, whereas Borg-Warner focuses on his conclusions regarding clutches.[19] The court therefore addresses the two categories of arguments.

#### a. Brake Dust

Honeywell generally challenges the reliability of Dr. Brodkin's causation opinions. First, it points out that Dr. Brodkin does not determine Mr. Jack's cumulative dose, and thus, Dr. Brodkin "simply concludes that because there is not a known threshold for safe exposure, no exposure . . . is safe." (Honeywell MTE Brodkin at 10.) Thus, Honeywell seemingly argues that Dr. Brodkin relies on the "every exposure" theory. (*See id.* (noting that Dr. Brodkin qualifies "exposure to any identified (but unquantified) level of fiber release . . . [to be] biologically significant in the development of [Mr. Jack's] disease"); *see also* Warren Pumps MTE at 3-7.)

But Dr. Brodkin's causation conclusions are not based on the theory that every exposure must necessarily be a substantial factor. Instead, he looks for an "identified

//

---

[19] DCo also brought a motion challenging Dr. Brodkin's testimony. (*See* DCo MTE Brodkin.) However, DCo's motion largely mirrors Honeywell's motion, with the caveat that DCo challenges Dr. Brodkin's conclusions concerning automotive gaskets rather than brake dust. (*See id.* at 2-3.) Thus, the court addresses DCo's motion in conjunction with Honeywell's motion. Ingersoll Rand, which joined in former Defendant Warren Pumps's motion, argues Dr. Brodkin relies on the inadmissible "every exposure" theory. (*See* Warren Pumps MTE at 3-8.) Because this argument overlaps with Honeywell's, the court addresses them together.

exposure," which requires a "well-characterized source, activity that generates fibers overcoming the body's defenses, and add[s] to the body['s] burden of asbestos." (Brodkin Dep. at 195:19-25.)  An "identified exposure" must be a "well-characterized source of asbestos, an activity that disrupts the source to generate significant airborne asbestos fibers that have sufficient intensity to overcome the body's defenses, add to the body's burden of asbestos, and therefore, increase risk for asbestos-related diseases." (*Id.* at 46:25-47:7.)  In other words, Dr. Brodkin analyzes the duration, frequency, and intensity of exposures to determine whether an exposure is significant.  (*Id.* at 193:15-19.)  Indeed, Dr. Brodkin's report belies Honeywell's contention that he subscribes to the "every exposure" theory.  For instance, Dr. Brodkin recognizes that Mr. Jack was exposed to asbestos fibers when installing and handling clutches but did not characterize those exposures as identified exposures.  (Brodkin Rep. at 2.15.)

Honeywell next challenges Dr. Brodkin's identified exposure approach as unreliable.  The court again disagrees.  Dr. Brodkin analyzed Mr. Jack's occupational and environmental history at length—including during an interview with Mr. Jack—and compared Mr. Jack's activities to the exposure associated with those activities documented in numerous published studies.  (*See* Brodkin Rep. at 5.4.)  He additionally factored in the asbestos content of the materials, how often Mr. Jack worked with those materials, how long he did that work, and where he worked with the materials.  (*See id.*) Dr. Brodkin relies on his significant experience compiling and analyzing occupational histories to then determine which of the exposures qualify as identified exposures.  (*See generally* Brodkin CV.)  Thus, Dr. Brodkin's characterization of Mr. Jack's identified

exposures has "a 'reliable basis in the knowledge and experience of the relevant discipline.'" *See Estate of Barabin*, 740 F.3d at 463.

Dr. Brodkin further relies on the Helsinki criteria, a document created by a group of 19 experts from around the world to clarify how to diagnose and attribute asbestos-related diseases. (*See* Brodkin Adams Decl. ¶ 2, Ex. 4.) The Helsinki criteria notes that "a history of significant occupational, domestic, or environmental exposure to asbestos will suffice for attribution" and that even an "occupational history of brief or low-level exposure should be considered sufficient for mesothelioma to be designated as occupationally related." (*Id.* at 313.) And finally, Dr. Brodkin references various published articles, government agency statements, and industry textbooks that support how he pinpoints identified exposures. (*See* Brodkin Dep. at 46:25-47:7.) In light of those publications, the court is further persuaded that Dr. Brodkin's methodology is reliable and thus admissible.

Honeywell makes much of the fact that Dr. Brodkin does not quantify Mr. Jack's exposure. (*See* Honeywell MTE Brodkin at 9-10; Brodkin Reply (Dkt. # 594) at 2-3.) But Dr. Brodkin explained that direct quantification is difficult because no equipment measured Mr. Jack's real-time exposure, and retroactively estimating his exposure involves a "wide range of uncertainty." (Brodkin Dep. at 40:17-41:13.) Nor is quantification necessary legally. *See Mavroudis v. Pittsburgh-Corning Corp.*, 935 P.2d 684, 687 (Wash. Ct. App. 1997) (requiring only that a substantial factor be "important," "material," and not "insignificant"); *see also Barabin v. Scapa Dryer Fabrics Inc.*, No. C07-1454JLR, Dkt. # 248, at 6 ("[T]he [c]ourt finds that the substantial factor causation

standard is a qualitative one that does not require hard and fast numerical absolutes

tracing each defendant's asbestos fibers to the plaintiff's lungs."). Thus, the court

declines to exclude Dr. Brodkin's testimony on account of his qualitative analysis.

Lastly, Honeywell and DCo dispute whether brake dust or gaskets increase the

risk of mesothelioma. (Honeywell MTE Brodkin at 11; DCo MTE Brodkin at 2-3.) In so

arguing, both defendants point to studies or expert testimony that disagree with Dr.

Brodkin's cited studies. (*See* Honeywell MTE Brodkin at 2-4, 11; DCo. MTE Brodkin at

2-3.) But the court cannot rule on the correctness of Dr. Brodkin's conclusions. *See*

*Estate of Barabin*, 740 F.3d at 463. And there is nothing to indicate that the four pages of

published studies Dr. Brodkin relies upon utilize unsound methodology. (*See* Brodkin

Rep. at 6.12-15.)

Honeywell and DCo's contrary studies may well influence the weight a jury

assigns to Dr. Brodkin's testimony, but they do not warrant exclusion. *See PacTool Int'l,*

*Ltd. v. Kett Tool Co., Inc.*, No. C06-5367BHS, 2012 WL 3637391, at *3 (W.D. Wash.

Aug. 22, 2012) (declining to exclude contradicting expert testimonies because "these

issues are best left to the factfinder to weigh during the battle of the experts"). Instead,

they merely highlight an area that reasonable experts may disagree about; it is not the

court's role to "determine which of several competing scientific theories has the best

provenance." *Marketquest Grp.*, 2018 WL 1756117, at *4 (quoting *Ruiz-Troche v. Pepsi*

*Cola*, 161 F.3d 77, 85 (1st Cir. 1998)) (internal quotation marks omitted).

//

//

In summary, the court concludes that Dr. Brodkin's testimony passes muster under Rule 702 and the *Daubert* standard. Accordingly, the court denies Honeywell and DCo's motions to exclude.[20]

### b. Clutches

Borg-Warner raises two separate arguments: (1) Dr. Brodkin's causation testimony regarding clutches is not based on the facts of this case (Borg-Warner MTE Brodkin at 7-9); and (2) Dr. Brodkin's two underlying studies on clutches are unreliable (*id.* at 9-10).[21] Neither ground warrants exclusion.

First, Borg-Warner's argument regarding the underlying facts go to the weight and not the admissibility of Dr. Brodkin's testimony. Dr. Brodkin documents that Mr. Jack reported working with "lots" of Borg-Warner clutches from 1955 to 1986, including several clutch bell housing removal-blowouts, removals of clutches, and repeat clutch jobs. (Brodkin Rep. at 2.14.) Mr. Jack also performed clutch replacements, which required disassembly of the clutch bell-housing part. (*Id.* at 2.13.) During this clutch work, Mr. Jack recalled using compressed air to blow out the clutch bell housings, which generated visibly dusty conditions. (*Id.*) Mr. Jack's work with clutches—in combination

---

[20] To the extent that Ingersoll Rand joins in Warren Pumps's product-specific argument—that Dr. Brodkin failed to analyze pumps (Warren Pumps MTE at 7-8)—the court concludes that this argument is unavailing. Ingersoll Rand, to state the obvious, did not produce pumps. And Dr. Brodkin explicitly references Ingersoll Rand compressors as products that Mr. Jack worked with. (*See, e.g.*, Brodkin Rep. at 2.5-6.) Thus, Dr. Brodkin did not fail to address Ingersoll Rand compressors. (*Id.* at 5.2.)

[21] Borg-Warner additionally argues that Dr. Brodkin's methodology is unreliable because he does not conclude "what number of clutch removals is a substantial contributing factor to mesothelioma." (Borg-Warner MTE Brodkin at 10.) The court rejects this argument for the same reasons it rejected Honeywell's quantification argument. *See supra* § III.B.3.a.

with the high asbestos content of clutches and the level of exposure such activities generate—constitute a sufficient factual basis for Dr. Brodkin's conclusion that Mr. Jack's work with clutches constitutes an identified exposure. Thus, Borg-Warner's disagreements over the factual basis of Dr. Brodkin's opinions do not make his report so fundamentally flawed that it could not assist the jury on the issue of causation. *See Marketquest Grp.*, 2018 WL 1756117, at *3.

Borg-Warner's qualms with two of Dr. Brodkin's cited studies also do not warrant exclusion. Borg-Warner challenges a 1987 study conducted by Timo Kauppinen and Kari Korhonen ("Kauppinen Study") and a 1970 study conducted by D.E. Hickish and K.L. Knight ("Hickish Study"). (Borg-Warner MTE Brodkin at 9-10.) At the outset, the court observes that Dr. Brodkin also relied on other studies involving clutches. (*See* Brodkin Rep. at 6.12-15.) Even though not all of the studies involve Borg-Warner clutches, the studies remain relevant to Dr. Brodkin's overall analysis of exposure from clutches. Thus, Borg-Warner is incorrect that without those two studies, Dr. Brodkin lacks scientific support for his conclusions. (*See* Borg-Warner MTE Brodkin at 9-10.)

Turning to the studies, the court agrees with Borg-Warner that the Hickish Study does not measure exposure from working with clutches. Instead, as Borg-Warner argues, the study measures break work exposure from the position of someone performing clutch repair work in an adjacent bay. (*See* Brodkin Ross Decl. ¶ 5, Ex. E ("Hickish Study") at 18.) But the Kauppinen Study does explicitly measure the fiber release during "clutch repair." (*Id.* ¶ 4, Ex. D ("Kauppinen Study") at 500-03.) The Kauppinen Study, combined with the other studies on clutches, constitute a sufficient scientific basis for Dr.

Brodkin's conclusion. Borg-Warner's remaining concerns, such as whether "clutch repair" sufficiently mirrors the work Mr. Jack performed, do not undermine the reliability of the underlying study and can be addressed on cross examination.

Accordingly, the court denies Borg-Warner's motion to exclude Dr. Brodkin's causation testimony regarding clutches.

### 4. Arnold Brody

Honeywell and Ingersoll Rand assert that Dr. Brody's causation testimony relies on the "every exposure" theory. (Honeywell MTE Brody at 1-4; Warren Pumps MTE at 6.) Plaintiffs respond that Dr. Brody will testify only on "matters of general causation" such as "how asbestos fibers move through the body . . . and cause disease on a cellular level," and that Dr. Brody "will not offer any case-specific testimony about [Mr.] Jack." (Brody Resp. at 1-2.) Thus, Plaintiffs maintain that Dr. Brody "will not attribute Mr. Jack's disease to 'every exposure' he had to asbestos." (*Id.* at 2.) The court agrees with Plaintiffs that, subject to those limitations, Dr. Brody's testimony is admissible.

First, the court notes that the bulk of Dr. Brody's proffered testimony—which explains what asbestos is and how it affects the body on a cellular level—goes unchallenged. (*See* Brody Rep. ¶¶ 7-43.) Instead, Honeywell and Ingersoll Rand take issue with statements in two paragraphs of Dr. Brody's report: (1) that "science has not identified an exposure to asbestos above background that does not induce mesothelioma"; and (2) that "every exposure to asbestos contribute[s] to [an individual's] cumulative dose." (Honeywell MTE Brody at 2-3 (quoting Brody Dep. at 29:20-22, 34:13-15); *see also* Warren Pumps MTE at 6; Brody Rep. ¶¶ 44-45.)

Neither of these statements run afoul of *Daubert* because they are general statements of the science behind asbestos-related disease. (*See* Brody Rep. ¶¶ 44-45.) The fact that every exposure adds to the total dose is an "irrefutable scientific fact," and it is "well-established" that the threshold level for developing mesothelioma is unknown. *See Rost v. Ford Motor Co.*, 151 A.3d 1032, 1045 (Pa. 2016). These "irrefutable scientific fact[s]" do not answer the legal question of whether particular exposures to asbestos are substantial factors. *See id.* Put another way, even an exposure that increases the risk of mesothelioma may fail to constitute a substantial factor.[22] *See Mavroudis*, 935 P.2d at 687. When concluding that the "every exposure" theory is inadmissible, it is not this court's intention "to preclude expert witnesses from informing juries about certain fundamental scientific facts . . . even if those facts do not themselves establish legal (substantial factor) causation." *See Rost*, 151 A.3d at 1045.

Second, Dr. Brody does not make the inferential leap that is troublesome in the "every exposure" or "cumulative exposure" theories—that is, he does not opine that because an exposure occurred and necessarily adds to the total dose, that single exposure must be a substantial cause. In fact, Dr. Brody stops short of offering any conclusion about the specific exposures Mr. Jack may have endured. (*See* Brody Rep. ¶¶ 44-45.)

//

---

[22] In conflating Dr. Brody's review of the literature with the "every exposure" theory, Honeywell skips over this distinction. (*See* Brody Reply (Dkt. # 585) at 2-4.) The court acknowledges that Dr. Brody's testimony regarding the failure to locate a safe level of exposure touches on the "every exposure" theory. However, the court recognizes a fine line between any increase of risk and one that is important, material, and not insignificant, as is required to qualify as a substantial factor. *See Mavroudis*, 935 P.2d at 687. Honeywell and Ingersoll Rand may renew their objections should Dr. Brody cross that line at trial.

1  Given this limitation, the court allows Dr. Brody's testimony to the extent that Dr. Brody

2  expresses no opinion on Mr. Jack's individual exposures and whether those exposures

3  constitute substantial factors. Accordingly, the court denies Honeywell and Ingersoll

4  Rand's motion to exclude Dr. Brody's expert testimony.

5  **D.  Barry Castleman**

6  Ford, Ingersoll Rand, and DCo challenge Dr. Castleman's historical overview of

7  asbestos literature and his conclusion of when asbestos hazards became well-known.

8  Their arguments center on two contentions: (1) Dr. Castleman is not qualified to opine

9  on medical and scientific literature; and (2) Dr. Castleman, without the proper

10  qualifications, can only speculate as to the knowledge defendants had at any given time.[23]

11  (*See* Ford MTE Castleman at 4-6; Warren Pumps MTE at 14-17.)

12  In response, Plaintiffs clarify the scope of Dr. Castleman's testimony. Dr.

13  Castleman will provide "historical information regarding the state-of-the-art knowledge

14  of asbestos and asbestos-related diseases, which . . . is relevant to what Defendants knew

15  or should have known about asbestos and its hazards." (Castleman Resp. at 1.) Dr.

16  *//*

---

17  [23] Ford additionally argues that Dr. Castleman should be precluded from testifying about
18  the content of any article he reviewed because the underlying articles constitute impermissible
    hearsay. (Ford MTE Castleman at 6.) However, the court notes that pursuant to Rule 703, an
19  expert may disclose otherwise inadmissible underlying facts or data "if their probative value in
    helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Fed. R.
20  Evid. 703. Thus, Rule 703 "permits . . . hearsay, or other inadmissible evidence, upon which an
    expert properly relies, to be admitted to explain the basis of the expert's opinion . . . for the
    limited purpose of explaining the basis for his expert opinion but not as general proof of the truth
21  of the underlying matter." *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1261-62 (9th Cir.
    1984) (internal citations omitted). Plaintiffs acknowledge that none of the articles underlying Dr.
22  Castleman's opinion will be admitted for the truth of the matter. (Castleman Resp. at 11-12.)
    Thus, the court declines to issue a blanket exclusion of all underlying studies.

Castleman will not testify on whether the asbestos literature was in fact correct (*id.* at 6 n.4) or "what any particular [d]efendant knew or should have known at any given time regarding asbestos" (*id.* at 10).

Given these limitations, the court concludes that Dr. Castleman's testimony is admissible under Rule 702 and *Daubert*. In fact, with those limitations, there is little dispute regarding Dr. Castleman's qualifications. The parties agree that Dr. Castleman is qualified to testify about the historic availability of literature on asbestos and the development of that literature. (*See* Ford MTE Castleman at 4 (acknowledging that Dr. Castleman is "certainly qualified to testify as to the existence of articles that discuss the relationship between asbestos dust and mesothelioma"); Warren Pumps MTE at 15 (same); Castleman Resp. at 1.) The parties additionally agree that Dr. Castleman is not qualified to judge the correctness of the medical literature. (Ford MTE Castleman at 4-5; Warren Pumps MTE at 16; Castleman Resp. at 6 n.4.) And lastly, the parties agree that Dr. Castleman does not know what any particular defendant knew about the hazards of asbestos. (Ford MTE Castleman at 5; Warren Pumps MTE at 15; Castleman Resp. at 10.)

Dr. Castleman is undoubtedly qualified to testify about the historical development of knowledge regarding the health hazards of asbestos. He has significant experience in researching the state of the art for asbestos from a historical perspective—indeed, his thesis, now a book in its fifth edition, focuses entirely on that topic. (*See* Castleman Rep. at 1.) Several courts considering Dr. Castleman's qualifications have concluded that he possesses "specialized knowledge" regarding the availability of asbestos literature, which will "assist the jury in understanding the state of the art with respect to asbestos . . . given

the sheer volume of data available on this topic." *Krik v. Crane Co.*, 71 F. Supp. 3d 784, 787 (N.D. Ill. 2014); *see also Waite v. All Acquisition Corp.*, 194 F. Supp. 3d 1298, 1310-11 (S.D. Fla. 2016) (concluding that Dr. Castleman satisfies the "relatively low burden" of being qualified to testify). The court reaches the same conclusion here.

Undeterred, Ford maintains that Plaintiffs' limitations of Dr. Castleman's testimony renders it wholly irrelevant. (Castleman Reply (Dkt. # 591) at 1-2 (asking "why is [Dr. Castleman] going to take up the jury's time").) Although Dr. Castleman will not testify to what any specific defendant knew, his testimony is nonetheless relevant for several reasons. First, Dr. Castleman's research "can serve the purpose of providing context and grounding scientific information integral to the determination of this case." *Waite*, 194 F. Supp. 3d at 1311. Second, under Washington law, "evidence of historical, medical, and scientific knowledge about the dangers of asbestos . . . may be considered by the trier of fact" on both strict liability and negligence claims. *Crittenden v. Fibreboard Corp.*, 794 P.2d 554, 559 (Wash. Ct. App. 1990). Because Plaintiffs bring both negligence and strict liability claims (*see* SAC ¶¶ 49-50), Dr. Castleman's testimony assists the jury in determining what any defendant knew or should have known based on the available literature, *see Crittenden*, 794 P.2d at 559.

Because the court finds Dr. Castleman qualified to testify within the limitations set by Plaintiffs, and because the court further finds that testimony to be relevant, the court denies Ford, Ingersoll Rand, and DCo's motions to exclude Dr. Castleman's testimony.

//

//

**E.      Charles Cushing**

Ford moves to exclude Dr. Cushing's statements regarding Mr. Jack's "likely expos[ure]" to asbestos during automotive work.  (MTE Cushing at 1-2.)  Ford emphasizes that Dr. Cushing is a naval architect with expertise in naval ships and shipyards, not automobiles or the brakes, gaskets, and clutches used in automobiles.  (*Id.* at 4-5.)  Thus, although Dr. Cushing is "plainly qualified to opine on the asbestos-containing products that were likely present on the naval and marine vessels Mr. Jack worked on," Ford maintains that Dr. Cushing "is not qualified to render opinions about the asbestos content of automotive products and asbestos exposure that might occur during automotive repair work."  (*Id.* at 4.)  The court agrees.

An expert must be "qualified . . . by knowledge, skill, experience, training, or education" to render expert opinions.  Fed. R. Evid. 702.  Thus, an expert must be qualified in the field they will testify about.  *See Lucido v. Nestle Purina Petcare Co.*, 217 F. Supp. 3d 1098, 1103 (N.D. Cal. 2016) (concluding that an expert in one field is not qualified to provide opinions about a different field).  Dr. Cushing is undisputely qualified in the construction of naval ships and products that are used on those ships.  (*See* Cushing Rep. at 27.)  However, he does not have any qualifications or experience examining the inner workings of automobiles, the asbestos content of automobile products, or what activities performed on those products would lead to asbestos exposure.  (*See generally id.*)  Thus, the court concludes that Dr. Cushing is not qualified under Rule 702 to opine on Mr. Jack's exposure to asbestos from his automotive work.

//

Viad does not contend otherwise. (*See* Cushing Resp.) Indeed, Viad seemingly concedes that Dr. Cushing has no expertise in automobiles, arguing instead that "Dr. Cushing's opinion that Mr. Jack was exposed to asbestos from brakes is admissible . . . as lay opinion" testimony. (*Id.* at 1.) Federal Rule of Evidence 701 allows lay testimony that is rationally based on the witness's perception, helpful to the trier of fact, and not based on scientific, technical, or specialized information. *See* Fed. R. Evid. 701. In *Lucido*, a veterinarian sought to provide opinions about what a reasonable consumer would consider to be material when purchasing dog food. 217 F. Supp. 3d at 1103. Although the veterinarian had no scientific, technical, or other specialized knowledge in marketing or consumer purchasing behavior, the court concluded that the veterinarian offered admissible lay testimony because she was drawing on particularized knowledge she had by virtue of her position—namely, what her clients have indicated is important. *Id.* Thus, although she was not an expert, she could testify based on her experience to what her clients relayed. *Id.* at 1104.

Mr. Cushing has no analogous experience with automobiles. There is no indication—and Viad provides no evidence—that Mr. Cushing has any experience with automobile work, such that he bases the challenged portion of his testimony on his perception or particularized knowledge. *See id.* at 1103-04. Moreover, asbestos exposure is an issue that requires scientific, technical, and specialized knowledge, as evidenced by the many experts in this case who opine on exposure. (*See, e.g.*, Brodkin Rep.) Because Mr. Cushing's opinion on Mr. Jack's exposure to asbestos from

//

1  automobile products is not rationally based on Mr. Cushing's perception and requires

2  specialized knowledge, the court declines to admit it as a lay opinion.

3        In sum, pursuant to Rule 702, Mr. Cushing is not qualified as an expert to render

4  opinions about exposure during automotive work.  *See* Fed. R. Evid. 702.  The opinion is

5  additionally not a proper lay opinion pursuant to Rule 701.  *See* Fed. R. Evid. 701.

6  Accordingly, the court grants Ford's motion to exclude Mr. Cushing from testifying

7  about Mr. Jack's asbestos exposure during automotive work.

8  **F.    William Longo**

9        Ingersall Rand and DCo make three main arguments to exclude Dr. Longo and the

10 MAS videos simulating the release of dust when working with brakes, gaskets, and

11 insulation:  (1) the studies are irrelevant due to the use of Tyndall lighting (Warren

12 Pumps MTE at 9-10); (2) the studies are irrelevant because they are not substantially

13 similar to the conditions in which Mr. Jack worked with the products (*id.* at 10-12; Longo

14 Reply (Dkt. # 586) at 2-3); and (3) Dr. Longo utilized unreliable scientific methods to

15 measure exposure to asbestos (Warren Pumps MTE at 13-14).  Plaintiffs respond that Dr.

16 Longo and the MAS studies are probative of Mr. Jack's general exposure to asbestos and

17 rely on techniques that are "widely used by industrial hygienists and safety professionals

18 in asbestos monitoring." (Longo Resp. at 2-12.)  At this stage, during which the court is

19 considering only whether the studies are allowable under Rule 702 and *Daubert*, the court

20 agrees with Plaintiffs that the studies pass muster.[24]

21 _____

22 [24] Ingersoll Rand in its reply argues that the videos should be excluded under Rule 403
   because any probative value is substantially outweighed by their prejudicial effect. (Longo

First, as to relevancy, the court reiterates that relevance in the *Daubert* context simply requires that "the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper*, 510 F.3d at 942. That is, as long as the evidence "logically advance[s] a material aspect of the party's case," that evidence is relevant. *Id.* Against this standard, the court concludes that Dr. Longo and the MAS studies will assist the trier of fact in understanding the issue of exposure. The video simulations depict the release of particles from brakes, gaskets, and insulation—products that are at issue here—when a person works with those products, as Mr. Jack did. Such evidence "logically advance[s] a material aspect" of Plaintiffs' case: When Mr. Jack worked with brakes, gaskets, and insulation, the work created visible dust and released asbestos fibers into the air, a fact that is foundational to establishing exposure. *See id.*; *see Lockwood v. AC&S, Inc.*, 744 P.2d 605, 612 (Wash. 1987). The use of Tyndall lighting does not alter the relevancy of those videos to the issue of exposure.

Ingersoll Rand and DCo are correct that tests must be conducted "under conditions substantially similar to the actual conditions" under which Mr. Jack worked. *See Lipson v. ON Marine Servs. Co., LLC*, No. C13-1747TSZ, 2013 WL 6536923, at *2 (W.D. Wash. Dec. 13, 2013) (quoting *Champeau v. Fruehauf Corp.*, 814 F.2d 1271, 1278 (8th Cir. 1987)) (internal quotation marks omitted). However, "dissimilarities between testing conditions and actual conditions 'affect the weight of the evidence, not its admissibility.'"

//

---

Reply at 3-4); *see* Fed. R. Evid. 403. Such an argument is premature, and thus, the court does not reach the Rule 403 issue. Ingersoll Rand may renew its argument in its motions in limine or at trial.

*Id.* (quoting *Champeau*, 814 F.2d at 1278). Thus, whether dissimilarity warrants

exclusion depends on the degree of dissimilarity. *See Barabin*, 2018 WL 840147, at *9.

For instance, in *Krik v. Crane Co.*, the court excluded Dr. Longo's studies because there

was "no relationship between the Longo/[MAS] [v]ideos [and] the facts of [that] case."

71 F. Supp. 3d at 791. Because the studies had "nothing to do with [the plaintiff] at all,"

there was an "insufficient 'fit' between the Longo/MAS Videos and the facts of [that]

case to warrant their use at trial." *Id.*

       But Plaintiffs proffer more than the plaintiff in *Crane Co.* did to illustrate fit. *See*

*id.* Specifically, Mr. Jack viewed the videos and testified that they depicted events

similar to the work he performed. (Jack Dep. at 85:14-87:13.) For instance, Mr. Jack

identified the brake product, the tools used, and the activities performed on the brakes in

the video as similar to the work he did with brakes. (*See id.*) Mr. Jack also characterized

the cleaning of gasket material off of a used valve as "fairly similar" to how he handled

gaskets and valves. (*Id.* at 110:23-111:20.) Thus, unlike in *Crane Co.*, there is some

relationship between the videos and this case; thus, the court concludes that the studies

are not so dissimilar that exclusion is warranted.[25] *See* 71 F. Supp. 3d at 791; *Barabin*,

2018 WL 840147, at *9. Ingersoll Rand and DCo's concerns regarding the differences

go to weight rather than admissibility. *See Lipson*, 2013 WL 6536923, at *2.

//

---

[25] Ingersoll Rand and DCo point to other courts that have found the studies not
sufficiently similar. (Warren Pumps MTE at 11-12; Longo Reply at 5.) Although that precedent
is instructive, the court must consider the record before it. Mr. Jack's deposition testimony
persuades the court that the degree of dissimilarity is not sufficient to warrant exclusion. (*See*
Jack Dep. at 85:14-87:13, 110:23-111:20.)

Lastly, the court finds that Dr. Longo's methodology to measure the quantity of asbestos release is reliable. Defendants do not directly challenge the reliability of the PCM, TEM, or the Tyndall lighting methods that Dr. Longo utilizes to measure asbestos release. (*See* Warren Pumps MTE at 13-14.) Nor would such a challenge succeed, as those techniques are published, peer-reviewed, and standardized protocols that constitute well-established practices in the scientific community. (*See* Longo Aff. ¶¶ 5E, 6D.)

For example, the PCM method is part of the NIOSH 7400 air sampling method, which is OSHA's accepted method of analysis when evaluating occupational exposures. (*See* Longo Adams Decl. ¶ 2, Ex. 4 (attaching an OSHA letter interpreting the PCM method as part of the OSHA/NIOSH 7400 air sampling methodology for measuring asbestos fibers in gasket removal testing).) The EPA and the International Standards Organization ("ISO") have published the TEM method, and Dr. Longo has additionally published the protocol in a peer-reviewed article. (*See* Longo Aff. ¶¶ 3, 5E; Longo Adams Decl. ¶ 2, Ex. 7.) Tyndall lighting is a technique used for many years by industrial hygienists to visualize the pathway of exposure; the EPA developed the technique as a standard testing method, and many published articles recognize the use of the technique.[26] (*See* Longo Aff. ¶¶ 6A, 6D; *see generally* Longo Adams Decl. ¶ 2, Ex.

//

---

[26] Although the court recognizes that Tyndall lighting is an accepted technique within the scientific community such that it is reliable under *Daubert* standards, the court emphasizes that it reaches no conclusion on the prejudicial effect, if any, of the technique. The court acknowledges that many courts have excluded the videos because of its prejudicial effect. (*See* Morgan Decl. (Dkt. # 475) ¶ 13, Ex. 11 (attaching order of exclusion because "the probative value of [the videos] would be substantially outweighed by its prejudicial effect").) The court does not presently reach that issue. *See supra* n.24.

7.)  The court is persuaded that these published methodologies enjoy general acceptance within the relevant scientific community.  *See Daubert*, 509 U.S. at 592-94; *see also Lipson*, 2013 WL 6536923, at *2 (qualifying Dr. Longo's methodologies as reliable).

Ingersoll Rand and DCo focus instead on two other courts that dismissed Dr. Longo's studies as "junk science."  (Warren Pumps MTE at 13-14.)  But neither case explains why the above methodologies are unreliable.  *In re Lamar County Asbestos Litigation* acknowledged that the standards perpetuated by OSHA, EPA, and other agencies "provide reliable source evidence . . . in understanding generally accepted scientific methodologies" but nonetheless summarily concluded that "[t]he MAS tests constitute 'junk science.'"  (Morgan Decl. ¶ 9, Ex. 7 at 1.)  *In re Garlock Sealing Tech., LLC* did not address the PCM or TEM methods at all; instead, the court fixated on typos and other shortcomings in Dr. Longo's expert report, the malfunctioning of Dr. Longo's equipment, and Dr. Longo's use of "tools above their safety ratings."[27]  504 B.R. 71, 79-80 (Bankr. W.D.N.C. 2014).  No such facts are presented here.  (*See* Warren Pumps MTE; Longo Reply.)  Thus, based on the record before it, the court declines to exclude Dr. Longo's studies as unreliable.

Accordingly, the court denies Ingersoll Rand and DCo's motion to exclude Dr. Longo's studies.

---

[27] *In re Garlock Sealing Tech.* characterizes Tyndall lighting as having "no scientific purpose" but does not expound on why that method is unreliable in light of its recognition by various government and professional entities.  *See* 504 B.R. at 79.  This conclusory statement is insufficient for the court to discount the evidence presented by Plaintiffs that Tyndall lighting is an accepted method utilized by industrial hygienists.  (*See* Longo Aff. ¶¶ 6A-6E; Longo Adams Decl. ¶ 2, Ex. 7 (publishing a study utilizing Tyndall lighting).)

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS Ford's motion to exclude Mr. Cushing's testimony on automotive products (Dkt. # 464) and DENIES the other motions to exclude (Dkt. ## 456, 461, 463, 465, 470, 483, 490, 497, 511, 516). The court further DENIES Plaintiffs' motion to extend the discovery deadline (Dkt. # 567) as moot.

Dated this 10th day of August, 2018.

JAMES L. ROBART
United States District Judge