UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| LESLIE JACK, et al., | CASE NO. C17-0537JLR |
| Plaintiffs, | ORDER ON MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| BORG-WARNER MORSE TEC, LLC, et al., | |
| Defendants. | |

## I.    INTRODUCTION

Before the court are seven motions for summary judgment.  Defendants filed the following motions: (1) Defendant Ford Motor Company's ("Ford") motion for partial summary judgment (Ford MSJ (Dkt. # 449)); (2) Defendant Union Pacific Railroad Company's ("Union Pacific") motion for summary judgment (Union Pacific MSJ (Dkt. # 476)); and (3) Defendant Borg-Warner Morse Tec, LLC's ("Borg-Warner") motion for summary judgment (Borg-Warner MSJ (Dkt. # 518)).  Plaintiffs Leslie Jack and David

Jack (collectively, "Plaintiffs") oppose Defendants' summary judgment motions (Pl. Consolidated Resp. (Dkt. # 604); Pl. Resp. Ford (Dkt. # 608); Pl. Resp. Union Pacific (Dkt. # 611); Pl. Resp. Borg-Warner (Dkt. # 613).)

Plaintiffs seek partial summary judgment on certain affirmative defenses asserted by: (1) Defendant DCo, LLC (f/k/a Dana Companies, LLC) ("DCo") (Pl. MSJ DCo (Dkt. # 503)); (2) Ford (Pl. MSJ Ford (Dkt. # 505)); (3) Borg-Warner (Pl. MSJ Borg-Warner (Dkt. # 507)); and (4) Union Pacific (Pl. MSJ Union Pacific (Dkt. # 509)). Defendants oppose Plaintiffs' summary judgment motions (Def. Jt. Resp. (Dkt. # 617); Ford. Resp. (Dkt. # 596); DCo Resp. (Dkt. # 597); Union Pacific Resp. (Dkt. # 607)).

The court has considered the motions, the parties' responses, the parties' replies, the relevant portions of the record, and the applicable law. Being fully advised,[1] the court

---

[1] Ford and Borg-Warner request oral argument on their respective motions. (*See* Ford MSJ at 1; Borg-Warner MSJ at 1.) Plaintiffs request oral argument in opposition to Ford's motion (*see* Pl. Resp. Ford at 1); Union Pacific's motion (*see* Pl. Resp. Union Pacific at 1); and Borg-Warner's motion (Pl. Resp. Borg-Warner at 1). Additionally, Plaintiffs request oral argument on their motions for partial summary judgment as to DCo (*see* Pl. MSJ DCo at 1); Borg-Warner (*see* Pl. MSJ Borg-Warner at 1); Ford (*see* Pl. MSJ Ford at 1); and Union Pacific (*see* Pl. MSJ Union Pacific at 1). All Defendants request oral argument in opposition to Plaintiffs' motions. (*See* Def. Jt. Resp. at 1; Ford Resp. at 1; DCo Resp. at 1; Union Pacific Resp. at 1.) A district court's denial of a request for oral argument on summary judgment does not constitute reversible error in the absence of prejudice. *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (citing *Fernhoff v. Tahoe Reg'l Planning Agency*, 803 F.2d 979, 983 (9th Cir. 1986)). There is no prejudice in refusing to grant oral argument where the parties are represented by counsel and have had ample opportunity to develop their legal and factual arguments through written submissions to the court. *Id.* ("When a party has [had] an adequate opportunity to provide the trial court with evidence and a memorandum of law, there is no prejudice [in refusing to grant oral argument] . . . .") (quoting *Lake at Las Vegas Investors Grp., Inc. v. Pac. Malibu Dev. Corp.*, 933 F.2d 724, 729 (9th Cir. 1991)) (alterations in *Partridge*). The issues in Defendants' and Plaintiffs' motions have been thoroughly briefed by the parties, and the court has determined that oral argument would not be of assistance in deciding any of the motions. *See* Local Rules W.D. Wash. LCR 7(b)(4). Accordingly, the court denies the parties' requests for oral argument.

GRANTS in part and DENIES in part Ford's motion for partial summary judgment (Dkt. # 449), GRANTS Union Pacific's motion for summary judgment (Dkt. # 476), and GRANTS in part and DENIES in part Borg-Warner's motion for summary judgment (Dkt. # 518). The court further GRANTS in part and DENIES in part Plaintiffs' motions for partial summary judgment on the affirmative defenses asserted by DCo (Dkt. # 503), Ford (Dkt. # 505), and Borg-Warner (Dkt. # 507), and DENIES as moot Plaintiffs' motion for partial summary judgment on Union Pacific's affirmative defenses (Dkt. # 509).

## II.    BACKGROUND

This case arises from decedent Patrick Jack's alleged exposure to asbestos-containing products manufactured or supplied by Defendants. (SAC (Dkt. # 253) ¶ 42E.) Plaintiffs claim that as a result of this exposure, Mr. Jack developed mesothelioma, the disease from which he died in October 2017. (*Id.* ¶ 42F; Adams Decl. (Dkt. # 605) ¶ 2, Ex. A (death certificate stating cause of death as "pleural mesothelioma").) Plaintiffs allege that Mr. Jack was exposed to asbestos as a child and a teenager through his father's work at Union Pacific; as a machinist in the Naval Reserve and the Navy from 1955 to 1962; as a machinist and piping inspector at the Puget Sound Naval Shipyard ("PSNS") from 1967 to 1973; as a professional automotive mechanic from 1962 to 1967; and when he performed automotive work on personal vehicles from 1955 to 2001. (SAC ¶ 42; Adams Decl. (Dkt. # 562) ¶ 2, Ex. 2 ("Brodkin Rep.") § 2 at 1-28.)[2] Plaintiffs bring

---

[2] Portions of Dr. Brodkin's report are attached to various parties' briefing. (*See, e.g.*, Fucile Decl. Ford MSJ (Dkt. # 450) ¶ 2, Ex. 9; Ross Decl. Borg-Warner MSJ (Dkt. # 519) ¶ 6,

various product liability claims, including negligence and strict liability claims, and seek compensatory and punitive damages.  (SAC ¶¶ 43-55.)

## A.    Evidence Concerning Union Pacific

Plaintiffs allege that as a child and a teenager, Mr. Jack was exposed to asbestos utilized by Union Pacific, his father's employer.  (*See* SAC ¶ 42B; Pl. MSJ Union Pacific at 3.)  According to Plaintiffs, Mr. Jack was (1) exposed to asbestos dust carried home on his father's clothes and (2) suffered bystander exposure when he accompanied his father to work on several occasions.  (Pl. MSJ Union Pacific at 3.)

Mr. Jack's father was a longtime Union Pacific employee.  From the 1930s to the mid-1940s, Mr. Jack's father worked in Union Pacific's "maintenance department." (Adams Decl. (Dkt. # 612) ¶ 2, Ex. C ("Jack Perp. Dep.") at 18:12:15.)[3]  At some point in the mid-1940s, Mr. Jack's father became a water service foreman for Union Pacific.  (*Id.* at 18:12-16.)  In Mr. Jack's recollection, his father worked at two Union Pacific locations in Seattle:  a South Seattle railroad yard, and the lower level of a Union Pacific passenger depot.  (Brodkin Rep. § 2 at 24; Jack Perp. Dep. at 19:4-25.)

---

Ex. E; Adams Decl. Resp. Union Pacific (Dkt. # 612) ¶ 2, Ex. E.)  The court refers generally to "Brodkin Rep." when citing the report.  Dr. Brodkin divides his report into sections and then numbers the pages within those sections.  (*See* Brodkin Rep. at 2.)  The court cites the section and relevant page numbers.

[3] Portions of Mr. Jack's perpetuation deposition testimony are attached to various parties' briefing.  (*See, e.g.*, Fucile Decl. Ford MSJ (Dkt. # 450) ¶ 2, Ex. 2-3); Moore Decl. Union Pacific MSJ (Dkt. # 477) ¶ 5, Ex. D; Adams Decl. Pl. MSJ DCo. (Dkt. # 504) ¶ 2, Ex. A, H; Adams Decl. Pl. MSJ Borg-Warner (Dkt. # 508) ¶ 2, Ex. H-I; Adams Decl. Pl. MSJ Union Pacific (Dkt. # 510) ¶ 2, Ex. A); Ross Decl. Borg-Warner MSJ (Dkt. # 519) ¶¶ 3, 8, Ex. B, G; Adams Decl. Resp. Ford (Dkt. # 610) ¶ 2, Ex. A-B; Adams Decl. Resp. Borg-Warner (Dkt. # 614) ¶ 2, Ex. A, C; Kero Decl. Def. Jt. Resp. (Dkt. # 618) ¶¶ 7-9, 11, Ex. 6-8, 10.)  The court refers generally to "Jack Perp. Dep." when citing that testimony.

Mr. Jack's mother passed away before Mr. Jack's sixth birthday. (Jack Perp. Dep. at 17:1-2.) After her death, Mr. Jack lived with his grandparents in Portland, Oregon. (*Id.* at 17:10-11, 18:6-9.) Mr. Jack testified that in the time that followed, his father travelled to Portland to visit Mr. Jack and his grandparents "once or twice a month, maybe." (Moore Decl. (Dkt. # 477) ¶ 5, Ex. E ("Jack Disc. Dep.") at 23:10-18.) [4] Mr. Jack recalled that, during those visits, his grandmother would wash his father's work clothes in the basement of his grandparents' home, an area where Mr. Jack frequently played. (Jack Perp Dep. at 33:3-13, 35:11-12.) He remembered that his grandmother would shake out his father's work clothes before washing them, generating dust. (*Id.* at 34:19-25.) Mr. Jack also testified that he would greet his father with a "big hug or something" when he came home from work, and that his father's work clothes were always "dirty." (*Id.* at 32:5-9, 32:12-16.)

In 1946, Mr. Jack moved to Seattle to live with his father, who continued to work for Union Pacific. (Jack Disc. Dep. at 22:11-12.) From approximately 1949 to 1952, Mr. Jack accompanied his father to work "a couple of times a year" for "maybe a couple hours or so" each time. (Jack Perp. Dep. at 18:17-19:1, 182:2-7.) Mr. Jack remembered visiting both the railroad yard and the depot. (*Id.* at 19:4-25; *see also* Brodkin Rep. § 2 at

---

[4] Portions of Mr. Jack's discovery deposition testimony are attached to various parties' briefing. (*See, e.g.*, Fucile Decl. Ford MSJ (Dkt. # 450) ¶ 2, Ex. 4-7; Ross Decl. Borg-Warner MSJ (Dkt. # 519) ¶¶ 4-5, Ex. C-D; Adams Decl. Pl. MSJ DCo (Dkt. # 504) ¶ 2, Ex. E; Adams Decl. Pl. MSJ Ford (Dkt. # 506) ¶ 2, Ex. A, G; Adams Decl. Pl. MSJ Borg-Warner (Dkt. # 508) ¶ 2, Ex. D, J; Adams Decl. Pl. MSJ Union Pacific (Dkt. # 510) ¶ 2, Ex. C; Adams Decl. Resp. Ford (Dkt. # 610) ¶ 2, Ex. D-F; Adams Decl. Resp. Union Pacific (Dkt. # 612) ¶ 2, Ex. G; Adams Decl. Resp. Borg-Warner (Dkt. # 614) ¶ 2, Ex. D, F; Kero Decl. DCo. Resp. (Dkt. # 618) ¶¶ 6, 10, 12-13, Ex. 5, 9, 11-12; Maderra Decl. Borg-Warner Rep. (Dkt. # 633-1) ¶ 2, Ex. A.) The court refers generally to "Jack Disc. Dep." when citing that testimony.

24.)  He testified that most of these visits occurred during the summertime and allowed his father to get him out of the house.  (Jack Disc. Dep. at 179:21-180:1, 182:8-15.)

During those visits, Mr. Jack watched his father and other workers engage in various activities.  Mr. Jack testified that on "a couple or three" occasions, he watched workers cut and fit pipes using hand-held hacksaws and power saws.  (Jack Perp. Dep. at 20:18-21:22, 28:4-8.)  Mr. Jack recalled that in hindsight, the pipes "looked like cement piping to [him], but at that time [he] didn't know."  (*Id.* at 21:3-6.)  Mr. Jack further stated that he observed the pipe work from distances that ranged between 10 and 40 feet, but admitted that he "was all over the place."  (*Id.* at 21:23-22:5.)  Additionally, Mr. Jack testified that he witnessed workers handle "white[,] chalky material."  (*Id.* at 24:4.)  Mr. Jack believed the material "appeared to be insulation, but at that time [he] didn't recognize it as such."  (*Id.* at 23:21-24.)  He estimated that he stood at least 10 feet away as workers wrapped pipes in insulation, and between 10 and 50 feet away as workers removed similar material from old pipes.  (*Id.* at 25:3-7, 26:21-24).  Mr. Jack also remembered watching as workers assembled and disassembled valves.  (*Id.* at 28:21-29:4.)  Mr. Jack testified that these activities generated dust, which he breathed. (*Id.* at 22:6-21, 31:4-12.)

Mr. Jack estimates that he last accompanied his father to work in 1952.  (*Id.* at 18:22.)  Mr. Jack moved out of his father's house in 1955, after graduating from high school.  (Jack Disc. Dep. at 23:23-24:1.)

Plaintiffs furnish no specific, direct evidence that Mr. Jack's father worked with or around asbestos-containing materials at Union Pacific.  Rather, Plaintiffs offer the

testimony of Dr. Brodkin, a physician of environmental and occupational medicine whom Plaintiffs have retained as an expert witness.  (Pl. Resp. Union Pacific at 2-3.)  At his deposition, Dr. Brodkin opined that in light of the period of Mr. Jack's father's employment, as well as Mr. Jack's descriptions of the piping and insulation materials he observed, Mr. Jack's father was likely exposed to asbestos-containing cement and insulation at Union Pacific worksites.  (Adams Decl. (Dkt. # 612) ¶ 2, Ex. F ("Brodkin Dep.") at 140:11-141:13.)[5]  To support his opinion, Dr. Brodkin cited the testimony of an industrial hygienist who, in an unrelated case, documented in the early 1980s asbestos use in the Burlington Northern Santa Fe ("BNSF") Railway system.  (*Id.* at 137:10-139:5.)  The industrial hygienist upon whom Dr. Brodkin relied, however, did not specifically document asbestos use at Union Pacific during this time period.  (*See id.*)

**B.  Evidence Concerning Ford**

Plaintiffs allege that Mr. Jack was exposed to asbestos-containing products sold by Ford, both during his work as a professional mechanic and over decades of personal automotive work.  (*See* SAC ¶ 41D.)  Plaintiffs cite a number of materials, including a deposition by Ford's corporate representative in an unrelated matter, which show that Ford both sold vehicles with asbestos-containing brakes and distributed and sold asbestos-containing brakes and clutches during the years when Mr. Jack performed

---

[5] Portions of Dr. Brodkin's deposition testimony are attached to various parties' briefing.  (*See, e.g.*, Fucile Decl. Ford MSJ (Dkt. # 450) ¶ 2, Ex. 9; Gaston Decl. Brodkin MTE (Dkt. # 486) ¶ 19, Ex. 18; Ross Decl. Brodkin MTE (Dkt. # 517) ¶ 3, Ex. C); Ross Decl. Borg-Warner MSJ (Dkt. # 519) ¶ 7, Ex. F; Adams Decl. Pl. Consolidated Resp. (Dkt. # 605) ¶ 2, Ex. E.)  The court refers generally to "Brodkin Dep." when citing that testimony.

automotive work.  (Adams Decl. (Dkt. # 610) ¶ 2, Ex. G ("Taylor Dep. 2009") at

13:24-16:3; Ex. H ("Ford 1984 Interrog.") at 6:16-8:23;[6] Ex. I ("Ford 1985 EPA

Letter").)  Ford does not challenge the substance or admissibility of these admissions.

(*See generally* Dkt.)  However, Ford disputes the nature, extent, and significance of Mr.

Jack's alleged exposure to asbestos-containing Ford products, as detailed below.

> 1.  Professional Automotive Work

From approximately 1962 to 1964, Mr. Jack was co-owner of an automotive repair

shop in Seattle called Dexter Avenue Auto Repair ("Dexter").  (Jack Perp. Dep.

129:5-130:1.)  During that period, Mr. Jack regularly performed brake and clutch jobs for

Dexter's customers.  (Fucile Decl. (Dkt. # 450) ¶ 2, Ex. 1 at 1.)  From approximately

1964 to 1968, Mr. Jack worked as a part-time mechanic for Apex Mobile Home Towing

("Apex") in Portland, Oregon.  (*Id.*)  There he was responsible for maintaining the

company's two Ford tow trucks.  (*Id.*)

> *a. Dexter*

Plaintiffs assert that while he worked at Dexter, Mr. Jack purchased

asbestos-containing brakes and clutches from Ford dealers and was exposed to asbestos

dust generated by those products.  (Pl. Resp. Ford at 4.)  During his perpetuation

deposition, Mr. Jack testified as follows:

> Q:  Do you remember the brand name or manufacturer of the clutches that
> you worked on at Dexter?
>
> A:  We had Bendix, Wagner, clutches purchased from the Pontiac dealer,
> clutches purchased from mostly the Ford dealer.

---

[6] The court cites the page number at the bottom-center of the document.

Q: What about the brands of brakes?

A: There again, it was Bendix, Wagner. I got a lot of brakes from Pontiac right from their dealer. Some of them Ford.

(Jack Perp. Dep. at 131:12-20.) Additionally, Mr. Jack testified that at Dexter he used an "arc grinder" to grind brakes of various brands. (*Id.* at 132:22-133:3.) Mr. Jack recalled that grinding brakes created significant amounts of dust (Jack Disc. Dep. at 708:15-20), which he breathed (Jack Perp. Dep. at 82:18-83:2).

Ford disputes that Mr. Jack was exposed to respirable asbestos from products sold by Ford in the course of his work at Dexter. A few days after Mr. Jack provided the testimony excerpted above, he testified that he did not recall whether he had ever purchased brakes from a Ford dealer for any Dexter customers. (Jack Disc. Dep. 158:8-12.) Mr. Jack also noted that he purchased clutches from a Ford dealer for only "two or three [Dexter] customers" who had requested that "strictly Ford materials be used in their car." (*Id.* at 155:18-25.) Mr. Jack could recall neither the name of the Ford dealer where he purchased the clutches nor the brand of the clutches he purchased from the Ford dealer. (*Id.* at 156:3-13.) Ford also emphasizes that Mr. Jack testified that while working at Dexter, he did not cut, sand, or otherwise abrade the friction surfaces on new clutches. (*Id.* at 156:15-21.)

*b. Apex Towing*

As a part-time mechanic at Apex, Mr. Jack maintained the company's two Ford tow trucks. Mr. Jack testified that between the two trucks, he performed approximately four or five brake jobs, approximately four to six clutch jobs, and a "couple engine

overhauls." (Jack Perp. Dep. at 152:25-159:24.) Additionally, Mr. Jack inspected the tow trucks' brakes every two or three months. (*Id.* at 162:11-25.) When performing clutch work, Mr. Jack used compressed air to blow the dust out from inside the clutches. (*Id.* at 161:18-162:1.) He testified that this filled the air with dust, which he breathed. (*Id.*) Mr. Jack testified that he also sanded and filed the new brakes, and then used an "air hose to blow them out." (*Id.* at 157:22-158:5.) This process, too, generated dust, which Mr. Jack assumed he breathed. (*Id.* at 158:20-159:1.)

In Mr. Jack's recollection, Apex's owner was "a hardcore Ford man" who "would not buy anything other than Ford products." (*Id.* at 153:4-7.) Mr. Jack believed that the brakes, clutches, and gaskets he removed and installed were purchased primarily from the local Ford dealer, Tonkin Ford. (*Id.* at 153:4-154:8, 161:9-13.) Mr. Jack testified that either he or Apex's owner would go to Tonkin Ford to purchase the brakes, clutches, and gaskets he installed in the tow trucks. (*Id.* at 153:4-154:8.)

2. Personal Automotive Work

Mr. Jack estimated that over the course of several decades, he performed automotive work on "a couple hundred" personal vehicles and vehicles that belonged to family and friends. (Jack Disc. Dep. at 694:11-14.) Plaintiffs assert that Mr. Jack was exposed to Ford's asbestos-containing friction products multiple times during his personal automotive work. (*See* Pl. Resp. Ford at 2.) Ford, on the other hand, identifies just one instance in Mr. Jack's personal automotive work—the removal, in 1986, of two rear drum brake shoes from a 1984 Ford Mustang—when Mr. Jack may have been exposed to asbestos-containing Ford products. (Ford MSJ at 1.)

Taken together, and in a light most favorable to Plaintiffs, the deposition testimonies of Mr. Jack and David Jack suggest that Mr. Jack may have worked with Ford friction products on three occasions.  First, Mr. Jack expressly recalled working with a set of Ford brakes in conjunction with his 1960 and 1962 Pontiac race cars.  (*See* Jack Perp. Dep. at 169:13-18.)  Mr. Jack explained that he performed "three or four" brake jobs on each of his race cars, using an arc grinder and compressed air.  (*Id.* at 169:20-24, 170:8-171:3.)  He suggested that at least one of those jobs involved installing or replacing a set of Ford brakes:

> Q:  What brands of brakes did you use on the '60 and '62 Pontiac?
>
> A:  Well, we had—on the brake side, we would get brakes from Pontiac, Ford, BorgWarner, Wagner.  When I say Ford, there was a set of Ford that worked on the Pontiac, but we didn't like them.

(*Id.* at 169:13-18.)  Second, David Jack testified that at some point in the mid-1980s, he and Mr. Jack performed a "complete rebuild" of a 1964 Ford Ranchero, a project that required replacing the car's "clutch, brakes, steering, [and] suspension." (Adams Decl. Resp. Ford (Dkt. # 610) ¶ 2, Ex. C ("David Jack Dep.") at 102:2-14.)[7]  David Jack recalled that the Ranchero still possessed its "original" parts when he and Mr. Jack "tore everything out from underneath and redid it."  (*Id.* at 102:18-20.)  Third, David Jack testified that he and Mr. Jack performed brake work on a 1984 Ford Mustang the family inherited from David Jack's grandfather in 1984 or 1985.  (*Id.* at 87:7-19.)  According to

---

[7] Plaintiffs attach portions of David Jack's deposition testimony to additional briefing. (*See* Adams Decl. Pl. MSJ Ford (Dkt. # 506) ¶ 2, Ex. B; Adams Decl. Pl. MSJ Borg-Warner (Dkt. # 506) ¶ 2, Ex. B-C; Adams Decl. Resp. Borg-Warner (Dkt. # 614) ¶ 2, Ex. E.)  The court cites generally to "David Jack Dep." when citing that testimony.

David Jack, his grandfather purchased the Mustang new and passed away shortly thereafter; he thus described the Mustang's parts as having been "factory new." (*Id.* at 88:16-20.) David Jack remembers that the Mustang had rear drum brakes and front disc brakes, and he believes his father "did all four." (*Id.* at 133:7-21.)

## C. Evidence Concerning Borg-Warner

Plaintiffs allege that Mr. Jack was exposed to asbestos-containing clutches manufactured by Borg-Warner while employed as a mechanic and while servicing personal vehicles. (*See* SAC ¶ 42D-E; Pl. Resp. Borg-Warner at 2-5.) Plaintiffs provide materials from unrelated cases that show that Borg-Warner's predecessor in interest, Borg-Warner Corporation, sold asbestos-containing clutches into the 1980s (Adams Decl. (Dkt. # 614) ¶ 2, Ex. N at 26:15-27:13), supplied asbestos-containing clutches to Ford for use as original equipment manufacturer parts (*id.* Ex. O at 38:15-18), and sold asbestos-containing clutch assemblies to car manufacturers as replacement parts (*id.* at 38:19-23).

During the discovery portion of his deposition, Mr. Jack testified he that installed several Borg-Warner clutches during his personal and professional automotive work. Mr. Jack testified that he likely installed "ten or more" Borg-Warner clutch discs while working at Dexter. (Jack Disc. Dep. at 166:24-167:8.) Additionally, Mr. Jack estimated that he installed "eight to ten" Borg-Warner clutch discs on personal vehicles and vehicles owned by family and friends. (*Id.* at 713:23-714:3.) Mr. Jack testified that he purchased Borg-Warner clutches from various Ford dealers; he recalled that "[s]ome of the clutches you got out of the Ford dealerships were unmarked outside, but there were

some that were marked with a BorgWarner name, white box." (*Id.* at 714:17-20.) Mr. Jack further stated that he could guarantee that only three of the new clutch discs he purchased from a Ford dealer came in a package marked with a Borg-Warner insignia. (*Id.* at 714:21-715:14.)

With respect to clutch removals, Plaintiffs identify at least three occasions on which Mr. Jack may have removed a Borg-Warner clutch. First, Mr. Jack testified that he believed that in the mid-1950s, he "did a clutch" on his 1946 Chevrolet. (Jack Perp. Dep. at 38:21-40:6.) Plaintiffs provide specifications showing that 1946 Chevrolets featured asbestos-containing Borg & Beck-brand clutches (Adams Decl. (Dkt. # 614) ¶ 2, Ex. G), as well as interrogatories from an unrelated case indicating that Borg-Warner's clutches were sold under the trade name Borg & Beck (*id.* Ex. H at 5).[8] Second, Mr. Jack testified that while working at Dexter, he removed from a customer's vehicle a Borg-Warner clutch he had previously installed. (Jack Disc. Dep. at 168:18-25.) Finally, Mr. Jack testified that he "did three clutch jobs" on his 1962 Pontiac race car, recalling that he "used BorgWarner" clutches "on two of those" jobs. (*Id.* at 713:1-4; *see also* Jack Perp. Dep. at 148:17-24 (recalling that "BorgWarners held up good" on the 1962 Pontiac).) Plaintiffs also furnish specifications from the Automobile Manufacturers Association showing that 1962 Pontiacs featured Borg & Beck asbestos-containing clutches. (Adams Decl. (Dkt. # 614) ¶ 2, Ex. I ("Pontiac Specs.") at 108-109.)[9]

---

[8] The court cites the page number at the bottom-center of the document.

[9] The court cites the page numbers at the lower right-hand corner of the specifications.

Borg-Warner disputes the extent of Mr. Jack's alleged exposure to asbestos-containing Borg-Warner clutches. To begin, Borg-Warner draws attention to Mr. Jack's admission that he never sanded or abraded the face of a new Borg-Warner clutch disc before installing it (Jack Disc. Dep. at 169:4-18), reducing the probability of meaningful asbestos exposure during clutch installations (*see* Borg-Warner MSJ at 8). Borg-Warner also contends that Mr. Jack's testimony shows that he removed just one Borg-Warner clutch throughout his personal and professional automotive work: the clutch he installed, and then removed, while working at Dexter. (*Id.* at 167:10-168:25.) As to the 1946 Chevrolet, Borg-Warner emphasizes that although Mr. Jack alluded to performing clutch work on the vehicle, he never affirmatively claimed to have removed the clutch. (*See* Jack Perp. Dep. at 38:21-40:6.) Indeed, during his discovery deposition, Mr. Jack expressly denied that he had performed any clutch work on the 1946 Chevrolet. (Jack Disc. Dep. at 488:21-25.) Moreover, Borg-Warner asserts that Plaintiffs have no evidence that the clutch disc in the 1946 Chevrolet was the original part, and thus cannot prove that the clutch Mr. Jack handled was manufactured by Borg-Warner. (Borg-Warner Rep. (Dkt. # 633) at 3.) Finally, as to the 1962 Pontiac, Borg-Warner notes that Mr. Jack testified during his discovery deposition that he did not remember whether he ever installed or removed a Borg-Warner clutch disc in connection with the 1962 Pontiac. (Jack Disc. Dep. at 170:6-14.)

**D.    Expert Testimony**

The parties rely on expert witnesses who opine on matters ranging from asbestos exposure to medical causation. The court previously described in detail various experts'

reports and deposition testimonies and ruled on the parties *Daubert* motions.[10]  (*See* 8/10/2018 Order (Dkt. # 628).)  Here the court summarizes only that expert testimony relevant to the instant motions and not previously excluded.

1. <u>Carl Brodkin</u>

Dr. Brodkin recounts Mr. Jack's occupational history, as well as the asbestos-containing products that he worked with in each job.  (Brodkin Rep. § 2 at 1-23.)  For instance, Dr. Brodkin notes that Mr. Jack worked intermittently on automobiles from 1955 to after 2001.  (*Id.* § 2 at 10.)  During this time, Mr. Jack had direct exposure to asbestos fibers from installing, cleaning, and removing brakes.  (*Id.* § 2 at 10-11; *see also id.* § 2 at 13 (qualifying Mr. Jack's exposure during his work with brakes as an identified exposure).)  Dr. Brodkin opines that Mr. Jack also had direct exposure to asbestos when he used compressed air to blow out clutch bell-housings when he removed clutches.  (*Id.* § 2 at 13-14.)  He points to Mr. Jack's specific recollection that he worked with "lots" of Borg-Warner clutches and performed "repeat clutch jobs" at the shop and on personal vehicles.  (*See id.* § 2 at 14.)  Dr. Brodkin qualifies Mr. Jack's removal of clutches as an identified exposure, whereas the installation and regular handling of the clutches only subjected Mr. Jack to de minimis exposure.  (*Id.* § 2 at 15.)

Based on Mr. Jack's occupational history, Dr. Brodkin concludes that Mr. Jack's mesothelioma was "causally related to direct and/or bystander occupational asbestos exposure" from Mr. Jack's time as a naval machinery repairman; a shipyard shop

---

[10] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

machinist and a nuclear inspector at the Shipyard; and an automotive mechanic. (*Id.* § 5 at 1.) Additionally, Dr. Brodkin concludes that Mr. Jack suffered "para-occupational/environmental exposure" to asbestos through his father's work at Union Pacific. (*Id.* § 1 at 2 (noting Mr. Jack's bystander exposure to "probable asbestos cement pipe . . . and pipe-covering insulation . . . with indirect exposure from contaminated clothing brought home for laundering").)

Specifically, as to the exposure during his automotive work, Dr. Brodkin observes that Mr. Jack regularly worked with brakes, clutches, and engine gaskets over his three decades of automotive work, often in an enclosed garage setting. (*Id.* § 5 at 4.) Such work included blowing out brakes with compressed air; grinding, sanding, and filing new brakes in the installation process; cleaning up brakes; and removing clutches with a compressed air blowout. (*Id.*) The literature reveals that these activities release large amounts of asbestos fibers. (*See id.*) Moreover, the products themselves have a high asbestos content. (*Id.*) Thus, Dr. Brodkin describes Mr. Jack's exposure to asbestos through his automobile work as "significant." (*Id.*)

At his deposition, Dr. Brodkin stated that he could not express Mr. Jack's total exposure to asbestos because "there is not a way to quantify Mr. Jack's dose" given that he was "not wearing a dosimeter" at the time of exposure. (Brodkin Dep. at 26:23-27:6, 40:1-7; *see also id.* at 53:5-9 ("When you use the word 'quantitative,' it implies that there is some actual measurement. That's not possible in Mr. Jack's case.").) Indeed, Dr. Brodkin notes that the literature on asbestos exposure does not identify a specific numerical threshold above which there is risk of disease, although various studies provide

a range or exposure that is correlated with increased risk of disease. (*Id.* at 36:13-22, 50:21-24, 161:17-23.)

Instead, Dr. Brodkin utilizes a qualitative approach, where the totality of the evidence—that is, the occupational and environmental history—determines whether an exposure increases the risk of an asbestos-related disease. (*Id.* at 35:5-8, 40:5-7.) Whether an exposure is significant depends on the intensity, the duration, and the frequency of that exposure. (*Id.* at 52:10-21; *see also id.* at 193:15-17 ("My assessment . . . is qualitative in terms of characterizing the duration, frequency, [and] intensity of exposures.").) Dr. Brodkin acknowledges that "[n]ot all exposures are significant." (*Id.* at 34:2-8, 122:15-24; *see also id.* at 45:1-3 ("Just because you have a source of asbestos does not mean it is a significant exposure.").) Rather, he looks for an "identified exposure," which is an exposure "that has a well-characterized source of asbestos, an activity that disrupts that source to generate significant airborne asbestos fibers that have sufficient intensity to overcome the body's defenses, add to the body's burden of asbestos, and, therefore, increase risk for asbestos-related diseases." (*Id.* at 47:2-7.)

### 2. Barry Castleman

Dr. Castleman's expert report reviews medical literature and industry-specific bodies of knowledge on asbestosis and asbestos-related cancers. (Adams Decl. (Dkt. # 564) ¶ 2, Ex. A ("Castleman Rep.") at 2-17.)[11] Specifically, Dr. Castleman recounts

---

[11] The court cites the page number at the bottom-center of the document.

studies in the automotive industry that analyzed asbestos in brakes, clutches, and gaskets, as well as the history of regulations concerning asbestos in brake and clutch work. (*Id.* at 14-15.) Dr. Castleman's report and deposition testimony also address historical awareness of the hazards of take-home exposure to asbestos. According to Dr. Castleman, by the mid-twentieth century, industrial employers had begun to take safeguards to prevent employees from carrying home toxic materials. (*Id.* at 11-12.) However, "[s]tudies on the occurrence of asbestos disease that included family members of asbestos-exposed workers were not published until the 1960s." (*Id.* at 13.) Two key studies, published in 1965 and 1967, "established that mesothelioma was causing deaths among persons with only household (and not occupational) exposure to asbestos." (*Id.*) As of 1955, however, "there was practically nothing in print" that linked secondary asbestos exposure to "household cases of disease." (Moore Decl. Union Pacific MSJ (Dkt. # 477) ¶ 7, Ex. F ("Castleman Dep.") at 19:12-24, 21:22-22:9.)[12]

## E.     Marriage of Mr. Jack and Ms. Jack

Mr. Jack and Ms. Jack wed on August 30, 2016, after Mr. Jack was diagnosed with mesothelioma. (Jack Perp. Dep. at 227:15-23.) By the time they married, Mr. Jack and Ms. Jack had been together for 31 years. (*Id.* at 227:18-20.) At his deposition, Mr. Jack explained their decision to marry:

> Q:  Why did you only get married in 2016?  Sorry it's a personal question, but—

---

[12] Plaintiffs also attach potions of Dr. Castleman's deposition testimony to their briefing. (*See* Adams Decl. Resp. Union Pacific (Dkt. # 612) ¶ 2, Ex. I.)  The court refers generally to "Castleman Dep." when citing that testimony.

A:  I'd come down with this disease, went to the lawyer, filled out wills and powers of attorneys.  The lawyer asked me how long we've been together.  I said, 30 years.  He says, a long engagement.  He said, it would make it a heck of a lot easier if you got married on all this paperwork and everything.

(*Id.* at 227:21-228:4.)  Additionally, Mr. Jack testified that Ms. Jack's health problems, and their wish to facilitate Mr. Jack's ability to make decisions about her medical care, also compelled the couple to marry.  (*Id.* at 228:13-23.)

For her part, Ms. Jack testified that she and Mr. Jack had planned to marry before Mr. Jack was diagnosed with mesothelioma.  (Adams Decl. Pl Consolidated Resp. (Dkt. # 605) ¶ 2, Ex. C ("Leslie Jack Dep.") at 39:10-17.)[13]  In fact, she claimed, the two "filled out or got the [marriage] application in July," before his August diagnosis.  (*Id.* at 39:13-14.)  Ms. Jack stated that "multiple things" influenced their decision to wed, including her own health.  (*Id.* at 39:24-40:6.)  Ms. Jack testified that in approximately 2014, she learned that she was suffering from an abdominal aortic aneurism, a condition for which she underwent surgery in May 2017.  (*Id.* at 40:13-19, 42:14-17.)  She explained that she and Mr. Jack "decided to get married because it would give him more control over my medical records, over—like I say, if something serious happened to me, like if I didn't survive the surgery."  (*Id.* at 40:20-23.)

//

//

//

---

[13] Union Pacific also attaches portions of Ms. Jack's deposition testimony to its briefing.  (*See* Moore Decl. Union Pacific MSJ (Dkt. # 477) ¶ 8, Ex. G.)

# III.    ANALYSIS

## A.    Legal Standard

Summary judgment is appropriate if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

The moving party bears the initial burden of showing there is no genuine dispute of material fact and that it is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of such a dispute in two ways: (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a fact finder could reasonably find in the nonmoving party's favor. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [nonmoving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007)

(internal quotation marks and citation omitted). The court may not weigh evidence or make credibility determinations in analyzing a motion for summary judgment because those are "jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Nevertheless, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). Accordingly, "mere allegation and speculation do not create a factual dispute for purposes of summary judgment," *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996), and "[a] trial court can only consider admissible evidence in ruling on a motion for summary judgment," *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002).

An expert opinion "may defeat summary judgment if it appears the affiant is competent to give an expert opinion and the factual basis for the opinion is stated in the affidavit[.]" *Walton v. U.S. Marshals Serv.*, 476 F.3d 723, 730 (9th Cir. 2007) (internal quotation marks and citation omitted). However, an expert's "conclusory report" is not sufficient to raise a genuine issue of material fact. *Id.* "[I]n the context of a motion for summary judgment, an expert must back up his opinion with specific facts." *United States v. Various Slot Machines on Guam*, 658 F.2d 697, 700 (9th Cir. 1981). "When the expert opinion is not supported by sufficient facts to validate it in the eyes of the law or when indisputable record facts contradict or otherwise render the opinion unreasonable," summary judgment is appropriate. *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d

1421, 1440 (9th Cir. 1995) (quoting *Brook Grp. Ltd v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)).

**B.** **Defendants' Motions for Summary Judgment and Partial Summary Judgment**

Defendants each assert several grounds for summary judgment or partial summary judgment. Applying Washington state law,[14] the court addresses their arguments in turn.

1. Secondary Exposure Claim

Union Pacific moves for summary judgment on Plaintiffs' secondary exposure claim. (Union Pacific MSJ at 1.)[15] Union Pacific argues that even assuming that Mr. Jack breathed asbestos dust his father carried home from work,[16] no reasonable juror

---

[14] Because federal jurisdiction is based on the diversity of the parties, the court must apply Washington choice of law rules. *See Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002). Under Washington law, absent an actual conflict with the laws and interests of another state, Washington law presumptively applies. *See Burnside v. Simpson Paper Co.*, 864 P.2d 937, 941 (Wash. 1994). No party has raised any such conflict, and no party has argued that any law other than Washington law governs Plaintiffs' claims. (*See generally* Dkt.) Accordingly, the court applies Washington substantive law.

[15] Alongside its reply, Union Pacific filed nine pages of evidentiary objections to several exhibits and deposition testimony cited in Plaintiffs' response. (*See* Union Pacific Rep. (Dkt. # 634); Union Pacific Ev. Obj. (Dkt. # 632).) Plaintiffs then filed a surreply in which they moved to strike Union Pacific's evidentiary objections as a violation of Local Rule 7(g). (Pl. Sur. (Dkt. # 647).) The court finds the challenged portions of Plaintiffs' response do not alter the court's determination of the merits of Union Pacific's summary judgment motion. Accordingly, for purposes of this order, the court denies as moot Union Pacific's evidentiary objections. At the same time, the court cautions Union Pacific that under Local Rule 7(g), "[r]equests to strike material contained in or attached to submissions of opposing parties shall not be presented in a separate motion to strike, but shall instead be included in the responsive brief, and will be considered with the underlying motion." Local Rules W.D. Wash. LCR (7)(g).

[16] For purposes of assessing whether Plaintiffs' secondary exposure claim against Union Pacific may survive as a matter of law, the court assumes that Mr. Jack's father worked with asbestos on Union Pacific premises. As detailed below, Union Pacific disputes that Mr. Jack's father was in fact exposed to asbestos-containing products as a result of its conduct. (*See infra* § III.B.2.a.)

could find that in and before 1955 Union Pacific knew or should have known of the risks that secondary asbestos exposure posed to employees' family members. (*Id*.)

Under Washington law, take-home asbestos exposure claims are cognizable under a negligence theory of liability.[17] *See Arnold v. Saberhagen Holdings, Inc.*, 240 P.3d 162, 169 (Wash. Ct. App. 2010); *Rochon v. Saberhagen Holdings, Inc.*, No. 58579-7-I, 2007 WL 2325214, at *2-3 (Wash. Ct. App. Aug. 13, 2007). The existence of a legal duty is an issue of law to be decided by the court, *Folsom v. Burger King*, 958 P.2d 301, 308 (Wash. 1998), and generally includes a determination of whether the harm was "foreseeable," *Rochon*, 2007 WL 2325214, at *1. A harm is foreseeable if the defendant knew or should have anticipated an unreasonable risk of danger to the plaintiff. *See, e.g.*, *Lockwood v. AC & S*, 722 P.2d 826, 847-48 (Wash. Ct. App. 1986), *aff'd*, 744 P.2d 605 (Wash. 1987).

Union Pacific argues that the risk of developing mesothelioma from secondary asbestos exposure was not foreseeable before 1955, the last year when Mr. Jack could have been exposed to Union Pacific-attributable asbestos at home. (Union Pacific MSJ at 17.) Union Pacific emphasizes that Dr. Castleman, Plaintiffs' expert, expressly acknowledged that before the mid-1960s, there were no published studies linking secondary asbestos exposure with the onset of asbestos disease. (*See* Castleman Dep. at

---

[17] Washington courts also recognize that take-home exposure plaintiffs may recover against "manufacturers and sellers" of asbestos-containing products on a strict liability theory. *See Lunsford v. Saberhagen Holdings, Inc.*, 106 P.3d 808, 812-13 (Wash. Ct. App. 2005). Plaintiffs do not allege that Union Pacific manufactured or sold asbestos products. (*See generally* SAC; Pl. Resp. Union Pacific.)

19:19-21.)  Additionally, Union Pacific urges the court to follow *Hoyt v. Lockheed Shipbuilding Co.*, C12-1648TSZ, 2013 WL 3270371, at *7 (W.D. Wash. Jun. 26, 2013), *aff'd sub nom. Hoyt v. Lockheed Martin Corp.*, 540 F. App'x 590 (9th Cir. 2013), in which the court expressly held "that the risk of danger from 'take home' asbestos exposure . . . was not foreseeable in the 1950s."

Plaintiffs respond that under Washington law, harm is foreseeable if "the risk from which it results was known or in the exercise of reasonable care should have been known," even if the particular harm at issue was not.  (Pl. Resp. Union Pacific at 6 (quoting *Travis v. Bohannon*, 115 P.3d 342, 346 (Wash. Ct. App. 2005)).)  During the relevant period of Mr. Jack's father's employment, Plaintiffs argue, "it was foreseeable to a premises owner and employer like Union Pacific that a family member could contract an illness from take-home exposure to poisons, toxins, and chemicals in the work environment, which would naturally include asbestos."  (Pl. Resp. Union Pacific at 5.) Plaintiffs excerpt sections of Dr. Castleman's testimony suggesting that as early as 1913, some industrial employers were aware that hazardous materials could cling to employees' work clothes and contaminate their homes.  (Pl. Resp. Union Pacific at 6 (citing Castleman Dep. at 19:21-21:16).)  Plaintiffs also emphasize Dr. Castleman's testimony on the writings of Dr. Wilhelm Hueper, a leading authority on occupational cancer who "in the 1950s" encouraged employers to "take protective measures to prevent . . . carcinogenic materials from going home" and "warned that the air pollution from asbestos factories could cause cases of cancer in the neighbors."  (*Id.* at 22:8-21.)

//

As Dr. Castleman concedes in his deposition, if in 1955 Union Pacific wanted to research the hazards of secondary exposure, it would have found "practically nothing in print." (Castleman Dep. at 19:20.) Dr. Castleman's report, too, makes clear that "[s]tudies on the occurrence of asbestos disease that included family members of asbestos-exposed workers were not published until the 1960s." (Castleman Rep. at 13.) According to Dr. Castleman, one of the first major studies on asbestos disease that included family members of asbestos-exposed workers was published in 1965—ten years after Mr. Jack last could have breathed asbestos dust in his father's home. (Castleman Rep. at 13.) At most, Plaintiffs' evidence suggests that by the 1950s, public health authorities possessed some awareness of the health risks posed by asbestos exposure. (Pl. Resp. Union Pacific at 7; Castleman Rep. at 6-9.) But that understanding centered on asbestos-exposed workers and people who lived in close proximity to asbestos emissions, not workers' family members. (Castleman Dep. at 22:7-21; Castleman Rep. at 11-12.) In short, there is no evidence in the record to charge Union Pacific with constructive knowledge of the dangers of take-home exposure to its employees' families during the relevant time period in and before 1955.

Plaintiffs identify no case, in Washington or elsewhere, that holds that the risks of secondary asbestos exposure were foreseeable in the 1950s. Indeed, the decisions of other courts favor the opposite conclusion. *See, e.g.*, *Hoyt*, 2013 WL 3270371, at *6 ("This Court conducted an independent review of the case law, and found no case in which a court has concluded that the risk of 'take home' exposure was foreseeable in the 1950s."); *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 444-45 (6th Cir. 2009)

1 (holding that "[w]ithout any published studies or any evidence of industry knowledge of

2 bystander exposure there is nothing that would justify charging [defendant]" with

3 knowledge of the risks of take-home exposure between 1951 and 1963).

4     Plaintiffs suggest that to survive summary judgment, they need not demonstrate

5 that in and before 1955 Union Pacific knew or should have known that take-home

6 asbestos exposure causes disease; rather, they argue, it is enough to show that Union

7 Pacific should have been aware of the hazards of asbestos exposure generally and should

8 have foreseen that its employees were carrying asbestos fibers home. (Pl. Resp. Union

9 Pacific at 6.) The court finds that argument unavailing. It more or less suggests that

10 Union Pacific should be charged with knowledge of the risks of take-home exposure at a

11 time when scientists and public health experts had not yet drawn causal links between

12 workers' direct exposure and family members' illnesses. That logic stretches the concept

13 of foreseeability too far, and does not accord with weight of existing law. *See Hoyt*, 2013

14 WL 3270371, at *6. Viewing the evidence in the light most favorable to Plaintiffs, and

15 drawing all reasonable inferences in Plaintiffs' favor, the court concludes that no

16 reasonable juror could find that in and before 1955, Union Pacific knew or should have

17 known of the risks that secondary asbestos exposure posed to its employees' family

18 members. Accordingly, the court grants Union Pacific's motion for summary judgment

19 on Plaintiffs' take-home exposure claim.

20     2. <u>Exposure and Causation</u>

21     Union Pacific, Ford, and Borg-Warner seek summary judgment on grounds related

22 to Plaintiffs' ability to show that Mr. Jack was exposed to Defendants'

asbestos-containing products and that such exposure actually caused Mr. Jack's mesothelioma. The court begins by stating Washington law on exposure and causation in asbestos suits. It then addresses each Defendant's motion in turn.

To prevail on a product liability theory under Washington law, "the plaintiff must establish a reasonable connection between the injury, the product causing the injury, and the manufacturer of the product." *Lockwood v. AC & S, Inc.*, 744 P.2d 605, 612 (Wash. 1987). "This does not mean, however, that a plaintiff . . . must personally identify the manufacturers of asbestos products to which he was exposed in order to recover from those manufacturers." *Id.* Rather, "[p]laintiffs in asbestos cases may rely on circumstantial evidence that the manufacturer's products were the source of their asbestos exposure." *Van Hout v. Celotex Corp.*, 853 P.2d 908, 913 (Wash. 1993). In *Lockwood*, for example, although there was "no direct evidence that [the plaintiff] worked with or near [the defendant's product]," 744 P.2d at 611, the court held that "it would be reasonable for a factfinder to infer that he was exposed to [the defendant's] product," *id.* at 612. First, witness testimony established that the defendant's product was used on the ship where the plaintiff worked. *Id.* Second, expert testimony showed that the asbestos on the vessel drifted in the air and could be inhaled by bystanders. *Id.* The court concluded that "the evidence . . . presented creates a reasonable inference that [the plaintiff] was exposed to [the defendant's] product." *Id.* at 613.

In suits implicating multiple sources of asbestos, Washington courts commonly apply the "substantial factor" test to determine whether exposure to a particular defendant's asbestos products proximately caused the plaintiff's illness. *Mavroudis v.*

*Pittsburg-Corning Corp.*, 935 P.2d 684, 687-89 (Wash. Ct. App. 1997) (noting that "substantial factor causation instructions are commonly given in asbestos-injury cases tried in Washington"); *see also Lockwood*, 744 P.2d at 623 (instructing jury in asbestos case on the substantial factor causation test). The Washington Supreme Court has identified several factors a trial court should consider when determining whether there is sufficient evidence for a jury to find that exposure to a particular defendant's products caused the plaintiff's injury. *Lockwood*, 744 P.2d at 613. Those factors include: (1) the "plaintiff's proximity to the asbestos product when the exposure occurred"; (2) "the expanse of the work site where asbestos fibers were released"; (3) "the extent of time that the plaintiff was exposed to the product"; (4) "the types of asbestos products to which the plaintiff was exposed"; (5) "the ways in which such products were handled and used"; and (6) "the evidence presented as to medical causation of the plaintiff's particular disease." *Id.*

### a. Union Pacific

In moving for summary judgment on Plaintiffs' bystander exposure claims, Union Pacific argues that Plaintiffs cannot satisfy their burden to prove that Mr. Jack's mesothelioma was proximately caused by asbestos products attributable to Union Pacific. (Union Pacific MSJ at 10.) Specifically, Union Pacific both disputes that Plaintiffs can show that Mr. Jack was actually exposed to asbestos on Union Pacific premises and maintains that "Plaintiffs cannot establish that this alleged exposure was a substantial contributing factor to his disease." (*Id.*)

//

Plaintiffs seek to establish that Mr. Jack suffered bystander exposure on Union Pacific premises on the basis of Mr. Jack's testimony and Dr. Brodkin's testimony and expert report. (*See* Pl. Resp. at 2-3.) Mr. Jack testified that approximately six to eight times between 1949 and 1952, he watched Union Pacific workers handle piping, valves, and insulation from distances that ranged from 10 to 50 feet. (*See supra* § II.A.) According to Dr. Brodkin, in light of Mr. Jack's descriptions of those materials and the period of his visits, it was "likely" the piping and insulation contained asbestos. (Brodkin Dep. at 140:11-141:13.) To support that assertion, Dr. Brodkin cited a survey, produced in the early 1980s, on the use of asbestos-containing materials—including cement pipes and insulation—in the BNSF Railway system. (*Id.* at 137:10-18.) As Dr. Brodkin conceded, however, that survey informed his "understanding [of] the exposure setting generally, not in terms of a specific building that Mr. Jack or his father would have been in." (*Id.* at 139:6-8.)

The court concludes that this evidence does not reasonably support the inference that Mr. Jack was actually exposed to asbestos on Union Pacific premises. Plaintiffs fail to adduce facts that locate any asbestos-containing products at any Union Pacific workplace at any point in Mr. Jack's lifetime—much less in Seattle between 1949 and 1952. Indeed, Plaintiffs' exposure evidence rests in large part on a survey of a different railroad system, conducted for purposes of a different lawsuit, decades after Mr. Jack visited Union Pacific worksites. (*See* Brodkin Dep. at 137:10-18.) Plaintiffs provide no witness testimony placing asbestos on Union Pacific premises, *see Lockwood*, 744 P.2d at 612 ("[A] plaintiff may rely on the testimony of witnesses who identify manufacturers of

1   asbestos products which were then present at his workplace."); nor sales records showing

2   that Union Pacific ever purchased asbestos-containing materials, *see Allen v. Asbestos*

3   *Corp., Ltd.*, 157 P.3d 406, 410 (Wash. Ct. App. 2011) ("[T]he sales records establish that

4   large quantities of [asbestos products] were ordered by the shipyard over multiple

5   years."); nor the testimony of Mr. Jack's father's coworkers on their working conditions,

6   *see O'Brien v. Nat'l Gypsum Co.*, 944 F.2d 69, 71 (2d Cir. 1991). Absent any evidence

7   of this type, Plaintiffs fail to satisfy *Lockwood*'s requirement that they establish a

8   "reasonable connection" between Mr. Jack's injury and Union Pacific's conduct.

9   *Lockwood*, 744 P.2d at 612.[18] Accordingly, the court grants Union Pacific's motion for

10  summary judgment on Plaintiffs' bystander exposure claim.

11  //

12  //

13

---

14  [18] Furthermore, exercising its gatekeeping role, *see Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014), the court finds that Dr. Brodkin's opinion lacks foundation sufficient to ensure its reliability under Federal Rule of Evidence 702. *See, e.g.*, *In re Silberkraus*, 336 F.3d 864, 870-71 (9th Cir. 2003) (court properly "discounted" significance of expert's conclusions where those conclusions were "not independently verified" and were not supported by sufficient facts); *see also Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22-23 (2d Cir. 1996) (excluding expert testimony under Rule 702 because expert's "projections . . . were without factual basis" and rested on "unsupported assumption"). A court may raise *sua sponte* the reliability of expert testimony. *See Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998) ("We have not required that the *Daubert* inquiry take any specific form and have, in fact, upheld a judge's *sua sponte* consideration of the admissibility of expert testimony."). The same finding extends to the report of Dr. Andrew Churg, Ford's expert, which concludes that Mr. Jack's mesothelioma was related to "his father's work at Union Pacific." (Fucile Dep. (Dkt. # 288) Ex. 1 at 3.) Dr. Churg's opinion on this point is unsupported by specific facts or data, and comes in the form of a conclusory assertion not appropriate for consideration at summary judgment. *See Timeline, Inc. v. Proclarity Corp.*, C05-1013JLR, 2007 WL 1574069, at *8 ("[A]n expert's 'conclusory report' is not sufficient to raise a genuine issue of material fact.") (quoting *Walton*, 476 F.3d at 730)).

*b. Ford*

Ford moves for partial summary judgment on the ground that Plaintiffs lack

evidence to put before the jury certain incidents of alleged asbestos exposure involving

Ford products.  (*See* Ford MSJ.)  Specifically, Ford argues that the court should allow

only the following claims to proceed to trial:  (1) Mr. Jack's "removal and replacement of

brakes, clutches and gaskets on two Ford trucks at Apex Mobile Home Towing from

1964 to 1968"; and (2) Mr. Jack's "removal of two rear drum brake shoes from a 1984

Ford Mustang in 1986." (*Id.* at 1.)  In response, Plaintiffs allege that four additional

sources of exposure involving Ford products pose issues for trial:  (1) Mr. Jack's

automotive work at Dexter; (2) Mr. Jack's handling of Ford brakes in connection with his

Pontiac race car; (3) Mr. Jack's 1986 overhaul of a 1964 Ranchero; and (4) Mr. Jack's

replacement of the front disc brakes on a 1984 Ford Mustang.  (Pl. Resp. Ford.)  The

court considers each of these four latter exposures in turn.

i.     Dexter

The parties' submissions identify two possible sources of asbestos exposure at

Dexter for which Ford bears potential liability:  clutches and brakes.[19]  In his perpetuation

deposition, Mr. Jack identified "clutches purchased from . . . the Ford dealer" as among

the various brands he handled at Dexter.  (Jack Perp. Dep. at 131:12-16.)  A few days

later, in additional deposition testimony, Mr. Jack stated that he purchased clutches from

[19] There is no evidence that Mr. Jack sustained asbestos exposure from Ford gaskets at Dexter.  Mr. Jack recalled only that he worked with Victor and Fel-Pro gaskets.  (Jack Perp. Dep. 133:13-17.)

an unnamed Ford dealer for just "two or three" Dexter customers. (Jack Disc. Dep. at 155:18-25.) Mr. Jack unequivocally testified that when installing the clutches he had purchased from the Ford dealer, he did not cut, sand, or otherwise abrade their friction surfaces. (*Id.* at 156:15-21.) Plaintiffs do not contend that Mr. Jack ever removed a Ford clutch at Dexter. (*See generally* Pl. Resp. Ford.)

Viewing this evidence in the light most favorable to Plaintiffs, Mr. Jack installed at least three Ford clutches at Dexter.[20] The court finds that Plaintiffs provide no evidence that any of these installations resulted, or could have resulted, in potentially causally significant asbestos exposure, however. In Dr. Brodkin's opinion, Mr. Jack sustained only "[d]e minimus" asbestos exposure when installing and handling asbestos-containing clutches; the real exposure risks lay in clutch removal. (Brodkin Rep. § 2 at 15; *see also* Brodkin Dep. at 44:8-14 (opining that installation of a clutch results in "de minimus [exposure] because it's not . . . an activity that would significantly disrupt the material.").) According to Dr. Brodkin, a de minimus exposure—in contrast to an identified exposure—"does not increase risk for disease in terms of any demonstrated scientific evidence." (Brodkin Dep. at 42:15-21.) For that reason, Dr. Brodkin does not consider clutch installations to be "biologically significant" events. (*Id.* at 113:14-22.)

---

[20] Mr. Jack testified that he could not identify the manufacturer of the clutches he purchased from the Ford dealer. (Jack Disc. Dep. at 156:9-13.) Given his testimony that the above-mentioned two or three Dexter customers requested that "strictly Ford materials be used in their car," the court assumes for purposes of Ford's motion that the clutches Mr. Jack purchased were manufactured by Ford. (*Id.* at 155:18-25.)

Plaintiffs do not contest Dr. Brodkin's opinion on the de minimus impact of clutch installations.  (*See generally* Pl. Resp. Ford.)  Nor do Plaintiffs provide other evidence that could show that Mr. Jack's installations of Ford clutches at Dexter increased his risk of disease in any way (*see id.*), a threshold they must clear to establish that disputes of fact remain for trial (*see* 8/10/2018 Order at 23-25 (rejecting "every exposure" theory of causation)); *Barabin v. Scapa Dryer Fabrics, Inc.*, C07-1454JLR, 2018 WL 840147, at *11-13 (W.D. Wash. Feb. 12, 2018) (same).  In view of Dr. Brodkin's opinion on the de minimus impact of clutch installations, Mr. Jack's testimony that he never abraded Ford clutches at Dexter, and the absence of evidence that Mr. Jack ever removed a Ford clutch at Dexter, the court finds that no reasonable factfinder could conclude that Mr. Jack sustained causally significant exposure when working with Ford clutches at Dexter.  Accordingly, Ford is entitled to partial summary judgment on the issue of Mr. Jack's installation of Ford clutches at Dexter.

In contrast, the court finds that issues of material fact remain with respect to Mr. Jack's alleged asbestos exposure from Ford brakes.  Mr. Jack testified that during his work at Dexter, he used an "arc grinder" to grind brakes of various brands inside a garage setting.  (Jack Perp. Dep. at 132:22-133:3.)  Specifically, Mr. Jack explained that he used the arc grinder to grind the "actual fibrous-type material" on new brake shoes, a process that generated "dusty and dirty" air.  (*Id.* at 82:14-83:2.)  When Plaintiffs' counsel asked Mr. Jack to identify the brands of brakes he worked on at Dexter, Mr. Jack testified that "[s]ome of them [were] Ford."  (*Id.* at 131:17-20.)  When Plaintiffs' counsel asked Mr. Jack if he used the arc grinder "on the brands of brakes that you've told us about," Mr.

Jack replied, "Yes, sir." (*Id.* at 132:24-133:3.) Mr. Jack's testimony is sufficient to support a reasonable inference that he ground Ford brakes at Dexter, sustaining in the process an identified asbestos exposure. (*See* Brodkin Rep. § 2 at 13 (characterizing "new brake install-grinding" of asbestos-containing brakes as an "identified exposure").)

Ford points out that Mr. Jack never specifically stated that he ground Ford brakes at Dexter. (Ford MSJ at 3-4.) In fact, Ford emphasizes, Mr. Jack testified that he did not recall whether he had ever purchased brakes from a Ford dealer for any of Dexter's customers. (Jack Disc. Dep. at 158:9-12.) Additionally, Mr. Jack testified that he had no recollection of the brand names of any brake components he may have removed at Dexter. (*Id.* at 463:12-464:1.) The court finds that these points implicate the credibility or weight of Mr. Jack's testimony, which cannot be assessed at summary judgment. *See Anderson*, 477 U.S. at 255. Thus, the court concludes that Plaintiffs' evidence that Mr. Jack was exposed to Ford-attributable asbestos when performing brake work at Dexter is sufficient to withstand summary judgment. *See Morgan v. Aurora Pump Co.*, 248 P.3d 1052, 1056 (Wash. Ct. App. 2011) ("[Plaintiffs] need not offer a detailed recollection of facts surrounding the exposure to the asbestos-containing product.").

### ii.    1984 Ford Mustang

The parties agree that there are disputes of material fact concerning Mr. Jack's removal of a 1984 Ford Mustang's two rear drum brake shoes in 1986. (*See* Ford MSJ at 1; Pl. Resp. Ford at 3.) Although Ford argues that only the rear drum brakes present issues for trial, Plaintiffs assert that "the evidence raises genuine issues of material fact regarding Mr. Jack's exposure to Ford's products . . . while working on all brakes from a

1984 Ford Mustang." (Pl. Resp. Ford at 7.) Plaintiffs point to the testimony of David

Jack, who stated that Mr. Jack removed the Mustang's front disc brakes in addition to the

rear drum brakes and described all of the Mustang's parts as having been "factory new."

(David Jack Dep. at 87:7-88:23, 133:7-13.)

Viewing the record in the light most favorable to Plaintiffs, the court finds that

Plaintiffs provide sufficient evidence to survive summary judgment on the issue of the

Mustang's front disc brakes. Plaintiffs provide Ford sales data, dated 1987, which show

that just 34 percent of the passenger cars sold in 1984 contained asbestos-free disc

brakes. (Adams Decl. (Dkt. # 610) ¶ 2, Ex. J at 92.)[21] David Jack's testimony supports a

reasonable inference that the Mustang still contained its original parts when Mr. Jack

removed its front and rear brakes. On the basis of this evidence, a reasonable juror could

conclude that Mr. Jack may have sustained some degree of asbestos exposure when

removing the Mustang's front disk brakes. Accordingly, partial summary judgment on

the issue of the front disc brakes is not appropriate.

iii.    Pontiac Race Car and 1964 Ford Ranchero

Plaintiffs argue that Mr. Jack suffered asbestos exposure from Ford products in

connection with two other personal vehicles: a Pontiac race car and a 1964 Ford

Ranchero. (Pl. Resp. Ford at 3-4.) Ford contends that Plaintiffs fail to establish exposure

with respect to both vehicles. (Ford Rep. (Dkt. # 629) at 4-6.)

//

---

[21] The court cites the page number at the lower right-hand corner of the document.

Mr. Jack testified that on at least one occasion, he used a set of Ford brakes on one of his Pontiac race cars. (Jack Perp. Dep. at 169:13-18.) From the record, it is not clear whether Mr. Jack installed or removed—or installed and removed—the Ford brakes on the Pontiac. (*See id.*) However, Dr. Brodkin's report identifies Ford brakes as among those brands "installed . . . on [Mr. Jack's] Pontiac drag racers between 1960-1966," and states that Mr. Jack "grinded" those brakes. (Brodkin Rep. § 2 at 12.) Additionally, Plaintiffs provide materials that indicate that any Ford brakes Mr. Jack purchased in the 1960s would have contained asbestos. (Ford 1984 Interrog. at 8:10-12 (Ford answers to interrogatories in unrelated case showing that before at least 1984, after-market or replacement brake linings sold by Ford "always contained asbestos").) Based on this evidence, a juror could reasonably find that Mr. Jack sustained asbestos exposure when installing Ford brakes on his Pontiac race car.

Ford disputes that a reasonable factfinder could conclude that Mr. Jack ever used Ford brakes on his Pontiac race car. (*See* Ford Rep. at 4-5.) Ford first emphasizes that Mr. Jack testified that he did not recall purchasing clutches or brakes from a Ford dealer for his personal automotive work. (Jack Disc. Dep. at 154:3-14.) Additionally, Ford draws attention to Mr. Jack's admission that he could not affirmatively identify a single manufacturer or supplier of the friction materials to which he was exposed in connection with his brake work. (*Id.* at 561:24-562:18.) These statements may well undercut Plaintiffs' ability to prove at trial that Mr. Jack encountered Ford asbestos products when performing brake work on the Pontiac, but they are not conclusive against Plaintiffs at summary judgment. *See Anderson*, 477 U.S. at 255.

As to the 1964 Ford Ranchero, Plaintiffs rely entirely on the testimony of Mr. Jack's son, David Jack. David Jack testified that in approximately 1986, he and Mr. Jack purchased a used 1964 Ford Ranchero. (David Jack Dep. at 102:2-11.) According to David Jack, he and Mr. Jack performed a "complete rebuild" of the Ranchero soon after they purchased it, including clutch and brake replacements. (*Id.* at 102:13.) Recalling the Ranchero's "well used and well loved" condition, David Jack claimed that the vehicle still contained its "factory" parts—that is, original manufacturer equipment. (*Id.* at 105:9-13.)[22] Plaintiffs' evidence shows that like any Ford car manufactured in the 1960s, the Ranchero would have gone to market with asbestos-containing brakes. (Taylor Dep. 2009 at 13:24-16:3; Ford 1984 Interrog. at 8:10-12.) As Ford points out, Dr. Brodkin's report is silent on the Ranchero. (Ford Rep. at 5; *see generally* Brodkin Rep.) If David Jack's testimony is believed, however, the jury could reasonably infer that the Ranchero contained its original parts when he and Mr. Jack rebuilt it in 1986, and that Mr. Jack sustained some degree of asbestos exposure as a result of removing the clutch and brakes.

//

//

---

[22] Ford argues that "Plaintiffs provided absolutely no admissible evidence to support David Jack's speculation that any work his father may have done on this used vehicle purchased in 1986 with 160,000 miles involved the removal of Ford OEM [original equipment manufacturer] parts." (Ford Rep. (Dkt. # 629) at 6-7.) However, Ford makes no specific evidentiary objections in its motion or reply. (*See* Ford MSJ; Ford Rep. (Dkt. # 629).) Additionally, Ford made no objections on the record during David Jack's deposition testimony on the Ranchero. (*See* David Jack Dep. at 102:2-105:13.) A party waives certain objections, such as to the form of questions or answers or to other errors that might be obviated, removed, or cured if promptly presented, by failing to make the objection at the deposition. *See* Fed. R. Civ. P. 32(d)(3)(B).

Ford is free to interrogate at trial the causal significance—or insignificance—of Mr. Jack's overhaul of the Ranchero.[23]

In sum, the court concludes that Plaintiffs raise triable issues of fact as to whether Mr. Jack was exposed to asbestos from Ford products when performing brake work at Dexter and on his Pontiac race car; when removing the front disc brakes and rear drum brakes from the 1984 Mustang; and when overhauling the 1964 Ranchero. The court grants partial summary judgment to Ford with respect to Mr. Jack's work with Ford clutches at Dexter.

### c. Borg-Warner

Borg-Warner moves for summary judgment on two grounds: (1) Plaintiffs cannot show that Mr. Jack was exposed to asbestos through Borg-Warner products, and (2) even if Mr. Jack's use of Borg-Warner products exposed him to asbestos, that exposure was not a substantial factor in causing his disease. (Borg-Warner MSJ at 1.)

### i. Exposure

The parties' submissions discuss three sources of Mr. Jack's alleged exposure to Borg-Warner-attributable asbestos: (1) Mr. Jack's installations of Borg-Warner clutches, (2) removals of Borg-Warner clutches, and (3) use of Borg-Warner brakes on his Pontiac

//

---

[23] In its reply, Ford obliquely raises a causation defense only with respect to Mr. Jack's work on the 1964 Ranchero. (*See* Ford Rep. at 5 ("Plaintiffs made no effort in their Response to supplement Dr. Brodkin's Report to create a triable issue on whether this work caused Mr. Jack's disease.").) Ford failed to assert a causation defense in its motion, however. (*See* Ford MSJ.) The court need not consider arguments introduced for the first time in a reply brief. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

race cars. Unhelpfully, Plaintiffs' response to Borg-Warner's motion, counsels' deposition questions, and Mr. Jack's testimony often refer to "clutch work" and "clutch jobs" generally, rather than the specific categories of exposure listed above. (*See, e.g.*, Pl. Resp. at 3; Jack Disc. Dep. at 716:22-23 ("Well, I did a lot of clutch work in the shop that I knew we used BorgWarner clutches in.").) Such imprecise language leaves unclear whether a particular job required that Mr. Jack install a Borg-Warner clutch, remove a Borg-Warner clutch, or both. These distinctions are significant: whereas clutch installations are associated with "de minimus" asbestos exposure, clutch removals can generate more meaningful amounts of asbestos dust. (*See* Brodkin Dep. at 113:14-114:2.) Because the court must draw all reasonable inferences in favor of the nonmoving party, *see Scott*, 550 U.S. at 378, the court construes the phrases "clutch job" and "clutch work" to potentially encompass clutch removals. Borg-Warner is entitled to dispute that construction at trial.

At his deposition, Mr. Jack testified that he installed "ten or more" Borg-Warner clutches during his professional automotive work (Jack Disc. Dep. at 166:24-167:8) and "eight to ten" Borg-Warner clutches on personal vehicles and vehicles owned by family and friends (*id.* at 713:23-714:3). Plaintiffs cannot show that Mr. Jack suffered potentially causally significant asbestos exposure as a result of any of these installations, however. Dr. Brodkin testified that installing or handling an asbestos-containing clutch disc merely results in "a de minimus exposure"; unless a user abrades or sands the clutch face, a clutch installation "likely releases some fibers," but does not constitute a "biologically significant" event (Brodkin Dep. at 113:14-114:2) and "does not increase

the risk for disease" (*id.* at 42:15-21).  In his discovery deposition, Mr. Jack

unequivocally testified that he never sanded or abraded the face of a new clutch disc

before installing it.  (Jack Disc. Dep. at 169:4-18).  Plaintiffs point to no additional

portions of Mr. Jack's testimony that would tend to cast doubt on this admission.  (*See* Pl.

Resp. Borg-Warner.)  Nor do Plaintiffs provide other evidence to suggest that a clutch

installation could increase one's risk for developing mesothelioma.  (*See id.*)

Accordingly, the court finds that Borg-Warner is entitled to partial summary judgment

with respect to Mr. Jack's installations of Borg-Warner clutches.

　　　　With respect to the removal of Borg-Warner clutches, the record is less clear.

Borg-Warner argues that Plaintiffs' evidence shows that Mr. Jack removed only one

Borg-Warner clutch in his lifetime:  a Borg-Warner clutch he installed, and then

removed, for a repeat customer at Dexter.  (Borg-Warner MSJ at 6.)  Plaintiffs, in

contrast, suggest that Mr. Jack identified at least three specific vehicles from which he

removed Borg-Warner clutches:  (1) the Dexter customer's vehicle, (2) a 1946 Chevrolet,

and (3) his 1962 Pontiac race car.  (Pl. Resp. Borg-Warner at 2-5.)  Additionally, as

Plaintiffs emphasize, Mr. Jack testified that in the course of his personal and professional

automotive work, he worked with Borg-Warner clutches in connection with "lots" of

cars.  (Jack Disc. Dep. at 695:12-16.)  Finally, Plaintiffs argue that Mr. Jack removed

Borg-Warner clutches from the Ford tow trucks he maintained at Apex.  (Pl. Resp. Borg-

Warner at 4.)  The court examines the evidence with respect to each of the alleged

exposures related to Mr. Jack's removal of Borg-Warner clutches.

*//*

At his perpetuation deposition, Mr. Jack testified that at some point in the mid-1950s, he "did a clutch" on his 1946 Chevrolet (Jack Perp. Dep. at 38:21-40:6). Plaintiffs' evidence shows that 1946 Chevrolets featured asbestos-containing Borg & Beck-brand clutches (Adams Decl. (Dkt. # 614) ¶ 2, Ex. G), a trade name for Borg-Warner (Adams Decl. (*id.* ¶ 2, Ex. H at 5). However, Plaintiffs provide no evidence whatsoever that the clutch Mr. Jack removed from the Chevrolet was the original part. Mr. Jack gave no testimony to that effect. (*See* Jack Perp. Dep. 38:21-40:6.) It is unclear when Mr. Jack acquired the Chevrolet, if it was new or used when it came into his hands, and whether its previous owners, if any, had replaced the clutch before selling it. In light of this gap in the record, Plaintiffs' summary assertion that "[t]he clutch [Mr. Jack] removed [from the Chevrolet] was manufactured by Borg & Beck and contained asbestos," is without support. *See Brown v. Crown Cork & Seal Co.*, No. 54039-4-I, 2005 WL 518990, at *3 (Wash. Ct. App. Mar. 5, 2005) (granting summary judgment to brake manufacturer where "[n]othing in the record indicate[d] . . . whether the original brakes were still on [the] cars" plaintiff serviced). Because Plaintiffs provide no evidence that Borg-Warner manufactured or supplied the clutch Mr. Jack removed from the Chevrolet, Plaintiffs cannot put that particular clutch work before the jury.

Similarly, the record does not support the conclusion that Mr. Jack was exposed to Borg-Warner-attributable asbestos when he replaced the clutches of the Ford tow trucks at Apex. In his perpetuation deposition, Mr. Jack testified that he performed four to six "clutch jobs" on the Ford tow trucks, and said he acquired the parts for such maintenance from a local Ford dealer. (Jack. Perp. Dep. 19:15-20.) Later, in response to unrelated

questioning during his discovery deposition, Mr. Jack testified that during his personal and professional automotive work, "usually when [he] got parts from [a] Ford dealer, a lot of them were identified either on the clutch or the box as BorgWarner." (Jack Disc. Dep. at 696:21-25.)   Plaintiffs stitch together these two pieces of testimony to argue that "while at Apex, [Mr. Jack] worked on large tow trucks using BorgWarner clutches." (Pl. Resp. Borg-Warner at 7 n.6.)   That contention is utterly speculative:  Mr. Jack never testified that he used Borg-Warner clutches when performing clutch work at Apex; Plaintiffs provide no evidence that Mr. Jack purchased Borg-Warner clutches from a Ford dealer while working at Apex; and Mr. Jack remarked on the Ford-Borg-Warner "association" when speaking generally about his automotive work, not about Apex.  (*See* Jack Disc. Dep. at 696:21-25.)  In short, there is insufficient evidence to avoid summary judgment on the claim that Mr. Jack removed Borg-Warner clutches at Apex.

    In contrast, a reasonable factfinder could infer that Mr. Jack sustained asbestos exposure when removing Borg-Warner clutches from his 1962 Pontiac race car.  Mr. Jack testified that he "did three clutch jobs" on his Pontiac race car, recalling that he "used BorgWarner" clutches "on two of those" jobs. (Jack Disc. Dep. at 713:1-4.)  Plaintiffs furnish specifications from the Automobile Manufacturers Association that show that 1962 Pontiacs featured Borg & Beck asbestos-containing clutches. (Pontiac Specs. at 108-109.)   As Plaintiffs emphasize, Mr. Jack testified that he removed clutches from "underneath [the] car in a confined area"; that clutch removals generated fine dust; and that he used compressed air to blow out the clutch bell-housings.  (Jack Perp. Dep. 70:6-71:12.)  In reply, Borg-Warner emphasizes that Mr. Jack testified at his discovery

deposition that he did not believe he had ever installed or removed a Borg-Warner clutch on the 1962 Pontiac. (Jack Disc. Dep. at 170:6-14.) That discrepancy raises issues of credibility for a factfinder to resolve, *see Matsushita Elec. Indus. Co.*, 475 U.S. at 587, but at the summary judgment phase does not preclude the court from considering Mr. Jack's earlier testimony.

Additionally, the court finds that Plaintiffs provide evidence sufficient to create issues of material fact with respect to other Borg-Warner clutches Mr. Jack may have removed during other automotive work. Mr. Jack stated that he "did several clutch jobs" involving Borg-Warner clutches "in the shop," apparently referring to his professional automotive work at Dexter. (Jack Perp. Dep. 149:13-18.) Mr. Jack additionally testified he "did BorgWarner clutches" on "four or five specific personal vehicles." (Jack Disc. Dep. at 713:7-16.) Elsewhere in his testimony, in response to a question about "installing and removing BorgWarner clutches," Mr. Jack stated that he did so on "lots" of vehicles. (*Id.* at 695:12-16.) Borg-Warner argues that this testimony is inconsistent with Mr. Jack's admissions that he could not recall removing a Borg-Warner clutch in his personal automotive work (*id.* at 174:14-17) or from any vehicle at Dexter, apart from that belonging to the repeat customer (*id.* at 169:19-23). Again, those discrepancies create credibility issues for trial, but cannot be resolved at summary judgment. *See Anderson*, 477 U.S. at 255. Mr. Jack's identification of Borg-Warner clutches, together with Plaintiffs' evidence that Borg-Warner sold asbestos-containing clutches into the 1980s, is sufficient to create issues of material fact as to whether Mr. Jack sustained asbestos

//

exposure when removing Borg-Warner clutches on personal vehicles and during his professional automotive work.

Finally, Plaintiffs argue that Mr. Jack was exposed to asbestos in connection with Borg-Warner brakes.  (Pl. Resp. at 4.)  Mr. Jack testified that he used Borg-Warner brakes on various race cars between the 1960s and approximately 2007.  (Jack Perp. Dep. 169:13-18; 208:3-209:14.)  But Plaintiffs offer no evidence that Borg-Warner manufactured or sold asbestos-containing brakes during the relevant period.  (*See* Pl. Resp. Borg-Warner.)  Accordingly, Plaintiffs cannot show that Mr. Jack sustained asbestos exposure from Borg-Warner brakes.

In sum, viewing the record in the light most favorable to Plaintiffs, the court finds that there is no evidence that Mr. Jack was exposed to asbestos attributable to Borg-Warner when working on his 1946 Chevrolet and the Ford tow trucks, or in connection with Borg-Warner brakes.  However, the court finds that Plaintiffs provide sufficient evidence to raise a reasonable inference that Mr. Jack was exposed to asbestos when removing Borg-Warner clutches from the repeat Dexter customer's vehicle, from one of his Pontiac race cars, and during other automotive work.  The court now turns to causation.

ii.    Causation

Borg-Warner contends that Plaintiffs' evidence is insufficient to establish that Mr. Jack's work with Borg-Warner clutches was a substantial factor in causing his mesothelioma.  (Borg-Warner MSJ at 10-18.)  Specifically, Borg-Warner raises the following arguments:  (1) Plaintiffs can show that Mr. Jack was exposed to asbestos only

in connection with one clutch removal, a one-time exposure that on its own is incapable of constituting a substantial factor; and (2) Dr. Brodkin's opinions on medical causation are impermissibly speculative. (*Id.*)  The court disagrees on both points.

Borg-Warner first asserts that Plaintiffs' causation evidence "rests entirely on that one single instance in which [Mr. Jack] removed a Borg-Warner clutch disc" from the repeat Dexter customer's vehicle.  (Borg-Warner MSJ at 15.)  Borg-Warner is correct that Plaintiffs cannot show that Mr. Jack's installations of Borg-Warner clutches were causally significant. (*See supra* § III.C.3.d.i.)  But as discussed above, Plaintiffs' evidence gives rise to a reasonable inference that Mr. Jack removed multiple Borg-Warner clutches—including at least two from his Pontiac racecar, "four or five" from his personal vehicles, and "several" during his professional automotive work. (*See supra* § III.B.2.c.i.)  Thus Plaintiffs are not, as Borg-Warner claims, tasked with showing that "one removal alone" substantially caused Mr. Jack's disease.  (Borg-Warner MSJ at 15.)

Under *Lockwood*, 744 P.2d at 613, a reasonable factfinder could conclude that Mr. Jack's removals of Borg-Warner clutches exposed him to asbestos in an aggregate amount sufficient to constitute a substantial factor in causing his mesothelioma.  The first two *Lockwood* factors concern Mr. Jack's proximity to the asbestos product and the expanse of the worksite.  *Id.*  Mr. Jack testified that he removed clutches while situated "underneath a car in a confined area"; as a result, he was in close proximity to both the clutches and the dust that the clutch removals generated.  (Jack Perp. Dep. 70:6-71:12.)  The third factor, "the extent of time that the plaintiff was exposed to the product," *Lockwood*, 744 P.2d at 613, is not readily apparent from the record; however, Mr. Jack's

Borg-Warner clutch work occurred at various points over the course of several decades. (*See* Brodkin Rep. § 2 at 14 (indicating that Mr. Jack worked with "lots" of Borg-Warner clutches between 1955 and 1986).) The next factors—the types of asbestos products involved and the ways in which the products were handled, *Lockwood*, 744 P.2d at 613 —weigh in Plaintiffs' favor. Clutch changes and removals are associated with "high airborne asbestos concentration," making it more likely that Mr. Jack sustained "significant asbestos exposure" when removing Borg-Warner clutches. (Brodkin Rep. at § 5 at 4.) Finally, Plaintiffs provide evidence of medical causation, *see Lockwood*, 744 P.2d at 613, through Dr. Brodkin's testimony and report. According to Dr. Brodkin, Mr. Jack's work with Borg-Warner clutches, including clutch removals and blowouts, constituted "a significant component of Mr. Jack's cumulative exposure" to asbestos. (Brodkin Dep. at 118:22-119:13.)

Borg-Warner disputes both the factual premises and reliability of Dr. Brodkin's medical opinions. First, Borg-Warner asserts that Dr. Brodkin's report "is not supported by Decedent's testimony," and identifies a number of places where the information documented in his report apparently diverges from Mr. Jack's deposition testimony. (Borg-Warner MSJ at 9.) Consequently, Borg-Warner argues, Dr. Brodkin's opinions "are not based on fact." (*Id.* at 17.) The court cannot, at this phase, impeach Dr. Brodkin's conclusions. Rather, the factual discrepancies Borg-Warner raises are for the jury to weigh at trial. *See Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1117 n.14 (9th Cir. 2004) (emphasizing that "questions regarding the nature of [an expert's] evidence [go] more to the 'weight' of his testimony—an issue properly explored

during direct and cross-examination").  Second, Borg-Warner contends that Dr. Brodkin

bases his medical opinions, in part, on "unreliable interpretations" of two scientific

studies on brake work exposure.  (Borg-Warner MSJ at 18.)  The court already

considered those criticisms when resolving Ford's motion to exclude Dr. Brodkin, and

found that they were issues for cross examination.  (*See* 8/10/2018 Order at 35-36

(concluding that "[t]he Kauppinen Study, combined with the other studies on clutches [on

which Dr. Brodkin relied], constitute a sufficient scientific basis for Dr. Brodkin's

conclusion").)

In light of the foregoing, a reasonable factfinder could conclude that Mr. Jack was

exposed to asbestos as a result of removing Borg-Warner clutches and that such exposure

was a substantial factor in causing his mesothelioma.  Accordingly, the court denies

Borg-Warner's motion for summary judgment on the issue of Mr. Jack's removal of

Borg-Warner clutches.

### 3. Ms. Jack's Recovery for Loss of Consortium

Plaintiffs' second amended complaint, filed after Mr. Jack's death, asserts that Ms.

Jack "has suffered and will suffer damages for loss of companionship, services, and

consortium."  (SAC ¶ 52.)  Ford and Borg-Warner urge the court to dismiss Ms. Jack's

claim for loss of consortium because she married Mr. Jack after he was diagnosed with

mesothelioma.  (Ford MSJ at 8; Borg-Warner MSJ at 19-21.)  They argue that under

Washington law, a spouse is barred from recovering for loss of consortium where the

injury that caused the loss precedes the marriage.  (*Id.*)  Plaintiffs respond that Ms. Jack

seeks loss of consortium damages on the basis of Washington's wrongful death statute,

RCW 4.20.010-.020, which provides for such damages regardless of whether the injury predates the marriage. (Pl. Consolidated Resp. at 3-9.)

Washington law defines loss of consortium as the loss of the "society, affection, assistance and conjugal fellowship" of one's spouse. *Ueland v. Reynolds Metals Co.*, 691 P.2d 190, 191 n.1 (Wash. 1984) (quoting Black's Law Dictionary (5th ed. 1979)). The spouse who suffers bodily injury is generally referred to as the "impaired spouse," while the spouse who suffers the loss of consortium is referred to as the "deprived spouse." *Reichelt v. Johns-Manville Corp.*, 733 P.2d 530, 536-37 (Wash. 1987).

Washington courts distinguish between common law loss of consortium claims and statutory wrongful death actions in which loss of consortium constitutes a measure of damages. *See Hatch v. Tacoma Police Dep't*, 27 P.3d 1223, 1223-24 (Wash. Ct. App. 2001); *Ginochio v. Hesston Corp.*, 733 P.2d 551, 553 (Wash. Ct. App. 1987). A claim for loss of consortium where the impaired spouse has not died is an independent cause of action governed by the common law. *Ginochio*, 733 P.2d at 553. Historically, common law did not recognize claims for "post-death damages." *Hatch*, 27 P.3d at 1224. Under Washington's wrongful death statute, however, the "personal representative" of a decedent may bring an action for damages "against the person causing the death," as long as the action accrues to the "benefit" of the decedent's spouse or children. RCW 4.20.010-.020. In a wrongful death suit, post-death loss of consortium "is not an

//

//

//

independent cause of action," but rather an "element" of the damages recoverable under the statute. *Ginochio*, 733 P.2d at 553.[24]

A common law loss of consortium claim does not lie where the injury to the impaired spouse predates the marriage. *Green v. Am. Pharm. Co.*, 960 P.2d 912, 918 (Wash. 1998); *see also Thykkuttathil v. Keese*, No. C12-1749RSM, 2013 WL 2458739, at *2 (W.D. Wash. Jun. 6, 2013).[25] This limitation reflects three rationales: "(1) a person should not be permitted to marry a cause of action; (2) one assumes with a spouse the risk of deprivation of consortium arising from any prior injury; and (3) as a matter of policy, tort liability should be limited." *Green*, 960 P.2d at 918 (citing *Stager v. Schneider*, 494 A.2d 1307, 1315 (D.C. App. 1985)). Washington courts and federal courts applying Washington law have declined to recognize exceptions to the prohibition against loss of consortium claims based on pre-marital injuries, even where the deprived spouse sustained a marriage-like relationship with the impaired spouse when the injury occurred. *See, e.g.*, *Roosma v. Pierce Cty.*, No. C16-5499RJB, 2018 WL 784590, at *9 (W.D. Wash. Feb. 8, 2018); *Vance v. Farmers Ins. Co.*, No. 76092-1-I, 2017 WL 4883353, at *4 (Wash. Ct. App. Oct. 30, 2017).

---

[24] The measure of damages under the wrongful death statute is the "actual pecuniary loss suffered by the surviving beneficiaries." *Parrish v. Jones*, 722 P.2d 878, 881 (Wash. Ct. App. 1986). "Pecuniary loss" has been held to include not only the monetary contributions the decedent would have made to the beneficiary, but also intangible losses such as the loss of the decedent's support, services, love, care, companionship, and consortium. *Id.*

[25] The *Green* court recognized a narrow exception to the general rule against recovery for premarital injuries in toxic exposure cases, where the injured spouse does not or cannot know of the injury at the time of the marriage. *Green*, 960 P.2d at 919. No party argues that the exception for latent and unknown injuries applies here.

The parties dispute whether *Green* governs Ms. Jack's claim for loss of consortium damages. Plaintiffs assert that *Green* does not apply, because Ms. Jack's claim is tethered to the wrongful death statute, under which the date of the spouses' marriage is immaterial. (Pl. Consolidated Resp. at 4-9.) Defendants, on the other hand, argue that *Green*'s "bright-line" prohibition against recovery for premarital injuries extends to wrongful death claims. (Borg-Warner Rep. at 7; Ford Rep. at 6.) Under that logic, Ms. Jack cannot recover such damages because she married Mr. Jack after he was diagnosed with mesothelioma. (*Id.*) To that end, Ford suggests that recovery for premarital injuries is barred when a loss of consortium claim is "converted" into a statutory wrongful death action, because both types of claims are born on "the date of injury." (Ford Rep. at 6 (emphasis omitted).)

To the court's knowledge, neither the Washington Supreme Court nor the state Court of Appeals has considered the issue the parties raise: whether a spouse who brings a statutory wrongful death claim may recover for loss of consortium where the marriage occurs after the injury that precipitates the decedent's death. Accordingly, the court "must resort to other authority and exercise [its] own best judgment" in determining how the Washington Supreme Court would resolve the issue. *Burns v. Int'l Ins. Co.*, 929 F.2d 1422, 1424 (9th Cir. 1991).

To begin, the court looks to the wrongful death statute itself. When a federal court sitting in diversity interprets a state statute, it must apply state rules of statutory construction. *In re First T.D. & Inv., Inc.*, 253 F.3d 520, 527 (9th Cir. 2001). Under Washington law, "[the court's] objective in construing a statute is to determine the

legislature's intent." *In re Estate of Blessing*, 273 P.3d 975, 976 (Wash. 2012). Where the statutory language is unambiguous, the court must refrain from adding to the statute words or clauses the legislature chose not to include. *State v. Kintz*, 238 P.3d 470, 477 (Wash. 2010). Rather, "the court should assume that the legislature means exactly what it says." *Davis v. Dep't of Licensing*, 977 P.2d 554, 556 (Wash. 1999) (internal quotation marks and citation omitted).

On its face, the wrongful death statute is unambiguous. It provides that a wrongful death claim is cognizable if two criteria are satisfied: (1) the action is brought by the decedent's personal representative, RCW 4.20.010, and (2) the action is brought for the benefit of the decedent's "wife, husband, state registered domestic partner, child or children," RCW 4.20.020. The statute does not constrict the definition of "wife [or] husband" to persons married to the decedent at the time of injury. *Id.* To read into the statute the common law limitation on loss of consortium claims would be to alter the plain language of the statute in a way the legislature did not authorize. If the legislature wanted to restrict loss of consortium damages to persons married to the decedent at the time of injury, it could have said so in the statute.

Additionally, out-of-state authority overwhelmingly recognizes the right of a spouse to recover under a wrongful death statute where the injury precedes the marriage. *See Domino's Pizza, LLC v. Wiederhold*, No. 5D16-2794, 2018 WL 2165224, at *5 (Fla. Dist. Ct. App. May 11, 2018) ("[V]irtually every out-of-state case to address this issue has held that a spouse is not required to be married at the time of injury to pursue a statutory wrongful death claim."). Several courts emphasize that a cause of action for

wrongful death vests in the surviving spouse on the date of the decedent's death, not the date of injury. *See, e.g.*, *Corley v. Louisiana*, 749 So.2d 926, 941 (La. Ct. App. 1999) ("The only relevant time for the determination of the relationship between potential claimants and the decedent is the date of death."); *Lovett v. Garvin*, 208 S.E. 2d 838, 840 (Ga. 1974) ("Nothing in the language of [the wrongful death] statute states or implies that the husband must be married to the wife at the time the injuries from which she subsequently dies are inflicted.").

Defendants collectively identify just one case in which a wrongful death statute was held to bar loss of consortium damages where the surviving spouse married the decedent after the injury. In *Kelly v. Georgia-Pacific, LLC*, 211 So.3d 340, 342-45 (Fl. Dist. Ct. App. 2017), the Florida District Court of Appeals concluded that because the state's wrongful death act did not "unequivocally" abrogate or supersede the common law marriage-at-the-time-of-injury rule, that rule was implicitly incorporated into the statute. As a result, the court held that the plaintiff, who married the decedent after his mesothelioma diagnosis, could not recover consortium damages as part of her wrongful death suit. *Id.* at 342. Notwithstanding the factual parallels between *Kelly* and Ms. Jack's claim, the court is unpersuaded that Washington courts would adopt *Kelly*'s reasoning. Washington's wrongful death statute grants a decedent's survivors an independent cause of action that was not recognized at common law. *See* RCW 4.20.010-.020. Importing into the statute common law principles that constrain the scope of the remedies the statute expressly provides would contravene legislative purpose and intent. *See Kelly*, 211 So.3d at 347 (Taylor, J., dissenting) ("[Florida's wrongful death]

statute gives a right of action not had under common law and it must be limited strictly to

the meaning of the language employed and not extended beyond its plain and explicit

terms."). Additionally, the court notes that another division of the Florida District Court

of Appeals recently rejected the *Kelly* court's reasoning, emphasizing that *Kelly* does not

accord with the weight of authority. *Wiederhold*, 2018 WL 2165224, at *5.

Finally, the court considers whether the policy rationales cited in *Green*, 960 P.2d

at 918, would be served by barring a wrongful death plaintiff from recovering for loss of

consortium where the decedent's injury predates the marriage. The "assumption of risk"

rationale arguably disfavors Ms. Jack's claim for loss of consortium: Ms. Jack likely

married Mr. Jack with the knowledge that mesothelioma is almost always fatal. The

other two considerations discussed in *Green* have less force in the context of a wrongful

death claim, however. First, a cause of action for wrongful death vests on the date of the

decedent's death, not the date of injury. *See Corley*, 749 So.2d at 941; *Lovett v. Garvin*,

208 S.E. 2d at 840. The surviving spouse thus cannot be said to "marry into" the

wrongful death claim, in contrast to a plaintiff who marries the impaired spouse in full

view of the spouse's injuries and then brings a common law loss of consortium claim.

Second, the statute itself limits potential defendants' liability to a narrow class of

foreseeable beneficiaries. *See* RCW 4.20.020 (limiting recovery to spouse, registered

domestic partner, or child of the decedent). Accordingly, allowing claims like Ms. Jack's

to proceed "does not expose a tortfeasor to unbounded liability." *Green*, 960 P.2d at 919.

For the foregoing reasons, the court finds that Washington's wrongful death

statute, RCW 4.20.010-.020, provides Ms. Jack a cause of action to seek damages for loss

of consortium arising from Mr. Jack's death.  At trial, Ms. Jack must show that she

satisfies the requirements of the statute—that is, that she is Mr. Jack's personal

representative and is bringing the action for her benefit as his wife.  *See* RCW

4.20.010-.020.  However, Ms. Jack is barred from seeking damages for any loss of

consortium she may have suffered during Mr. Jack's lifetime, as she and Mr. Jack were

not married at the time of his alleged injuries.  *See Green*, 960 P.2d at 918.  Accordingly,

the court grants in part and denies in part Defendants' motions for summary judgment

with respect to Ms. Jack's claim for loss of consortium.[26]

### 4.  Concert of Action and Conspiracy, Premises Liability, and "Catch-All" Claims

In addition to product liability claims, Plaintiffs' complaint asserts, *inter alia*,

claims "based upon the theories of . . . concert of action and conspiracy, premises

liability, the former RCW 49.16.030, and any other applicable theory of liability."  (SAC

¶ 45.)  Ford seeks summary judgment on all claims against Ford based on theories of

---

[26]  Former Defendant Honeywell International, Inc. ("Honeywell") moved for summary judgment on Ms. Jack's "claims for loss of consortium and for loss of household services" on the same grounds discussed above, *i.e.*, that because Ms. Jack married Mr. Jack after his diagnosis, those claims fail as a matter of law.  (*See* Honeywell MSJ (Dkt. # 481) at 3.)  DCo and Ford joined Honeywell's motion for partial summary judgment (DCo Not. of Joinder (Dkt. # 484); 7/19/2018 Order (Dkt. # 529) (granting Ford's motion for joinder).)  Honeywell and Plaintiffs have since reached settlement.  (*See* Dkt. # 698.)  To the extent the household services issue remains before the court on account of DCo and Ford's joinder in Honeywell's motion, the court finds that Ms. Jack is not as a matter of law barred from seeking damages for loss of household services incurred after Mr. Jack's death.  Those damages are recoverable under Washington's wrongful death statute, RCW 4.20.010-.020, which for the reasons discussed above provides Ms. Jack a cause of action.  *See Parrish v. Jones*, 722 P.2d 878, 881 (Wash. Ct. App. 1986) (stating that wrongful death statute permits recovery for "the actual pecuniary loss suffered by the surviving beneficiaries," a measure of damages that includes both lost monetary contributions and loss of consortium).  However, Ms. Jack may not recover for any loss of household services incurred before Mr. Jack's death.

liability other than product liability.  (Ford MSJ at 8.)  Former Defendant Honeywell similarly sought summary judgment on Plaintiffs' non-product liability claims. (Honeywell MSJ (Dkt. # 481) at 4-5.)  DCo joined Honeywell's motion.  (DCo Not. of Joinder.)  In their consolidated response, Plaintiffs "withdraw[] the claims, as to these Defendants, for concert of action and conspiracy, premises liability, and any other applicable theory of liability."  (Pl. Consolidated Resp. at 12.)  Accordingly, the court denies as moot Ford and DCo's motions for summary judgment on all non-product liability claims.

### 5. Punitive Damages

Honeywell moved for summary judgment on Plaintiffs' claims for punitive damages on the ground that Washington law does not contemplate punitive damages for tort claims.  (Honeywell MSJ at 3; *see also* SAC ¶ 55.B.)  Ford and DCO joined Honeywell's motion.  (DCo Not. of Joinder; 7/19/2018 Order (granting Ford's motion for joinder).)  In their consolidated response, "Plaintiffs concede they will not pursue any punitive damages claim."  (Pl. Consolidated Resp. at 12.)  The court thus denies as moot DCo and Ford's motions for summary judgment on Plaintiffs' claims for punitive damages.

### 6. Summary

The court grants Union Pacific's motion for summary judgment.  Additionally, the court grants partial summary judgment to Ford on the issue of Mr. Jack's work with Ford clutches at Dexter.  However, the court denies Ford's motion with respect to Plaintiffs' allegations of asbestos exposure in connection with Mr. Jack's brake work at Dexter and

on his Pontiac race car, his removal of the 1984 Mustang's front disc brakes and rear

drum brakes, and his overhaul of the 1964 Ranchero. The court further grants partial

summary judgment to Borg-Warner on the issues of Mr. Jack's installations of Borg-

Warner clutches, Mr. Jack's maintenance of the Apex tow trucks, and Mr. Jack's use of

Borg-Warner brakes. The court denies Borg-Warner's motion with respect to Mr. Jack's

removals of Borg-Warner clutches. Additionally, the court grants in part and denies in

part Defendants' motions on the issue of loss of consortium damages: although Ms. Jack

may not seek damages for loss of consortium she incurred during Mr. Jack's lifetime, she

may seek damages for loss of consortium she has incurred since his death. Finally, the

court denies as moot Ford and DCo's motions on Plaintiffs' catch-all claims and punitive

damages, because Plaintiffs have withdrawn those claims.

**C.     Plaintiffs' Motions for Partial Summary Judgment**

Plaintiffs move for summary judgment on several affirmative defenses asserted by

the remaining Defendants, DCo, Borg-Warner, and Ford.[27]  To begin, Plaintiffs urge the

court to grant summary judgment on all the affirmative defenses these Defendants assert

in their answers, on the ground that during discovery Defendants failed to specify

evidence in support of their affirmative defenses.  (*See* Pl. MSJ DCo at 4; Pl. MSJ Ford at

4; Pl. MSJ Borg-Warner at 4.)  In addition, Plaintiffs argue that Defendants fail to present

evidence capable of supporting the following affirmative defenses at trial: (1) failure to

---

[27] Plaintiffs also move for summary judgment on affirmative defenses asserted by Union Pacific.  (*See* Pl. MSJ Union Pacific.)  In light of the court's determination that Union Pacific is entitled to summary judgment (*see supra* § III.B.1-2.a), the court denies as moot Plaintiffs' motion for summary judgment as to Union Pacific.

mitigate damages; (2) the learned intermediary defense; (3) contributory negligence; (4)

assumption of risk; and (5) superseding cause.  The court addresses each issue in turn.

### 1.  Plaintiffs' Motion as to All Affirmative Defenses

At various points during discovery, Plaintiffs propounded interrogatories

regarding Defendants' affirmative defenses.  (*See* Adams Decl. (Dkt. No. 504) ¶ 2, Ex. G

("DCo Interrog.") (responses dated April 9, 2018); Adams Decl. (Dkt. No. 506) ¶ 2, Ex.

E ("Ford Interrog.") (responses dated Dec. 6, 2017); Adams Decl. (Dkt. No. 508) ¶ 2, Ex.

F ("Borg-Warner Interrog.") (responses dated August 15, 2017).)  Plaintiffs asked that

each Defendant "identify all evidence in support of each of [its] affirmative defenses."

(*See* Borg-Warner Interrog. No. 5; DCo Interrog. No. 9; Ford Interrog. No. 7.)

Additionally, Plaintiffs requested that each Defendant identify by name any person or

entity that Defendant alleged to be a substantial factor in causing Mr. Jack's disease, as

well as all facts and documents in support of that allegation.  (*See* DCo Interrog. Nos.

2-5; Borg-Warner Interrog. No. 1; Ford Interrog. Nos. 1-4.).  Defendants objected to

these interrogatories, arguing that Plaintiffs' questions called for protected work product

and were vague and overbroad.  (*See, e.g.*, DCo Interrog. at 7;[28] Ford Interrog. at 18;[29]

Borg-Warner Interrog. at 10.[30])  Discovery closed on June 18, 2018.  (*See* 6/22/2017

Minute Order (Dkt. # 184).)

---

[28] The court cites the page number at the lower left-hand corner of the document.

[29] The court cites the page number at the bottom center of the document.

[30] The court cites the page number at the lower left-hand corner of the document.

Plaintiffs now argue that Defendants provided inadequate responses to Plaintiffs'

interrogatories.  Consequently, Plaintiffs contend, they are entitled to summary judgment

on all the affirmative defenses Defendants raise in their answers.  (Pl. MSJ Rep. (Dkt.

# 640) at 6-7 ("Plaintiffs are entitled to summary judgment due to Defendants' refusal to

answer Plaintiffs' contention interrogatories."); *see also* Pl. MSJ DCo at 4; Pl. MSJ Ford

at 4; Pl. MSJ Borg-Warner at 4.)  Plaintiffs dispute that their interrogatories were

burdensome or overbroad.  (*See* Pl. MSJ Rep. at 8.)  They also appear to allege that

Defendants' failure to adequately respond to their interrogatories will prejudice Plaintiffs

at trial.  (*Id.*)

Federal Rule of Civil Procedure 37 prescribes the remedy for a party's failure to

adequately uphold its discovery obligations.  *See* Fed. R. Civ. P. 37.  Under the Rule, "a

party seeking discovery may move for an order compelling an answer, designation,

production, or inspection . . . if . . . a party fails to answer an interrogatory."  Fed. R. Civ.

P. 37(a)(3)(B)(iii).  If a court grants the movant's motion, it may "require the party . . .

whose conduct necessitated the motion . . . to pay the movant's reasonable expenses

incurred in making the motion, including attorney's fees."  Fed. R. Civ. P. 37(a)(5).

Before moving for an order to compel discovery, however, the movant must in good faith

confer or attempt to confer with the opposing party.  Fed. R. Civ. P. 37(a)(1); *see also*

Local Rules W.D. Wash. LCR 37(a)(1).

Plaintiffs did not file a motion under Rule 37 or otherwise call to the court's

attention Defendants' allegedly deficient responses to Plaintiffs' interrogatories.  (*See*

Dkt.)  Moreover, Plaintiffs' motion and Defendants' joint response indicate that during

the discovery period, Plaintiffs' counsel never met with opposing counsel regarding the responses Plaintiffs found wanting[31]—despite the court's express instruction that the parties seek to resolve discovery matters between themselves, and, absent agreement, request a conference with the court. (*See* 6/22/2017 Minute Order.) Time constraints cannot explain Plaintiffs' failure to act: Plaintiffs received Borg-Warner's responses to its interrogatories over a year ago, and Ford's followed a few months later. Indeed, Plaintiffs' motion appears to try to make hay from a discovery dispute the parties should have addressed long ago.

Courts that have considered summary judgment motions premised on allegedly inadequate discovery responses have rejected the extraordinary remedy Plaintiffs propose here. In *Myers v. United States, et al.*, No. 02CV1349-BEN, 2004 WL 7323090, at *2 (S.D. Cal. Nov. 4, 2004), the plaintiff urged the court to preclude defendants from asserting any affirmative defendants on the ground that defendants failed to identify "specific facts" or "evidence" in support of those defenses when responding to the plaintiff's interrogatories. The court declined to adopt such a "drastic sanction," citing the plaintiff's failure to utilize Federal Rule of Civil Procedure 37. *Meyers*, 2004 WL 7323090, at *2; *see also Miller v. Cottrell, Inc.*, No. 06-0141-CV-W-NKL, 2007 WL 3376731, at *6 (W.D. Mo. Nov. 8, 2007) ("To the extent Plaintiffs seek an order striking

---

[31] Plaintiffs' motions in limine state that Plaintiffs "initiated meet and confer efforts regarding Borg-Warner's deficient responses to the interrogatories." (Pl. MIL (Dkt. # 664) at 10.) However, Plaintiffs do not specify whether they in fact met and conferred with Borg-Warner. (*See id.*) Plaintiff's motions in limine do not mention any meet and confer efforts with respect to other Defendants. (*See generally id.*)

Cottrell's affirmative defenses as a sanction for failing to comply with discovery obligations, Plaintiffs should file a motion for sanctions, not a motion for summary judgment."); *Alstrin v. St. Paul Mercury Ins. Co.*, 179 F. Supp. 2d 376, 395 (D. Del. 2002) ("The court will not strip [the defendant] of potentially meritorious defenses simply because it failed to determine whether it would assert such defenses until after it had responded to plaintiffs' contention interrogatories.").

As the *Myers* court emphasized, a motion for summary judgment premised on the opposing party's alleged discovery violations fails to properly invoke the standard by which the court must adjudicate such a motion under Rule 56. *See Myers*, 2004 WL 7323090, at *2. Here, as in *Myers*, Plaintiffs' blanket motion for partial summary does not identify "those portions of the materials on file that [they] believe[] demonstrate the absence of any genuine issue of material fact" with respect to Defendants' affirmative defenses. *Id.* (quoting *T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)). Plaintiffs' motion thus fails as a matter of law.

Furthermore, at this time the court does not see how Plaintiffs will suffer prejudice on account of Defendants' deficient responses to the interrogatories at issue. Plaintiffs contend that "[t]he first Plaintiffs learn of the facts behind [Defendants'] affirmative defenses should not be in the middle of trial." (Pl. MSJ Rep. at 8.) In principle, the court agrees. But the record suggests that the facts underlying Defendants' affirmative defenses have already been disclosed through the parties' extensive discovery and summary judgment motions. *See Myers*, 2004 WL 7323090, at *1 (emphasizing "volume of discovery"). Tellingly, Plaintiffs' reply brief does not identify as previously unknown

any facts on which Defendants relied when responding to Plaintiffs' motions for partial summary judgment on affirmative defenses. (*See generally* Pl. MSJ Rep.) Accordingly, the court denies Plaintiffs' motion for partial summary judgment as to all affirmative defenses on discovery-related grounds.[32]

### 2. Failure to Mitigate Damages

Plaintiffs move for summary judgment against Borg-Warner on the affirmative defense of failure to mitigate damages. (Pl. MSJ Borg-Warner at 5; *see also* Borg-Warner Ans. (Dkt. # 435) ¶ 34.) Plaintiffs argue that Borg-Warner "cannot show that Patrick Jack failed to mitigate damages because, among other things, mesothelioma is almost uniformly fatal." (Pl. MSJ Borg-Warner at 5.)

Borg-Warner joined Defendants' joint opposition to Plaintiffs' motions, which does not address mitigation of damages (*see* Def. Jt. Resp.), and did not file a separate opposition (*see* Dkt.). When a party opposing summary judgment fails to address the movant's assertions of fact, the court may grant summary judgment, provided that the motion and supporting materials show that the movant is entitled to it. Fed. R. Civ. P. 56(e).

//

---

[32] If at trial Defendants seek to introduce evidence that was not disclosed during discovery and is materially prejudicial to Plaintiffs, then Plaintiffs may file a motion for sanctions under Rule 37(c)(1). *See* Fed. R. Civ. P. 37(c)(1); *see also Putz v. Golden*, No. C10-0741JLR, 2012 WL 13019220, at *5-6 (W.D. Wash. May 22, 2012). In that event, the burden will lie with Defendants to demonstrate that they should escape sanctions because their omissions were harmless or substantially justified. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001) ("Implicit in Rule 37(c)(1) is that the burden is on the party facing sanctions to prove harmlessness.").

The doctrine of mitigation of damages "prevents recovery for those damages the injured party could have avoided by reasonable efforts taken after the wrong was committed." *Pub. Util. Dist. No. 2 of Pac. Cty. v. Comcast of Wash. IV, Inc.*, 336 P.3d 65, 76 (Wash. Ct. App. 2014) (quoting *Bernsen v. Big Bend Elec. Coop., Inc.*, 842 P.2d 1047, 1051 (Wash. Ct. App. 1993).) "The party whose wrongful conduct caused the damages . . . has the burden of proving the failure to mitigate." *Cobb v. Snohomish Cty.*, 935 P.2d 1384, 1389 (Wash. Ct. App. 1997). In cases involving medical injuries, the defendant not only must establish that the injured party failed to use reasonable care to mitigate damages, but also must show that the failure to mitigate aggravated the party's injury or otherwise increased the damage suffered. *See Fox v. Evans*, 111 P.3d 267, 270 (Wash. Ct. App. 2005) ("To support a mitigation instruction, expert testimony must establish that the alternative treatment would more likely than not improve or cure the plaintiff's condition."); *Hawkins v. Marshall*, 962 P.2d 834, 838-39 (Wash. Ct. App. 1998) (finding no evidence that plaintiff's failure to follow her doctor's advice aggravated her conditions or delayed her recovery).

Borg-Warner, as a party whose conduct allegedly caused Mr. Jack's disease, would at trial carry the burden to prove that Mr. Jack failed to mitigate his damages. *See Cobb*, 935 P.2d at 1389. Borg-Warner provides no evidence that Mr. Jack failed to follow medical advice or otherwise increased his damages. *See Fox*, 111 P.3d at 270. Accordingly, Plaintiffs are entitled to partial summary judgment on Borg-Warner's affirmative defense of failure to mitigate damages.

*//*

### 3. Learned Intermediary Doctrine

Plaintiffs move for partial summary judgment against DCo and Borg-Warner on these Defendants' assertion of the sophisticated purchaser doctrine, also known as the learned intermediary doctrine.[33]  (Pl. MSJ DCo at 6-7; Pl. MSJ Borg-Warner at 7-8.)  In its answer, DCo states that "[Mr. Jack's] employer[]" not only was or should have been aware of the hazards of asbestos, but also "was warned" of the dangers of asbestos-containing products and . . . failed to rely upon such warning."  (DCo Ans. (Dkt. # 265) ¶ 28.)  Similarly, Borg-Warner contends that Mr. Jack "was employed by knowledgeable and sophisticated employers and any duty Borg-Warner may have had to warn him of any potential damages in using Borg-Warner's products was discharged by the employers' intervening duty to give him any required warnings."  (Borg-Warner Ans. ¶ 46.)  Plaintiffs argue that Washington law does not recognize the sophisticated purchaser doctrine in the context of asbestos litigation, and that even if the defense were available, neither DCo nor Borg-Warner can show that they reasonably relied upon Mr. Jack's employers to warn him of the hazards of asbestos exposure.

Courts use inconsistent terminology when discussing the sophisticated purchaser doctrine in the context of asbestos litigation.  *See Cabasug v. Crane Co.*, 988 F. Supp. 2d 1216, 1219 (D. Haw. 2013) (remarking on "inconsistent[]" terminology).  Some courts refer to the "learned intermediary" doctrine, an affirmative defense traditionally invoked

---

[33] Plaintiffs use the term "learned intermediary" doctrine.  (*See* Pl. MSJ DCo at 6-7; MSJ Borg-Warner at 7-8.)  Defendants use the terms "sophisticated purchaser" and "knowledgeable intermediary."  (*See* Def. Jt. Resp. at 12-15.)

by prescription drug and medical device manufacturers who may satisfy their duty to warn by informing prescribing physicians of the dangers associated with their products. *See, e.g.*, *Nye v. Bayer Cropscience*, 347 S.W.3d 686, 700-704 (Tenn. 2011) (discussing extension of learned intermediary doctrine to asbestos context). Other courts refer to the "sophisticated purchaser" doctrine, *see Cabasug*, 988 F. Supp. 2d at 1224-28; *In re Asbestos Litgation*, 542 A.2d 1205, 1209 (Del. 1986), or the "sophisticated intermediary" doctrine, *see Webb v. Special Elec. Co., Inc.*, 370 P.3d 1022, 1033 (Cal. 2016). At least one court has distinguished between the learned intermediary or sophisticated purchaser doctrine, on one hand, and the "sophisticated user" defense, on the other. *Cabasug*, 988 F. Supp. 2d at 1219 ("Under the sophisticated user defense, manufacturers or suppliers of a product have the burden of demonstrating that the ultimate end-user of the product (*i.e.*, [the plaintiff]), was . . . already aware or reasonably should have been aware of the dangers of asbestos."). Here, Defendants refer interchangeably to the sophisticated purchaser and sophisticated user doctrine, but the substance of their arguments rests upon the sophisticated purchaser doctrine—that is, they allege that "knowledgeable intermediar[ies]" stood between themselves and Mr. Jack.[34] (Def. Jt. Resp. at 15.)

Washington case law on the sophisticated purchaser or learned intermediary doctrine centers almost exclusively on the pharmaceutical context. *See Taylor v. Intuitive Surgical, Inc.*, 389 P.3d 517, 524-25 (Wash. 2017). But Washington courts have

---

[34] Defendants also assert the affirmative defense of contributory negligence, which resembles the sophisticated user doctrine. The court addresses contributory negligence below (*see infra* § III.C.4).

recognized a variant of the sophisticated purchaser doctrine in toxic tort claims, where a manufacturer or supplier of the products alleged to have caused the plaintiff's injuries warns the plaintiff's intermediary or employer of the products' dangerous propensities. *See, e.g.*, *Reed v. Pennwalt Corp.*, 591 P.2d 478 (Wash. Ct. App. 1979). In *Reed*, the Washington Court of Appeals held that a caustic soda manufacturer was not required to warn the employees of a food processing plant of the product's hazards; the manufacturer fulfilled its duty by warning the plaintiff's employer, which purchased the soda and had exclusive control over its use in the plant. *Id.* at 482. As the *Reed* court explained, such limitations on manufacturer liability "[are] particularly appropriate when . . . the intermediate buyer is a large industrial concern with its own safety programs and method of product distribution and where the manufacturer may have no effective means of communicating the warnings to the ultimate user." *Id.* at 481.

Washington courts have yet to consider whether a defendant-manufacturer or supplier may invoke the sophisticated purchaser doctrine in an asbestos suit. Other jurisdictions take various approaches. One state supreme court has declined to extend the sophisticated purchaser doctrine to the asbestos context, "[g]iven the highly hazardous nature of asbestos [and] the dire consequences to the unwarned consumer." *Nye*, 347 S.W. 3d at 704. *See also Mack v. Gen. Elec. Co.*, 896 F. Supp. 2d 333, 343 (E.D. Penn. 2012) (holding that "the 'sophisticated purchaser' defense is not available under maritime law in cases involving asbestos"). In contrast, some courts have found that manufacturers and suppliers of asbestos-containing products are not liable for a user's injuries where they knew or reasonably believed that an intermediary, such as an

employer, was aware of the dangers of asbestos and reasonably concluded that the intermediary would warn the user. *See, e.g.*, *In re Asbestos Litigation*, 542 A.2d 1205, 1212 (Del. 1986) (declining to grant summary judgment on the defendant's "sophisticated purchaser" defense, on grounds a jury could find that the defendant knew or should have known the purchaser did not warn its employees about asbestos hazards). Still other courts have held that a manufacturer may invoke the learned intermediary doctrine only if it has actually warned the intermediary or knew a warning was unnecessary because the intermediary was already aware of asbestos-related hazards. *See Eagle-Pincher Indus., Inc. v. Balbos*, 604 A.2d 445, 465 (Md. 1992) (where the defendant suppliers knew asbestos was inherently dangerous and made no attempt to warn the employer, the submission of the sophisticated purchaser defense to the jury was not warranted).

Typically, where Washington courts have not spoken on an issue before the court, the court "must resort to other authority and exercise [its] own best judgment" in determining how the Washington Supreme Court would resolve the issue. *Burns*, 929 F.2d at 1424. Here, however, the court need not decide whether and under what circumstances the Washington Supreme Court would permit asbestos manufacturers and suppliers to invoke the learned intermediary doctrine for the simple reason that DCo and Borg-Warner provide no evidence that Mr. Jack encountered their products while working for a sophisticated purchaser of any kind.

Defendants focus almost exclusively on the Navy's knowledge of asbestos hazards. Specifically, Defendants imply that if Mr. Jack was informed of those dangers

during his naval service, then they cannot be held liable for a later failure to warn. (*See* Def. Jt. Resp. at 15 ("The Navy and PSNS facts here support the defense[] of . . . knowledgeable intermediary, specifically the fact that the Navy retained exclusive control over the procedures followed by Navy (including PSNS) personnel when handling asbestos.") But neither Plaintiffs nor Defendants allege that Mr. Jack ever worked with DCo or Borg-Warner products during his naval service. Rather, both Defendants are alleged to have manufactured or supplied asbestos-containing automotive products that Mr. Jack used in the course of his personal and professional automotive work. (*See* Pl. MSJ DCo at 2 (stating that "Mr. Jack worked with automobiles, including automobiles utilizing [DCo's] Victor gaskets"); Pl. MSJ Borg-Warner MSJ at 2 (alleging that "Mr. Jack worked with asbestos-containing BorgWarner clutches as a professional auto mechanic" and during personal automotive work); *see generally* Def. Jt. Rep.)

In all its variants, the sophisticated purchaser doctrine is particular as between defendants: a defendant-manufacturer may assert the defense only if it relied on an intermediary to warn the injured party of the hazards of the manufacturer's own products. *See Adkins v. GAF Corp.*, 923 F.2d 1225, 1230 (6th Cir. 1991) ("[T]he pivotal inquiry in determining whether [the sophisticated purchaser] defense is available is a fact-specific evaluation of the reasonableness of the supplier's reliance on the third party to provide the warning."). Because no facts in the record support the inference that either DCo or Borg-Warner relied on any intermediaries to communicate the alleged hazards of its own products to Mr. Jack, Plaintiffs are entitled to partial summary judgment as to these Defendants' assertion of the sophisticated purchaser doctrine.

4. <u>Contributory Negligence and Assumption of Risk</u>

Plaintiffs move for partial summary judgment against DCo and Borg-Warner on the affirmative defenses of contributory negligence and assumption of risk. (Pl. MSJ DCo at 4-6; Pl. MSJ Borg-Warner at 6-7; Pl. MSJ Union Pacific at 6-7.) According to Plaintiffs, Defendants provide no evidence that Mr. Jack was aware of the hazards of asbestos when working with Defendants' products and thus cannot show that he was contributorily negligent or that he knowingly assumed the risks of asbestos exposure. (Pl. MSJ DCo at 4-6; Pl. MSJ Borg-Warner at 6-7.) In opposing Plaintiffs' motion, Defendants argue that Mr. Jack negligently or knowingly failed to take certain safety precautions while working with asbestos-containing products, thereby increasing his risk of developing mesothelioma. (Def. Jt. Resp. at 15-18.)

*a. Washington Product Liability Act*

The availability of the affirmative defenses of contributory negligence and assumption risks depends in part on whether the action sounds in negligence or strict liability and in part on whether the Washington Product Liability Act of 1981 ("WPLA"), RCW § 7.72, *et seq.*, governs Plaintiffs' claims. Before 1981, the former comparative negligence statute, RCW 4.22.010 (1974), operated to reduce a plaintiff's recovery in negligence actions in proportion to the plaintiff's contributory negligence.[35] In contrast, a

_____

[35] Before 1974, contributory negligence was a complete bar to a plaintiff's recovery in negligence. *See, e.g.*, *Crawford v. Miller*, 566 P.2d 1264, 1266 (Wash. Ct. App. 1977) (contrasting contributory negligence as "a total defense" with the post-1974 "comparative negligence formula" of RCW 4.22.010). The comparative negligence regime introduced in 1974 applies retroactively. *Coulter v. Asten Group, Inc.*, 146 P.3d 444, 450 (Wash. Ct. App.) (holding that the trial court properly rejected the argument that the plaintiff was barred from recovering

defendant in a strict liability action to which pre-1981 law applies is barred from

asserting contributory negligence, as "strict liability is based on a no-fault concept" to

which negligence principles are inapposite. *Seay v. Chrysler Corp.*, 609 P.2d 1382, 1384

(Wash. 1980) (quoting *Wenatchee Wenoka Growers Ass'n v. Krack Corp.*, 576 P.2d 388,

391 (Wash. 1978)). Unlike the affirmative defense of contributory negligence, the

assumption of risk doctrine "operates as a damage-reducing factor" in both negligence

and strict liability actions brought under pre-WPLA law. *See, e.g.*, *South v. A.B. Chance

Co.*, 635 P.2d 728, 728 (Wash. 1981) (answering a certified question from the U.S.

District Court for the Western District of Washington regarding the impact of an

assumption of risk defense in strict liability actions to which the WPLA is not

applicable); *Boeke v. Int'l Paint Co., Inc.*, 620 P.2d 103, 105 (Wash. Ct. App. 1980)

(holding that an assumption of risk defense is available in negligence actions as "a

damage-reducing factor").

The WPLA not only created a single cause of action for product liability claims,

*see e.g.*, *Wash. Water Power Co. v. Graybar Elec. Co.*, 774 P.2d 1199, 1204 n.4 (Wash.

1989), but also replaced the former comparative negligence statute with a broad

contributory fault provision, *see Christensen v. Royal Sch. Dist. No. 160*, 124 P.3d 283,

285 (Wash. 2005). In a product liability action brought under the WPLA, "any

contributory fault chargeable to the claimant diminishes proportionately the amount

---

for asbestos-related injuries incurred before 1974 on account of his contributory negligence); *Godfrey v. State*, 530 P.2d 630, 634 (Wash. 1975) (holding that because the legislature intended that the comparative negligence statute apply retroactively, "there is no question whether the total bar to recovery has been abolished once and for all").

awarded as compensatory damages for an injury attributable to the claimant's contributory fault."  RCW 4.22.005; *see also Lundberg v. All-Pure Chem. Co.*, 777 P.2d 15, 18 (Wash. Ct. Ap. 1989) (noting that "[t]here currently is no reason to distinguish between negligence and strict liability actions for purposes of instructing a jury on the plaintiff's comparative fault").  The term "contributory fault" encompasses a broader range of conduct than the former comparative negligence statute, including both contributory negligence and certain variants of assumption of risk.  *Scott v. Pac. W. Mountain Resort*, 834 P.2d 6, 12-13 (Wash. 1992) (noting that "implied primary" assumption of risk continues to operate as a complete bar to recovery under the WPLA, but that other forms of assumption of risk only reduce damages); *Falk v. Keene Corp.*, 782 P.2d 974, 980 (Wash. 1989) ("RCW 4.22.005 and 4.22.015 . . . provide that in actions involving product liability claims the contributory negligence of a plaintiff diminishes proportionately damages otherwise recoverable.").

The WPLA supplants common law product liability claims that arise on or after its effective date, July 26, 1981.  *Macias v. Saberhagen Holdings, Inc.*, 282 P.3d 1069, 1073 (Wash. 2012); *see also* RCW 4.22.920(1).  This rule is complicated where "a plaintiff's alleged exposure to injury-causing products is prolonged or continuous in nature."  *Fagg v. Bartells Asbestos Settlement Tr.*, 339 P.3d 207, 211 (Wash. Ct. App. 2014).  In such cases, the WPLA applies unless "substantially all" of the exposure was alleged to occur before July 26, 1981.  *Macias*, 282 F.3d at 1073; *see also Koker v. Armstrong Cork, Inc.*, 804 P.2d 659, 663-64 (Wash. Ct. App. 1991) (where "substantially all" of the injury-producing events exposing a plaintiff to asbestos occurred prior to the WPLA's effective

date, the plaintiff's product liability claim did not "arise" after that date). "For purposes of determining whether a claim arises under the WPLA as to a specific defendant, the determinative factor is when all or substantially all of the plaintiff's exposure to that defendant's particular asbestos-containing products occurred." *Fagg*, 339 P.3d at 213.

The parties' briefing neglects the WPLA's applicability to Plaintiffs' negligence and strict liability claims. Defendants' joint response assumes the WPLA applies. (*See* Def. Jt. Resp. at 16-17 (referring to "comparative fault system established in RCW 4.22.005").) Plaintiffs fail to address the issue. (*See* Pl. Rep. at 3-5.) It is not the court's task to do so here: the question of whether "substantially all" of the events giving rise to Mr. Jack's injuries occurred before 1981 is at least partly a question of fact.

Even so, the court can at this time consider in part the merits of Plaintiffs' motions. Whether or not Plaintiffs' negligence claims take the form of a product liability action under the WPLA, Defendants are free to argue comparative fault, which encompasses both contributory negligence and assumption of risk. Similarly, regardless of whether pre-1981 law or the WPLA governs Plaintiffs' strict liability claims, Defendants may assert an assumption of risk affirmative defense. *South*, 635 P.2d at 729 (holding that an assumption of risk defense is available in claims not governed by the WPLA); *Christensen*, 124 P.3d at 289 ("[T]he contributory fault statute encompasses . . . assumption of risk."). The viability of Defendants' contributory negligence defense to Plaintiffs' strict liability claims is less clear. If pre-1981 law applies, Defendants' contributory negligence affirmative defense fails as a matter of law. *See Seay*, 609 P.2d at 1384. But if the WPLA applies, Defendants may, on the basis of

the WPLA's broad comparative fault scheme, seek to reduce Plaintiffs' damages on account of Mr. Jack's own negligence. *See Falk*, 782 P.2d at 980.

Accordingly, the court reserves ruling on Plaintiffs' motions for partial summary judgment on the affirmative defense of contributory negligence as to Plaintiffs' strict liability claims against DCo and Borg-Warner. Plaintiff's motions are thus denied in part. The court can, however, consider whether Plaintiffs are entitled to partial summary judgment on Defendants' affirmative defenses of contributory negligence and assumption of risk as to Plaintiffs' negligence claims, because these affirmative defenses are available regardless of whether the WPLA applies.

> ### b. *Washington Law on Contributory Negligence and Assumption of Risk*

To prove contributory negligence under Washington law, "the defendant must show that the plaintiff had a duty to exercise reasonable care for her own safety, that she failed to exercise such care, and that this failure is a cause of her injuries." *Gorman v. Pierce Cty.*, 307 P.3d 795, 807 (Wash. Ct. App. 2013). "Whether there has been negligence or comparative negligence is a jury question unless the facts are such that all reasonable persons must draw the same conclusion from them, in which event the question is one of law for the courts." *Dunnington v. Virginia Mason Med. Ctr.*, 389 P.3d 498, 503 (Wash. 2017) (quoting *Hough v. Ballard*, 31 P.3d 6, 10 (Wash. Ct. App. 2001)).

To invoke the doctrine of assumption of risk, "a defendant must show that the plaintiff knowingly and voluntarily chose to encounter the risk." *Home v. N. Kitsap Sch.*

//

*Dist.*, 965 P.2d 1112, 1119 (Wash. Ct. App. 1998).[36]  Specifically, "the evidence must

show the plaintiff (1) had full subjective understanding (2) of the presence and nature of

the specific risk, and (3) voluntarily chose to encounter the risk."  *Id.* (quoting *Kirk v.*

*Wash. State Univ.*, 746 P.2d 285, 288 (Wash. 1987)); *see also Stevens v. CBS Corp.*, No.

C11-6073RBL, 2012 WL 5844704, at *6 (W.D. Wash. Nov. 19, 2012) (assessing the

assumption of risk defense under Washington law in the context of an asbestos-related

personal injury claim).  "Knowledge and voluntariness are questions of fact for the jury,

except when reasonable minds could not differ."  *Home*, 1112 P.2d at 1119.

Defendants' evidence of Mr. Jack's alleged contributory negligence and

assumption of risk falls into two categories:  the Navy's knowledge of asbestos hazards

and Mr. Jack's knowledge of asbestos hazards.  Puzzlingly, most of Defendants' response

addresses evidence of the Navy's understanding of the dangers of asbestos exposure

during the period of Mr. Jack's naval service and employment at PSNS.  (*See* Def. Jt.

Resp. at 4-11).  According to Defendants, "if a jury finds that PSNS or the Navy knew

about a potential for [Mr. Jack] to be exposed to asbestos, then on the same evidence . . .

the jury could reasonably conclude that [Mr. Jack] in fact knew the same and voluntarily

assumed the risk of resulting injury."  (Def. Jt. Resp. at 19.)  The court rejects

---

[36] Among Washington courts, "[t]he entire doctrine of 'assumption of risk' is surrounded
by much confusion."  *Scott*, 834 P.2d at 12.  The Washington Supreme Court has identified four
facets of the doctrine of assumption of risk:  (1) express assumption of risk; (2) implied primary
assumption of risk; (3) implied reasonable assumption of risk; and (4) implied unreasonable
assumption of risk.  *Home v. N. Kitsap Sch. Dist.*, 965 P.2d 1112, 1118 (Wash. Ct. App. 1998).
The latter two facets "are nothing but alternative names for contributory negligence."  *Id.*  The
parties' submissions do not address which of these variants are at issue here.

Defendants' efforts to impute to Mr. Jack the Navy's knowledge of asbestos-related dangers. *See Kelly v. CBS Corp.*, No. 11-CV-03240-VC, 2015 WL 12942244, at *1 (N.D. Cal. April 13, 2015) ("The defendants . . . may not seek to impute the Navy's knowledge to [the plaintiff].") Defendants emphasize that in 1950, PSNS issued a safety manual that instructed workers to wear respirators when handling asbestos-containing insulation. (Def. Jt. Resp. at 7 (citing Warren Pumps Exp. Discl. (Dkt. # 297) Ex. 1 at 18).) But Defendants do not show that Mr. Jack—or any other worker at PSNS— received that manual. (*See* Def. Jt. Resp. at 15-20.) In fact, Mr. Jack unequivocally denied that he ever saw it. (Jack Disc. Dep. 400:11-15.) There is no evidence in the record that Mr. Jack actually received information from the Navy that caused him to know, or should have caused him to know, of the dangers of asbestos exposure. *See Kelly*, 2015 WL 12942244, at *1.

Nonetheless, Defendants provide circumstantial evidence that Mr. Jack may have gained some awareness of asbestos hazards in the late 1970s. First, Defendants offer an occupational history form, dated August 1979, which reported that Mr. Jack "had some exposure to asbestos by working 50% of time aboard ship where he encountered same space exposure with asbestos workers," as well as "some exposure to asbestos by working as an auto mechanic." (Kero Decl. (Dkt. # 618) ¶ 11, Ex. 10 at 1.) On the basis of that evidence, a juror could reasonably infer that Mr. Jack discussed asbestos exposure with a medical provider in 1979. Additionally, Mr. Jack testified that in the late 1980s or early 1990s, he attended a PSNS training on asbestos exposure where he was instructed

//

1 to "lay . . . asbestos-type components" on damp rags to lessen the risk of exposure.  (Jack

2 Disc. Dep. at 72:2-17.)

3   Taken together, Defendants' evidence could conceivably support the inference that

4 a reasonable worker who underwent the same occupational health assessment Mr. Jack

5 did in 1979, and attended the same PSNS training, was aware that asbestos exposure

6 poses health risks.  Additionally, a reasonable factfinder could conclude that after 1979,

7 Mr. Jack was subjectively aware of those risks.  To be sure, Defendants' evidence is far

8 from conclusive.  Neither Borg-Warner nor DCo adduces evidence to show that Mr.

9 Jack's alleged exposures to their products only occurred after he discussed his

10 occupational asbestos exposure in 1979.  (*See generally* Def. Jt. Rep.; DCo Resp.)

11 Moreover, Mr. Jack testified that the PSNS exposure training did not instruct workers to

12 wear respirators or masks when handling asbestos-containing materials.  (Jack Disc. Dep.

13 72:12-21.)  But in light of the evidence Defendants do provide, as well as the fact-

14 intensive nature of the contributory negligence defense under Washington law, *see*

15 *Dunnington*, 389 P.3d at 503, the court denies Plaintiffs' motions for partial summary

16 judgment on DCo and Borg-Warner's contributory negligence and assumption of risks

17 defenses with respect to Plaintiffs' non-strict liability claims.

18   5. <u>Superseding Cause</u>

19   DCo, Borg-Warner, and Ford seek to assert the affirmative defense of superseding

20 cause.  Specifically, these Defendants argue that "Mr. Jack's exposure to asbestos in the

21 Navy and at PSNS can be found to be a superseding cause of his injury."  (Def. Jt. Resp.

22 at 21.)  Plaintiffs move for summary judgment on the affirmative dense of superseding

cause as to each of these Defendants, asserting that "[i]t was entirely foreseeable that other entities might fail to warn or protect persons such as Mr. Jack" from asbestos-related harms. (Pl. MSJ DCo at 9; Pl. MSJ Borg-Warner at 10; Pl. MSJ Ford at 6.)

A superseding cause is "a new independent cause that breaks the chain of proximate causation between a defendant's negligence and an injury," becoming "the sole proximate cause of the injury" and absolving a defendant's "liab[ility] for harm to another which his antecedent negligence is a substantial factor in bringing about." Wash. Pattern Jury Inst. § 15.05; *Campbell v. ITE Imperial Corp.*, 733 P.2d 969, 972-73 (Wash. 1987) (citing the Restatement (Second) of Torts § 440 (1965)). "Whether an [intervening] act may be considered a superseding cause sufficient to relieve a defendant of liability depends on whether the intervening act can reasonably be foreseen by the defendant; only intervening acts which are not reasonably foreseeable are deemed superseding causes." *Crowe v. Gaston*, 951 P.2d 1118, 1122 (Wash. 1998) (internal quotation marks and citations omitted). Where the negligence of another is alleged to be a superseding cause, the defendant must show that "the intervening negligence . . . [is] so extraordinary or unexpected that it falls outside the realm of reasonably foreseeable events; unless this threshold is met, there is not [a] superseding cause." *Hoglund v. Raymark Indus., Inc.*, 749 P.2d 164, 171 (Wash. Ct. App. 1987).

To survive Plaintiffs' motion for partial summary judgment on superseding cause, Defendants must show that a reasonable factfinder could conclude that the asbestos exposure Mr. Jack suffered as a result of non-party entities' conduct was so unforeseeable

as to absolve Defendants of their potential liability.  *See Crowe*, 951 P.2d at 1122.

Defendants do not make that showing here.  Rather, they default to arguments on

proximate cause.  Given the nature and extent of Mr. Jack's exposures to asbestos during

his naval service and at PSNS, Defendants contend, their own products cannot be found

to have proximately caused Mr. Jack's disease.  (*See* Ford Resp. at 5-6 ("[E]ven if the

jury finds that Ford was negligent or at fault in distributing asbestos-containing products,

the jury could find . . . that . . . the PSNS exposures combined with the Navy exposures[]

were the sole proximate cause of Mr. Jack's disease[.]"); DCO Resp. at 3 ("DCo

strenuously disagrees that any product for which it is responsible caused or contributed to

[Mr. Jack's] illness.").)

These assertions undoubtedly bear on proximate causation and apportionment of

fault.  But Defendants cannot premise a superseding cause defense solely on the

allegation that Mr. Jack suffered other, more causally significant exposures to the very

same harm they are alleged to have produced.  *See Campbell*, 733 P.2d at 972 (noting

that superseding cause may be found where "the intervening act created a *different type of

harm* than otherwise would have resulted") (emphasis in original).  Moreover,

Defendants provide no evidence to suggest that the asbestos exposure Mr. Jack suffered

in the Navy and at PSNS was capable of "break[ing] the original chain of causation"

between Defendants' alleged negligence and Mr. Jack's injury.  *Id.* at 973 (internal

quotation marks and citation omitted).  In fact, the expert opinions in the record

overwhelmingly contemplate the possibility of co-occurring causes.  (*See* Brodkin Rep.

§§ 2, 5.)

Based on the evidence before the court, Defendants' superseding cause defense fails as a matter of law. The court thus finds that Plaintiffs are entitled to summary judgment as to DCo, Borg-Warner, and Ford's affirmative defense of superseding cause.

### 6. Summary

In sum, the court denies Plaintiffs' blanket motion for summary judgment on Defendants' affirmative defenses. The court grants Plaintiffs' motion for summary judgment against Borg-Warner on the affirmative defense of failure to mitigate damages. The court grants Plaintiffs' motions for summary judgment against DCo and Borg-Warner on the sophisticated purchaser doctrine. The court denies in part and reserves ruling in part on Plaintiffs' motions for summary judgment against DCo and Borg-Warner on the affirmative defenses of contributory negligence and assumption of risk. The court grants Plaintiffs' motions for summary judgment against DCo, Borg-Warner, and Ford on the affirmative defense of superseding cause.

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part Ford's motion for partial summary judgment (Dkt. # 449), GRANTS Union Pacific's motion for summary judgment (Dkt. # 476), and GRANTS in part and DENIES in part Borg-Warner's motion for summary judgment (Dkt. # 518). The court further GRANTS in part and DENIES in part Plaintiffs' motions for partial summary judgment on the

//

//

//

affirmative defenses asserted by DCo (Dkt. # 503), Ford (Dkt. # 505), and Borg-Warner (Dkt. # 507).  Finally, the court DENIES as moot Plaintiffs' motion for partial summary judgment on the affirmative defenses asserted by Union Pacific (Dkt. # 509).

Dated this 17th day of September, 2018.

The Honorable James L. Robart
U.S. District Court Judge