1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| LESLIE JACK, individually and as Personal Representative of PATRICK JACK; DAVID JACK, Individually,<br><br>        Plaintiffs,<br><br>    v.<br><br>ASBESTOS CORPORATION LTD., et al.,<br><br>        Defendants. | NO.  2:17-cv-00537 JLR<br><br>DEFENDANT DCO LLC'S TRIAL BRIEF<br><br>THE HONORABLE JAMES L. ROBART<br>Trial Date:  October 1, 2018 |

Defendant  DCo  LLC,  formerly  known  as  Dana  Companies,  LLC,  respectfully

submits the following trial brief.

## I. STATEMENT OF FACTS

### A.    Factual Background

Decedent Patrick Jack was born in Portland, OR on August 4, 1936.  He attended

and graduated from high school in Ballard, WA in 1955.  Following high school, Mr. Jack

worked at  the  Boeing  Company  from  1955  to  1961,  while  concurrently  undergoing  a

machinist apprenticeship program.  He then served in the U.S. Navy Reserves from 1954

to 1961, and entered active duty from 1961-1962, serving aboard the USS Charles E.

DEFENDANT DCO LLC'S TRIAL BRIEF - 1 of 25
(**2:17-cv-00537 JLR**)
[4822-2575-7810]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 -  FACSIMILE (206) 676-7575

Brannon (DE-446) as a Machine Repairman 3rd Class.  From 1962 to 1964 he co-owned an auto repair shop in Seattle, where he performed automotive mechanical repairs.  From 1964 to 1968 he was a union machinist at Electronics Specialties Co., in Portland, Oregon, which made airplane parts.  During that same period, he worked as a tow truck maintenance mechanic for a mobile home towing company.  Mr. Jack started working at the Puget Sound Naval Shipyard ("PSNS") in late 1967 or early 1968 and worked there until his retirement in 1993.  He began as an Inside Machinist, working in the shop repairing valves, pumps, pipe hangers, flanges.  Mr. Jack later became a Nuclear Inspector at PSNS but was once "loaned" to the Outside Machinists for about one year in the 1973 to 1974-time period.  Thereafter, he returned to his normal job duties.  As a Nuclear Inspector, Mr. Jack inspected the work of the Nuclear Outside Machinists on ships and submarines.

Plaintiffs admit Mr. Jack received exposure to asbestos and asbestos-containing products during both his Navy Reserve/Navy service and during his shipyard work at PSNS.  Depending on the outcome of Plaintiffs' Motion for Reconsideration (Dkt. 714), DCo may present evidence that Mr. Jack was also exposed to asbestos at Union Pacific premises when he visited his father.

In addition, Plaintiffs claim that Mr. Jack had exposure to asbestos-containing products in association with his service work on automobiles from 1954 to 2016.  Plaintiffs claim he was exposed to asbestos from his work with and around automotive friction products including brakes, clutches, and gaskets; throughout his work as a professional mechanic; on his own personal race cars; the race cars of his friends; and through his work on the vehicles of friends, family, and on his own vehicles.

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 -  FACSIMILE (206) 676-7575

**B.**   **Plaintiffs' Claims Against DCo and Issues Related to the "Victor Gaskets" Box Found in Mr. Jack's Garage**

Plaintiffs' claims against DCo relate to Decedent Patrick Jack's work with Victor gaskets—one of the brands of gaskets he identified using during his work on vehicles. Mr. Jack estimated he removed over 200 Victor gaskets spanning over three decades. DCo's corporate representative for the Victor Products Division, Marcella Duncan, will testify the Victor Products Division made thousands of different gaskets that varied in many ways, such as size, shape, and physical characteristics according to the type of engine, size of engine, number of cylinders, make of engine, year, and model of engine. Some, but not all, of the Victor gaskets placed in the stream of commerce contained asbestos mixed with other materials, such as steel, elastomeric binder material, and copper.  Other gaskets manufactured by Victor contained no asbestos and were made of cellulose, metals, rubber, cork and other materials.

Mr. Jack had a box in his garage with "VICTOR GASKETS" printed on it and testified that the box was for a 1939 Allis Chalmers bulldozer he had worked on. (Dkt. # 515-10 [excerpts of Mr. Jack's deposition] at 53:4 – 54:1.)  Plaintiffs' expert, Sean Fitzgerald, tested the 31 gaskets he located inside this box and found 6 of them contained asbestos (chrysotile and tremolite).  See, e.g., Dkt. #511, DCo's Motion to Exclude Fitzgerald. Plaintiffs admit to the Court that Mr. Jack did not work with the gaskets inside this box (Dkt. 571, 8:20-21, ["Of course he did not work on these unused Victor gaskets from a sealed box."]) but, nevertheless, intend to argue the gaskets inside this box are "precisely the type of gaskets that Mr. Jack had worked on hundreds of times" and were "plainly representative of the types of exposures Mr. Jack had when he removed and replaced Victor gaskets from countless vehicles for six decades."  (Dkt # 571 at 8:18-23.)  This

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 -  FACSIMILE (206) 676-7575

box, and the speculative conclusions Plaintiffs intend to draw from the gaskets inside the box, are misleading and prejudicial for three reasons:

(1) There is no evidence the gaskets Sean Fitzgerald found in this box were actually the gaskets that came in the box when it was placed in the stream of commerce; and

(2) The box and the gaskets are irrelevant to the issue of exposure or causation because Mr. Jack was not exposed to the gaskets; and

(3) The gaskets in this box are misleading, confusing and prejudicial because there is no evidence they are representative of the Victor gaskets Mr. Jack worked with throughout his life.

"[N]o photos of the gaskets within the sealed box existed before" Sean Fitzgerald tested the gaskets for asbestos (Dkt. 571 at 6:8-11) and virtually all of the gaskets have no identifying markers, which makes it impossible for a jury, lay witness or expert to conclude the gaskets were, in fact, Victor gaskets. Mr. Jack testified he purchased the box "probably 20 years" earlier (approximately 1997).  There is insufficient evidence to establish the provenance of this box or its contents at the time it was purchased or factory sealed.  DCo does not dispute the fact that the box appears to be a genuine Victor Gasket box.  However, the available evidence contradicts Plaintiffs' assumption that the box is factory sealed and contains gaskets manufactured by Victor that were sold in the regular course of product distribution and sale.

When Mr. Jack received the box, handwriting on the box included, "Allis Chalmers Complete O Haul Set, $125, Rare, From Warehouse in Oregon" and the word, "Obsolete." Mr. Jack does not know who wrote either entry.  (Dkt # 589-1 at 557:13 – 558:7.) Furthermore, while Plaintiffs insist the box was sealed and contains unused gaskets, *inside* the purported sealed box contained a ripped sheet of white paper with handwriting

DEFENDANT DCO LLC'S TRIAL BRIEF - 4 of 25
(**2:17-cv-00537 JLR**)
[4822-2575-7810]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 -  FACSIMILE (206) 676-7575

on it as well as bend or broken gaskets.  (Dkt. # 457-4 – 457-7.)  No evidence exists as to the source or meaning for the handwriting on or inside the box and no explanation exists as to why the gaskets inside the box are bent or broken.

There is also no reliable way to conclude the box was sealed or that the contents of the box are what they were when Mr. Jack bought some times in the 1990s.  Mr. Jack's son, David, moved the box at times in his father's garage and testified the box was damaged or unopened, which prompted him to push back into the box the gaskets that were sticking out:  (Dkt # 589-2 at 181:20 – 182:5.)  -He testified, "well, the box is taped up and things were sticking out of it, so I've physically seen a gasket sticking out of that box, and you shove it back in and push the piece of cardboard back in so they don't fall out." (*Id.* at 182:19-22.)

Furthermore, it would be misleading, confusing, and prejudicial for Plaintiffs to argue to the jury that these gaskets were representative of the "hundreds" of Victor gaskets Mr. Jack replaced because Mr. Jack never testified to such a thing.  He testified the gaskets inside the box were for a 1939 Allis-Chalmers bulldozer, which is not representative of gaskets he testified to replacing on automobiles and race cars. He also testified gasket kits usually contained nine or ten gaskets (Dkt. 515-10 at 44:4-16)—not the 31 Sean Fitzgerald found in the box Plaintiffs' counsel sent to him.

DCo objects to Plaintiffs referring to this box or the gaskets inside under FRE 401, 402 and 403 and identifies these objections with specific explanations in its objections to Mr. Jack's page-line deposition designations.

**DEFENDANT DCO LLC'S TRIAL BRIEF** - 5 of 25
(**2:17-cv-00537 JLR**)
[4822-2575-7810]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 -  FACSIMILE (206) 676-7575

C.      DCo's Knowledge of Asbestos Hazards.

Before the mid-1970s, there was no reliable evidence generally accepted in the medical community that asbestos thermal insulation products posed occupational health hazards to users or bystanders.

During World War II, asbestos-containing products were widely used in United States shipyards because of their incomparable qualities of tensile strength, moldability, and fire, heat, and corrosion resistance.   In 1945, Dr. Fleischer and his associates conducted an in-depth health survey of four shipyards involving 1,683 workers.   The study included chest X-rays and extensive measurements of airborne dust at the worksites.  Despite heavy dust concentrations, the researchers found almost no evidence of asbestos disease.  The researchers concluded that "the character of the asbestos pipe-covering industry on board naval vessels is such that conclusions drawn from other asbestos industries such as textiles cannot be applied" and that "[i]t may be concluded that [installing] such pipe-covering is not a dangerous occupation."  Fleischer, *Journal of Industrial Hygiene Toxicology,* 25:9 (1945).   In 1947, the American Conference of Governmental Industrial Hygienists established a safe level called the "Threshold Limit Value" for exposure to asbestos at 5 million particles per cubic foot.

The conclusions of Dr. Fleischer and his researchers remained virtually unchallenged until 1965, when Dr. Irving Selikoff published *The Occurrence of Asbestosis Among Insulation Workers in the United States*, Annals of the New York Academy of Science 132 (1965).  Even then, Dr. Selikoff agreed with Dr. Fleischer that the health risk of the textile industry could not be extrapolated to the insulation industry because of their different working conditions:

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 -  FACSIMILE (206) 676-7575

> The different occupations vary widely in important respects: in intimacy, intensity and duration of exposure; in variety and grade of asbestos used; in working conditions; in concomitant exposure to other dusts and inhalants.

*Id.* at 139.

It is clear that as late as 1968, Dr. Selikoff remained convinced that asbestos-containing thermal insulation products could be used safely if appropriate industrial hygiene were practiced.  In an April 10, 1968, letter from Dr. Selikoff to G.W. Burgess, then president of Fibreboard Paper Products Corporation, Dr. Selikoff wrote,

> The New York Academy of Sciences has had a continuing interest in problems of health hazards in the asbestos insulation industry.  Recent evidence suggests that while these hazards may be significant, conversely *they may be sharply reduced or eliminated by appropriate remediable (sic) measures*.
>
> The Academy's Division of Environmental Sciences is therefore convening a Working Group on Insulation Industry Hygiene to consider the steps necessary to formulate an *appropriate industrial hygiene program for this important industry*.

(Emphasis added.)  Thus, at the end of the 1960s, not even those scientists at the cutting edge of asbestos medicine were calling for a ban on the use of asbestos.

In 1970, Dr. Selikoff explained why medical researchers had failed for so long to recognize the danger of occupational exposure to asbestos.  Asbestos health hazards were obscured by (1) the extremely long latency period (20 to 40 years) of asbestos-related diseases, (2) the mistaken belief that simple dust-suppression measures would be sufficient to protect workers, and (3) the difficulty of identifying stable populations of asbestos workers for epidemiological research.  Selikoff, *Partnership for Prevention—The Insulation Industry Hygiene Research Program*, 39 Industrial Medicine No. 4 (April 1970).

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Dr. Selikoff's initial conclusions, published in 1965, were preliminary and tentative, having been based on a small sample of 632 insulation workers, the confirming results of a more definitive study, based on a sample of 17,800 insulators, was not published until 1979.  Selikoff, Hammond & Seidman, *Mortality Experience of Insulation Workers in the United States and Canada, 1943-1976*, 330 Annals of the New York Academy of Sciences, 91-116 (1979).

Not until 1975 and 1976 did Dr. Selikoff and his associates begin a systematic study of the asbestos exposure experienced by those shipyard workers who were not directly involved in installing or removing asbestos insulation products.  Such workers, including painters, electricians, welders, carpenters, and boilermakers, had only indirect and secondary exposure because they worked in the proximity of insulators.  (These workers are often described as "bystanders" in epidemiological literature.)  Dr. Selikoff found that many of these bystanders had radiological evidence of asbestos disease and might have an increased risk of related cancers, although "[the] full extent of such risk is not now known."  Selikoff, Lilis & Nicholson, *Asbestos Disease in United States Shipyards*, 330 Annals of the New York Academy of Sciences, 295, 308 (1979).   Other epidemiological studies of bystander exposure cited by Dr. Selikoff in his 1979 article were published in the period 1975-1979.

The biological processes by which asbestos dust causes injury are still not understood.  Nor do researchers understand why some but not all similarly exposed workers develop asbestos-related diseases.  The hazardous nature of asbestos exposure has been demonstrated only by epidemiological research, that is, by studies of groups of insulation workers and bystanders over several decades of time.

**DEFENDANT DCO LLC'S TRIAL BRIEF** - 8 of 25
(**2:17-cv-00537 JLR**)
[4822-2575-7810]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 -  FACSIMILE (206) 676-7575

Doctors now know that such workers have an abnormally high incidence of certain lung disorders, but they do not know <u>why</u> this is true.  Reliable evidence that Amosite and Crocidolite asbestos dust is harmful in the low concentrations encountered by incidental users and even bystanders was simply not available in the years during which Mr. Coogan claims that he was exposed to thermal insulation products from his salvage yard operations or from his auto body repair work.  There is still no reliable evidence, even today, that exposure to dust from products, such as brake and clutch linings containing tiny amounts of chrysotile asbestos can cause mesothelioma.[1]

Beginning June 2, 1972, Federal Regulations required that the following warning be posted in work areas where airborne concentrations of asbestos fibers in were excess of certain then-described limits:

**Asbestos**

**Dust Hazard**

**Avoid Breathing Dust**

**Wear Assigned Protective Equipment**

**Do Not Remain in Area Unless Your Work Requires It**

**Breathing Asbestos Dust May Be Hazardous to Your Health**

20 C.F.R. § 1910.93a(g) (1972).  The Code of Federal Regulations continued to mandate use of this same warning until 1986 when the wording of the warning was changed to include specific references to "cancer" and "lung disease."

---

[1] The evidence at trial will show that there are no reliable epidemiology studies which show any link between exposure to automotive products such as brake linings and mesothelioma.  The exposure risk from automotive gaskets would be even less than that from brake linings.

**DEFENDANT DCO LLC'S TRIAL BRIEF** - 9 of 25
(**2:17-cv-00537 JLR**)
[4822-2575-7810]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 -  FACSIMILE (206) 676-7575

These warnings were intended to emphasize to insulation contractors and their employees the need to limit asbestos exposure to that level then believed to be safe. According to the author of "Asbestos and Health in 1969," the precautions were thought necessary to prevent the development of pulmonary fibrosis and lung cancer.

Dana complied with the OSHA warning requirements as they pertained to the automotive gasket industry.  Dana first published installation and work practices guides and later placed warnings on its products as required by OSHA.

The state-of-the-art evidence to be presented in this case will establish that exposure, such as that claimed by Plaintiffs, was not reasonably understood to create a risk of mesothelioma during most of the years that Plaintiffs allege decedent Patrick Jack was exposed to DCo/Dana products.  Thus, there is no basis for holding DCo liable under the facts of this case. Under Washington law, the Product Liability Act, and even prior common law, requires an assessment of the product, and warnings or instructions pertaining to the product *at the time of manufacture*, not years or decades afterwards with the benefit of hindsight.

### III. <u>NO DUTY TO WARN IS OWED FOR A RISK WHICH IS NOT FORESEEABLE</u>

The existence of a duty to warn is a threshold question determined as a matter of law. *Simonetta v. Viad Corp.,* 165 Wn.2d 341, 349, 197 P.3d 127 (2008).[2]  A product liability negligence claim focuses on the manufacturer's conduct.  *Young v. Key Pharmaceuticals, Inc.*, 130 Wn.2d 160, 178, 922 P.2d 59 (1996).   As an element of a

---

[2] In *Simonetta v. Viad Corp.,* 165 Wn.2d 341, 349, 197 P.3d 127 (2008), the Washington Supreme Court adopted the Court of Appeals' statement that "Foreseeability does not create a duty but sets limits once a duty is established," *Simonetta v. Braaten,* 137 Wn. App. 15, 23 n.2, 151 P.3d 1019 (2007).  Once this initial determination of legal duty is made, the jury's function is to decide the foreseeable range of danger therefore limiting the scope of that duty.

**DEFENDANT DCO LLC'S TRIAL BRIEF** - 10 of 25
(**2:17-cv-00537 JLR**)
[4822-2575-7810]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 -  FACSIMILE (206) 676-7575

negligence claim under products liability, as in any negligence case, the plaintiff must demonstrate a duty owed by the defendant.   *Hansen v. Friend*, 118 Wn.2d 479, 485, 824 P.2d 483 (1992).   The existence of a duty is a threshold question determined as a matter of law.  *Briggs v. Pacificorp,* 120 Wn. App. 319, 322, 85 P.3d 369 (2003).  Once a duty is found, the jury determines the scope of that duty based on the foreseeable range of danger.  *Bernethy v. Walt Failor's Inc.*, 97 Wn.2d 929, 933, 653 P.2d 280 (1982).

Under negligence law, a defendant has a duty to exercise ordinary care, and [a] manufacturer's duty of ordinary care is a duty to warn of hazards involved in the use of a product which are or should be known to the manufacturer*. Reichelt v. Johns-Manville Corp.*, 107 Wn.2d 761, 772, 733 P.2d 530 (1987).   A manufacturer's duty to use ordinary care is bounded by the foreseeable range of danger.  *Koker v. Armstrong Cork Inc.*, 60 Wn. App. 466, 480, 804 P.2d 659, *rev. denied*, 117 Wn.2d 1006, 815 P.2d 265 (1991).   It is only once a duty is found to exist, that the jury decides foreseeability by determining whether the harm was within the foreseeable scope of risk. *Rikstad v. Holmberg*, 76 Wn.2d 265, 270, 456 P.2d 355 (1969).

Here, Plaintiffs' negligence claims arise in the context of Mr. Jack's alleged use of the products at issue at a time when the dangers of chrysotile asbestos, if any, were unknown to manufacturers such as DCo/Dana.   Moreover, governmental standards regulations, as represented by the guidelines and rules issued by the U.S. Occupational Safety and Health Administration ("OSHA") not only did not ban or outlaw the use of chrysotile asbestos in gaskets, but still has not done so to this day.  Under the facts of this case, DCo had no duty to warn of hazards associated with the use of its products that was never foreseeable.  Plaintiffs' negligence claim fails.

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 -  FACSIMILE (206) 676-7575

1

## IV. <u>PLAINTIFFS CANNOT DEMONSTRATE A POST-SALE DUTY TO WARN</u>

2

Plaintiffs cannot show any post-sale duty to warn.  Before this Court can allow a

3

claim for a post-sale duty to warn to go to the jury, it must find that the Plaintiffs have

4

sufficient evidence on each of the elements of such a claim.  See *Esparza v. Skyreach*

5

*Equip., Inc.*, 103 Wn. App. 916, 935 (2000) ("Whether a manufacturer has a [post-sale]

6

duty to warn is a question of law for the court."); *Briggs v. Pacificorp,* 120 Wn. App. at 322

7

("The existence of a duty is a threshold question determined as a matter of law.").  As will

8

now be shown, Plaintiffs cannot establish at least two of the elements required under

9

10

Washington law to present a jury issue on a claim for post-sale failure to warn.

11

Accordingly, there should be no evidence admitted relating to any post-exposure duty nor

12

any jury instruction of such a duty.

13

The elements of a post-sale duty to warn claim are set forth in *Lockwood v. AC&S,*

14

*Inc.* 109 Wn.2d 235, 744 P.2d 605 (1987), and several other Washington cases.  First,

15

the manufacturer must have "sufficient notice about a specific danger associated with

16

the product." *Esparza*, 103 Wn. App. at 935.  Accord, *Thongchoom v. Graco Children's*

17

18

*Products, Inc.*, 117 Wn. App. 299, 306-07 (2003).  Second, there must be evidence of

19

proximate cause, that is, that a post-sale warning "could help to prevent or lessen the

20

harm." *Lockwood*, 109 Wn.2d at 260.  See *Esparaza*, 103 Wn. App. at 936 (must be

21

"sufficient evidence from which a trier of fact could determine that [manufacturer's]

22

23

failure to warn [post-sale] was a proximate cause of [plaintiff's] injuries.").  Finally, there

24

must be sufficient evidence that a post-sale warning would have been feasible or

25

26

LAW OFFICES
**GORDON THOMAS HONEYWELL LLP**
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 -  FACSIMILE (206) 676-7575

"practicable." *Lockwood,* 109 Wn.2d at 260 (post-sale warning "should be required to the extent practicable . . . [which] will depend on the circumstances.").[3]

These elements of a post-sale duty to warn claim under Washington law are consistent with the requirements set forth in Restatement (Third) of Torts §10, Products Liability (1998), and the case law in many states.  Thus, §10 requires (1) knowledge of the hazards by the manufacturer – the seller must "know or reasonably should know that the product poses substantial harm to persons or property;" (2) proximate causation – that the post-sale warning can be "acted on by those to whom a warning might be provided;" and (3) feasibility of a post-sale warning – it must be possible that "those to whom a warning might be provided can be identified."

Given the timing and circumstances of Mr. Jack's claimed work with DCo's Victor-brand automotive gaskets from the 1950s through at least the 1980s, and his disease – mesothelioma -- Plaintiffs cannot meet at least two of the required elements of a post-sale duty to warn claim: proximate cause and practicability and feasibility of a post-sale warning.

With respect to proximate cause, Mr. Jack claims that he worked with Victor-brand automotive gaskets from the 1950s through the 1980s, and that exposure to asbestos fiber from those gaskets caused his mesothelioma.  On these facts, Plaintiffs cannot show that a post-sale warning by DCo, a warning after the late 1980s, could have "prevent[ed] or lessen[ed]" his cancer.  *Lockwood*, 109 Wn.2d at 260. Thus, Plaintiffs

---

[3] The Washington cases make clear that a post-sale duty to warn claim is a claim under negligence and not under strict liability.  See *Lockwood*, 109 Wn.2d 235, 261, 744 P.2d 605 (1987) (argument that post-sale evidence is irrelevant to strict liability claim is "highly persuasive"); *Ayers v. Johnson & Johnson Baby Products*, 117 Wn.2d 747, 765, 818 P.2d 1337 (1991) (post-sale duty to warn claim under Washington Product Liability Act "clearly embraces a negligence standard"); *Falk v. Keene Corp.*, 113 Wn.2d 635, 653, 782 P.2d 974 (1989) (same).

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 -  FACSIMILE (206) 676-7575

cannot show that a post-sale warning by DCo, for instance, in 1988 that cutting or scraping Victor-brand automotive gaskets could be hazardous would have had any impact on either Mr. Jack's work practices with respect to those gaskets or his alleged disease. This is not the sort of typical post-sale failure to warn case where the plaintiff used a product, such as a defective tool, intermittently over a period of years and a post-sale warning of hazards at some point in that period might have prevented an injury.  *E.g., Dixon v. Jacobsen Mfg. Co.,* 270 N.J. Super. 569, 584-86 (App. Div. 1994) (finding post-sale duty to warn when plaintiff was injured using 20-year old snow thrower and warning of danger of discharge chute, discovered after the sale, might have prevented the harm).

The situation in *Lockwood* was quite different.  The disease at issue in that case was asbestosis, and the plaintiffs had evidence that the disease was exacerbated by the fact that the plaintiff kept smoking even after he had ceased working with defendant's asbestos products.  Thus, in *Lockwood,* the plaintiff "argued that if he had been informed after he stopped working at the shipyards of the danger due to asbestos exposure and of the risk of smoking while asbestos fibers remained in his body, he could have reduced his disability by stopping smoking."  109 Wn.2d at 260.

On these facts, the court concluded that a post-sale failure to warn claim was viable, even after the plaintiff had ceased working with the product, because a warning in that case to quit smoking "could [have] help[ed] to prevent or lessen the harm."  *Id.*  In other words, *Lockwood* was a case "where a person's susceptibility to the danger of a product continue[d] after that person's direct exposure to the product ha[d] ceased," and a warning of that susceptibility (*i.e.*, through smoking) could have alleviated the harm.  *Id.*

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 -  FACSIMILE (206) 676-7575

In this case, by contrast, Plaintiffs have not and cannot show that a post-sale warning by DCo would have made any difference.[4]  Under the facts as alleged by Plaintiffs, there is no change in Mr. Jack's work practices with respect to automotive gaskets or any other behavior after 1980 that would have had any effect on his injury. There is no claim, for example, that Mr. Jack worked with automotive gaskets after 1980 or that smoking or some other behavior exacerbated or enhanced his mesothelioma.  But without such evidence that a failure by DCo to warn Mr. Jack in the mid to late 1980s was a proximate cause of his mesothelioma, i.e., that a post-1988 warning would have "prevent[ed] or lessen[ed] the harm," Plaintiffs do not have a viable claim for a post-sale duty to warn.

Plaintiffs also cannot sustain their burden of adducing evidence to show that a post-sale warning to Mr. Jack was feasible or practicable.  While *Lockwood* did not elaborate on its requirement that a post-sale warning must be shown to be "practicable," the general rule under Washington law is that the duty to warn runs only to "foreseeable" users of a product.  *See Lunsford v. Saberhagen Holding, Inc.*, 125 Wn. App 784, 793, 160 P.3d 1089 (2005) (in order to find a duty to warn household members of dangers of second-hand exposure to asbestos, plaintiffs have burden of showing "that it was foreseeable" that household member would be exposed); *Braaten v. Saberhagen Holdings,* 165 Wn.2d 373, 383, 198 P.3d 493 (2008) (duty to warn "extends to foreseeable users of the manufacturer's product").  As a matter of common sense, a post-sale duty to warn extends only to product users who are "known" or that can be

---

[4] To the extent Plaintiffs allege a post-sale warning would have caused Mr. Coogan to alter his conduct, such an argument improperly attempts to impose on Dana liability for plaintiff's exposure to the products of other entities.

**DEFENDANT DCO LLC'S TRIAL BRIEF** - 15 of 25
(**2:17-cv-00537 JLR**)
[4822-2575-7810]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 -  FACSIMILE (206) 676-7575

"readily identified."[5]  Thus, imposing a post-sale duty-to-warn only to those product users who are "known" or "readily identifiable" by the manufacturer is a reasonable construction of the requirement in Washington law under *Lockwood* that a post-sale warning be "practicable," and the requirement under *Lunsford* and *Braaten* that a duty to warn runs only to "foreseeable" product users.

In this case, Plaintiffs cannot show that Mr. Jack was a "known" or "readily identifiable" user of DCo's Victor-brand automotive gaskets.  Mr. Jack claims to have worked with Victor gaskets intermittently as part of his auto repair work for customers at a small co-owned auto repair business from 1962 to 1964 (his only commercial auto mechanic work), and for the remainder of the 1954 to 1990 time period on his own personal vehicles, race cars, and vehicles of friends and family as more of a hobbyist.  Plaintiffs' claim is that Mr. Jack may have purchased Victor-brand automotive gaskets from auto parts distributors or auto parts stores who in turn bought them from DCo.  As such, Mr. Jack is at least four steps removed from DCo.  His name would not have been, for example, in DCo records so that DCo could identify him and issue a post-sale warning.  Thus, he is not a "known" user of Victor-brand automotive gaskets.

The issue of the practicability or feasibility of post-sale warnings is discussed in the comments to §10 of the Restatement (Third).  As those comments explain, "an unbounded post-sale duty to warn would impose unacceptable burdens on product

---

[5] *See, e.g., Burton v. R.J. Reynolds Tobacco Co.*, 397 F.3d 906, 912 n.1 (10th Cir. 2005) ("Kansas also recognizes that manufacturers have a post-sale duty to warn only those purchasers who 'can be readily identified or traced' by the manufacturer"); *Lerardi v. Lorillard, Inc.*, 777 F. Supp. 420, 421-22 (E.D. Pa. 1991) (finding no continuing duty to warn smokers of dangers of asbestos contained in cigarette filters because it would be impossible to ascertain the identity of all those who smoked the cigarettes over a four-year period), *aff'd*, 14 F.3d 47 (3d Cir. 1993); *Lewis v. Ariens Co.*, 434 Mass. 643, 649 (2001) (holding that manufacturer owes no continuing duty to warn unknown second-hand purchaser of product because he is "a member of a universe too diffuse and too large for manufacturers or sellers of original equipment to identify"); *Dixon*¸ 270 N.J. Super. at 586 (collecting cases).  Section 10 of the Restatement (Third) takes a similar position, requiring that "those to whom a [post-sale] warning might be provided can be identified".

DEFENDANT DCO LLC'S TRIAL BRIEF - 16 of 25
(**2:17-cv-00537 JLR**)
[4822-2575-7810]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 -  FACSIMILE (206) 676-7575

settlers," since "[t]he costs of identifying and communicating with product users years after sale are often daunting."  See §10, comment a.  The comments recognize that, in some cases "customer records may identify the population to whom warnings should be provided."  *Id.*, comment e.  "Records may [also] indicate classes of product users, or geographically limited markets."  *Id.*  But, the comments conclude, "when no such records are available, the seller's inability to identify those for whom warnings would be useful may properly prevent a post-sale duty to warn from arising."  *Id.*

Here, Mr. Jack was not a long-term commercial automotive mechanic or product user whose name would be in DCo's records.   For example, if DCo had delivered a post-sale warning concerning the appropriate work practices for trimming or removing gaskets from automotive engine surfaces in the form of an advertisement, that advertisement would reasonably have been directed to automotive mechanics, and not to "shade-tree mechanics" like Mr. Jack.  In short, Mr. Jack was neither a known nor a readily identifiable user of DCo's Victor-brand automotive gaskets, and such facts provide a second reason why Plaintiffs cannot proceed in this case on a claim for post-sale duty to warn.

## V. <u>PROXIMATE CAUSE REQUIRES BOTH CAUSE-IN-FACT AND LEGAL CAUSE</u>

To meet the burden of proof on proximate cause, Plaintiffs must establish both cause-in-fact and legal cause.  Ordinarily, a plaintiff must show that defendant's conduct, in a direct sequence unbroken by any new cause, produced plaintiff's injury and that <u>but for</u> that conduct, the injury would not have happened.  *Hertog v. City of Seattle*, 138 Wn.2d 265, 282-83, 979 P.2d 400 (1999); WPI 15.01.

However, in certain fact situations, the "but for" test is unworkable and the "substantial factor" test is substituted.  One of these situations occurs when two or more

DEFENDANT DCO LLC'S TRIAL BRIEF - 17 of 25
(**2:17-cv-00537 JLR**)
[4822-2575-7810]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 ·  FACSIMILE (206) 676-7575

uses combine to produce an injury and either alone was sufficient to have produced the injury. *Daugert v. Pappas,* 104 Wn.2d 254, 260-263, 704 P.2d 600 (1985).  In this case, there will be evidence that Mr. Jack was exposed to several asbestos-containing products during his lifetime.  The evidence will show that Mr. Jack's exposures to these various asbestos-containing products differ in intensity and duration. Thus, a "substantial factor" test for proximate cause is appropriate.  See *Lockwood v. AC & S, Inc.*, *supra*; *Daugert v. Pappas*, 104 Wn. 2d 254, 704 P. 2d 600 (1985); *Mavroudis v. Pittsburgh-Corning Corp.*, 86 Wn. App. 22, 935 P.2d 684 (1997).  Under this test, Plaintiffs must establish that a particular defendant's product(s) was a "substantial factor" in the causation of his disease.  A "substantial factor" is an important or material factor and not one that is insignificant.  *Id.*

Plaintiffs cannot meet that burden here.  Plaintiffs cannot set forth credible evidence at trial that will establish that decedent Patrick Jack in fact worked with asbestos-containing products manufactured by DCo.  As set forth in the fact section above, the evidence produced by Plaintiffs and gained through deposition testimony does not create a case that Mr. Jack was exposed to products manufactured by DCo which he can establish were, in fact, asbestos-containing automotive gaskets because DCo made <u>all</u> of its asbestos-containing gaskets during the relevant time period also in a non-asbestos-containing gasket.  Even if Plaintiffs get past their first difficult hurdle, Mr. Jack's own testimony minimizes the amount of time spent handling, trimming gaskets with a knife, and/or scraping off used asbestos-containing gaskets that he knew to have been manufactured by DCo's Victor brand.  Under these circumstances, Plaintiffs will not be able to establish that Mr. Jack's limited or non-exposure to DCo's Victor-brand

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 -  FACSIMILE (206) 676-7575

automotive gasket products was a substantial factor in the development of Mr. Jack's alleged mesothelioma.

Moreover, cause-in-fact, or alternatively "substantial factor" causation, is not by itself a sufficient basis for establishing proximate cause. *King v. Seattle,* 84 Wn.2d 239, 249, 525 P.2d 228 (1974).  The second element of proximate cause is "legal cause."  If a defendant's conduct was not the legal cause of harm, the defendant is not liable.

The doctrine of legal cause functions to limit liability based on "mixed considerations of logic, common sense, justice, policy, and precedent." *Hartley v. State,* 103 Wn.2d 768, 779, 698 P.2d 77 (1985), quoting *King v. Seattle, supra,* 84 Wn.2d at 250. *See also Simonetta v. Viad Corp.,* 165 Wn.2d 341, 349, 197 P.3d 127 (2008).  The legal cause doctrine provides that the causal connection between wrongful conduct and resulting injury must be close enough to justify imposing liability.  If a defendant's conduct is too remote, too insubstantial, or too insignificant in bringing about the injury, liability cannot be imposed. *See, e.g., Hartley v. State, supra, Porter v. Sadri*, 38 Wn. App. 174, 685 P.2d 612 (1984).  Legal cause is a question of law, and therefore a question to be decided by the Court, not by the jury.  Here, the evidence will establish that any exposure to an asbestos-containing product manufactured by DCo would have been insubstantial.

## VI.  EXPERT OPINIONS TO DEMONSTRATE SUBSTANTIAL FACTOR CAUSATION CANNOT BE PREMISED ON THE SO-CALLED "CUMULATIVE EXPOSURE" OR "TOTAL DOSE" THEORIES

To demonstrate that certain claimed exposures to asbestos were a substantial contributing factor to Mr. Jack's development of Mesothelioma, DCo anticipates Plaintiffs will rely heavily upon the testimony of their expert witnesses at trial.  Based upon the deposition testimony of Plaintiffs' expert witnesses, DCo is concerned that Plaintiffs' expert witnesses may seek to insert the "cumulative exposure" or "total dose" theory of

DEFENDANT DCO LLC'S TRIAL BRIEF - 19 of 25
(**2:17-cv-00537 JLR**)
[4822-2575-7810]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

disease causation into this case – a theory that has been roundly criticized and rejected in courts around the country, including this Court.

For instance, in the recent case of *Barabin v. Scapa Dryer Fabrics,* 2018 WL 840147, 105 Fed. R. Evid. Serv. 786, Prod. Liab. Rep. (CCH) P. 20, 277 (Feb. 12, 2018), this Court was presented with the situation of an expert witness who opined that "any exposure than an individual suffered that were in addition to ambient air levels . . .would, on a more likely that not basis, have been a substantial factor in causing the alleged disease." *Barabin*, 2017 WL 840147 at p. 14.   This Court engaged in the following analysis in precluding such testimony:

> Additionally, Dr. Cohen states that *the cumulative exposure, or total dose, causes the disease and argues that "it is impossible to exclude any exposures as being a substantial factor in causing the illness."* (*Id.* at 6.) *Dr. Cohen posits that "each and every exposure contributes to the person's total dose that caused the asbestos-related disease. Thus, all the asbestos ... to which a person is exposed ... contributed to cause the asbestos-related disease."* (*Id.* at 6 (emphasis added).) The use of the word "thus" reveals Dr. Cohen's belief that each individual exposure is a causal factor simply because it contributed to the total dose. Indeed, he posits that "[t]his is true even if the exposure was within the standard permissible exposure limits at the time of the exposure." (*Id.*) *This portion of Dr. Cohen's opinion is almost indistinguishable from the "cumulative exposure" theory, where because no single exposure can be excluded from the total exposure, every exposure must be a substantial factor.*
>
> *Because Dr. Cohen relies on both the "every exposure" and "cumulative exposure" theories, his causation testimony is likewise unreliable.* Accordingly, the court grants Scapa's motion to exclude Dr. Cohen's testimony on causation in this matter.

*Barabin*, 2017 WL 840147 at p. 14-15 (emphasis added).

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 -  FACSIMILE (206) 676-7575

Another of Plaintiffs' experts, Dr. Brodkin, states that he performs a "qualitative" assessment to characterize the duration, frequency, and intensity, and thus the significance, of exposures.  Brodkin Dep. at 193:11-19.  In this regard, he recites a litany as to how he determines, in his own terminology, whether an "identified exposure" exists:

> An identified exposure is an exposure characterized by the constructed occupational and environmental history that has a well-characterized source of asbestos, an activity that disrupts that source to generate significant airborne asbestos fibers that have sufficient intensity to overcome the body's defenses, add to the body's burden of asbestos, and, therefore, increase risk for asbestos-related diseases such as mesothelioma.

Brodkin Dep. at 46:25-47:7.  Yet a careful parsing of these criteria indicates that nothing distinguishes between a supposedly "identified" or "significant" exposure and any other.  A "well-characterized source of asbestos" simply confirms that asbestos indeed is present in a product or material.  Without it, there obviously could be no exposure in the first place.  Likewise, "an activity that disrupts that source" also is necessary for there to be any exposure; the simple presence or proximity of an asbestos-containing product does not result in respirable airborne asbestos fibers.  This in turn must generate airborne asbestos fibers of "sufficient intensity to overcome the body's defenses [and] add to the body's burden of asbestos."  Missing from that sequence is any quantification or even qualification of the phrase "add to the body's burden of asbestos."  By how much, and in what manner?  Absent such a qualification, Dr. Brodkin's methodology simply allows "each and every exposure" to be considered significant.  Indeed, the final step in this litany says as much – that *because* an exposure add[s] to the body's burden of asbestos, it "therefore" increases the risk and is an "identified exposure."  He simply doesn't have a methodology or criterion beyond this to determine if an exposure is

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 -  FACSIMILE (206) 676-7575

causative or significant.  Thus, despite – or under cover of – his recitation of various factors to consider when characterizing sources, Dr. Brodkin can conclude that anything that results in *any* actual exposure (as opposed unverified claims of exposure) for that reason alone is a significant contributing factor.

## VII. CONTRIBUTORY FAULT AND ASSUMPTION OF RISK REDUCE PLAINTIFFS' DAMAGES

The evidence may show that at certain times Mr. Jack voluntarily and unreasonably assumed a known risk by refusing to take safety precautions (such as wearing a respirator) or failing to exercise ordinary care. Mr. Jack's comparative negligence and assumptions of risk are factors by which "fault" should be apportioned and Plaintiffs' recovery, if any, reduced.  RCW 4.22.005; 4.22.015; *South v. A.B. Chance Co.,* 96 Wn.2d 439, 440, 635 P.2d 728 (1981).

RCW 4.22.005 and 4.22.015 apply by their terms if this matter is governed by the Washington Product Liability Act (which is the subject of separate briefing, *e.g.*, Dkt. #718).  For common law (pre-WPLA) strict product liability causes of action, *South v. A.B. Chance Co.,* 96 Wn.2d 439, 440, 635 P.2d 728 (1981) determined that assumption of risk was a damage-reducing consideration.

As for the issue of comparative negligence in common-law strict product liability actions, the majority in *Seay v. Chrysler Corp.*, 93 Wash.2d 319, 323, 609 P.2d 1382 (Wash. 1980) reasoned that negligence is conceptually different than strict products liability and therefore comparative negligence did not apply in common-law strict product liability actions.  As noted by Justice Utter in dissent, "The principal objection to adopting a comparative strict liability system is the inevitable collision between fault and no-fault concepts."  93 Wash.2d at 325.

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 -  FACSIMILE (206) 676-7575

This distinction has not withstood the test of time.  The adoption of RCW 4.22.015 expressly combined strict liability and negligence concepts into a unified definition of "fault."  While that statute does not apply, the inevitable conclusion to be drawn is that as a matter of common law, there is no longer reason not to apply comparative negligence principles to strict product liability actions.  *South v. A.B. Chance* said as much, albeit in the (different but related) context of assumption of the risk.  It noted that one of the justifications for the result in *Seay* was the latter's observation of the legislature's failure to adopt a broader version of comparative fault by statute. But:

> Finally, the inaction referred to and relied upon by the majority in *Seay* is no longer present. Section 8 of chapter 27, Laws of 1981, appears to mandate that comparative fault is not a bar to recovery, but rather a damage-reducing factor. *While the statute is not applicable here it does reflect a public policy statement which is persuasive in our determination of judicial polic*y.

96 Wash.2d 441.

This same reasoning applies here:  While RCW 4.22.005 and 4.22.015 do not apply by their terms, they demonstrate that the concerns that once existed about melding negligence concepts with strict liability no longer are present.  Given these developments, and under the authority of *South v. A.B. Chance,* this Court can and should conclude that, as a matter of common law, comparative fault principles apply to Washington's judicially-created doctrine of strict products liability.[6]

---

[6] DCo is cognizant that the Court's Order of September 17, 2018, addressing DCo's comparative fault affirmative defense, stated "If pre-1981 law applies, Defendants' contributory negligence affirmative defense fails as a matter of law." Dkt. # 706 at 71:20-21. Given that the Court ultimately reserved ruling on the issue, however (Id. at 72:3-6), DCo takes the liberty of further addressing it here, in conjunction.

DEFENDANT DCO LLC'S TRIAL BRIEF - 23 of 25
(**2:17-cv-00537 JLR**)
[4822-2575-7810]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 -  FACSIMILE (206) 676-7575

## VIII.  CONCLUSION

In summary, Plaintiffs will be unable to establish the liability of DCo, LLC for either a design defect or failure to warn claims defined in RCW 7.72.030.  Similarly, Plaintiffs cannot meet their burden to establish any negligence on the part of DCo.  Finally, Plaintiffs cannot establish the requisite proximate cause between Mr. Jack's alleged exposure, if any, to DCo's Victor-brand automotive gasket products and the development of his alleged mesothelioma.  DCo also requests that the jury be instructed in accordance with the above.

Dated this 25th day of September, 2018.

GORDON THOMAS HONEYWELL LLP


By /s/ Diane J. Kero_____
Diane J. Kero, WSBA No. 11874
dkero@gth-law.com
Michael E. Ricketts, WSBA No. 9837
mricketts@gth-law.com

-and-


DeHAY & ELLISTON, LLP
R. Thomas Radcliffe, Maryland No. 8612010418
Admitted *Pro Hac Vice*
Mahsa Kashani Tippins, California No. 242685
Admitted *Pro Hac Vice*

Attorneys for Defendant DCo LLC f/k/a Dana
Companies LLC

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 -  FACSIMILE (206) 676-7575

1

2

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing those attorneys of record registered on the CM/ECF system.

/s/ Karen L. Calkins
Karen L. Calkins, Legal Assistant
GORDON THOMAS HONEYWELL LLP

DEFENDANT DCO LLC'S TRIAL BRIEF - 25 of 25
(2:17-cv-00537 JLR)
[4822-2575-7810]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 -  FACSIMILE (206) 676-7575